## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: NAVISTAR MAXXFORCE ENGINES MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 14-cv-10318 |
| | MDL No. 2590 |
| __THIS FILING RELATES TO:__ | Hon. Joan B. Gottschall |
| | **FIRST MASTER CONSOLIDATED CLASS ACTION COMPLAINT** |
| *Antioch Building Materials Co., et al. v. Navistar, Inc.*, Case No. 1:14-cv-07602 (N.D. Ill.) | **JURY TRIAL DEMANDED** |
| *B&T Express, Inc., et al. v. Navistar International Corp.*, Case No. 1:14-cv-05841 (N.D. Ill.) | |
| *City of Detroit Lakes v. Navistar International Corp.*, Case No. 1:15-cv-01375 (N.D. Ill.) | |
| *Denis Gray Trucking, Inc., et al. v. Navistar International Corp.*, Case No. 1:14-cv-05249 (N.D. Ill.) | |
| *Fike Logistics, Inc. v. Navistar, Inc.*, Case No. 5:14-cv-00201 (W.D. Ky.) Transferred Case No. 1:15-cv-00254 (N.D. Ill.) | |
| *Foerst v. Navistar, Inc.*, Case No. 1:14-cv-07680 (N.D. Ill.) | |
| *G&G Specialized Carriers LLC v. Navistar, Inc.*, Case No. 2:14-cv-01057-CNC (E.D. Wis.) Transferred Case No. 1:14-cv-10337 (N.D. Ill.) | |
| *Gettysburg Auto Transport, LLC v. Navistar International Corporation*, Case No. 1:14-cv-08006 (N.D. Ill.) | |

*Hamilton v. Navistar, Inc.*,
Case No. 1:14-cv-09295 (N.D. Ill.)

*HD Transportation Inc., et al. v. Navistar, Inc.*,
Case No. 0:15-cv-00055 (D. Minn.)
Transferred Case No. 1:15-cv-00583 (N.D. Ill.)

*Klinger v. Navistar, Inc.*,
Case No. 1:14-cv-01914 (M.D. Pa.)
Transferred Case No. 1:14-cv-10335 (N.D. Ill.)

*Par 4 Transport, LLC v. Navistar, Inc.*,
Case No. 1:14-cv-05151 (N.D. Ill.)

*Priority Towing, Inc. v. Navistar, Inc.*,
Case No. 9:14-cv-81202 (S.D. Fla.)
Transferred Case No. 1:14-cv-10319 (N.D. Ill.)

*Southern California Moving, Inc. v. Navistar International Transportation Corp. and Navistar, Inc.*,
Case No. 2:15-cv-00008 (S.D. Tex.)
Transferred Case No. 1:15-cv-00615 (N.D. Ill.)

*Storey Trucking Company Inc., et al. v. Navistar International Corp.*,
Case No. 4:15-cv-00244 (N.D. Ala.)
Transferred Case No. 1:15-cv-01707 (N.D. Ill.)

*Wright Transportation, Inc. v. Navistar, Inc.*,
Case No. 1:14-cv-07805 (N.D. Ill.)[1]

---

[1] The effect of this First Master Consolidated Class Action Complaint is to supersede the complaints filed in each of these listed actions, but only these actions. This Complaint also adds several named plaintiffs who were not named in the original complaints in the listed action but now seek to serve as named plaintiffs. Any plaintiffs in these listed actions who are not named herein are no longer seeking to serve as named plaintiffs in this litigation.

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ........................................................................ 1

 A. Nature of the Defect.............................................................................. 2

 B. The Navistar Warranties ...................................................................... 4

 C. As a Result of the Defect, the Trucks Repeatedly Fail, Uniformly Injuring Proposed Class Members.................................................................................. 6

II. PARTIES ................................................................................................... 8

 A. Plaintiffs................................................................................................ 8

 B. Defendants .......................................................................................... 53

III. JURISDICTION AND VENUE ............................................................... 58

IV. CHOICE OF LAW ................................................................................... 59

V. FACTUAL ALLEGATIONS .................................................................... 59

 A. Background........................................................................................... 59

 B. Navistar's Authorized Dealers............................................................ 61

 C. The Navistar Defendants Concealed the Defect. ................................ 62

 D. The Navistar Defendants Knew About the Defect at Least as Early as 2004........... 63

 E. Navistar's Representations Regarding the MaxxForce Engines.............................. 66

 F. The Defect is Widespread and Harms the Class ................................. 70

VI. TOLLING OF STATUTES OF LIMITATIONS ..................................... 73

VII. CLASS ALLEGATIONS .......................................................................... 75

 A. Class Definitions................................................................................. 75

 B. The Prerequisites of Rule 23(a) Are Satisfied ................................... 78

 C. The Prerequisites of Rule 23(b)(1) and (b)(2) Are Satisfied .................................. 82

 D. The Prerequisites of Rule 23(b)(3) Are Satisfied .................................... 83

VIII.    CAUSES OF ACTION .................................................................................................. 84

    A.    Claims Brought on Behalf of the Nationwide Class ................................................... 84

    B.    Claims Brought on Behalf of State Sub-Classes ........................................................ 90

    C.    Claims Brought on Behalf of the California Sub-Class ............................................. 97

    D.    Claims Brought on Behalf of the Idaho Sub-Class .................................................... 99

    E.    Claims Brought on Behalf of the Illinois Sub-Class ............................................... 102

    F.    Claims Brought on Behalf of the North Carolina Sub-Class ................................... 104

    G.    Claims Brought on Behalf of the Ohio Sub-Class ................................................... 105

    H.    Claims Brought on Behalf of the Oklahoma Sub-Class .......................................... 107

    I.    Claims Brought on Behalf of the Texas Sub-Class ................................................. 109

    J.    Claims Brought on Behalf of the Washington Sub-Class ........................................ 111

    K.    Claims Brought on Behalf of the Wisconsin Sub-Class .......................................... 113

Plaintiffs Storey Trucking Company, Inc.; Lakeside Leasing, Inc.; Southern California Moving, Inc.; Antioch Building Materials, Co.; Sloan Transport, Inc.; David A. Lord d/b/a Lord AG Transportation; Carmichael Leasing Co., Inc. d/b/a Carmichael NationaLease; Binder Trucking, Inc.; Joandnas Operations, Inc.; Fike Logistics, Inc.; Wright Transportation, Inc.; Phifer Trucking, Inc.; OMCO Enterprises, LLC; ALJEN Enterprises, LLC; A.T.T. Trucking, LLC; H.J. O'Malley Trucking, LLC; Traficanti Trucking, LLC; B&T Express, Inc.; Gettysburg Auto Transport, LLC; Randy Klinger; Steven A. Hamilton; Denis Gray Trucking, Inc.; Par 4 Transport, LLP; Emerald Trucking LLC; G&G Specialized Carriers LLC; and Michael Jackson, Sr. ("Plaintiffs"), on behalf of themselves and all other similarly-situated persons and entities, by and through their designated attorneys, bring this class action complaint against Navistar International Corporation and its subsidiary Navistar, Inc.[2] (together, "Navistar") and allege as follows:

## I. NATURE OF THE ACTION

1. Plaintiffs bring this class action for declaratory judgment and/or injunctive relief, as well as money damages against Navistar for: unfair, unlawful, and fraudulent business practices; breach of express and implied warranties; and related claims, on behalf of themselves and all persons or entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce 11, 13, or 15 Advanced EGR diesel engine (the "MaxxForce Engines" or "Engines") (the "Class" or "Classes").

2. Navistar sold or leased the 2010-2013 model year Engines to Plaintiffs equipped with a defectively-designed integrated emissions system (the "Defect"). The emissions system

---

[2] Navistar International Corporation and Navistar, Inc., as alter ego entities, and/or agents of one another, will be referred to hereinafter as "Navistar" or "the Navistar Defendants."

Defect resulted from Navistar's election to use "Exhaust Gas Recirculation" (or "EGR") emissions technology with the MaxxForce Engines to comply with the Environmental Protection Agency ("EPA") emissions standards for trucks manufactured with model years 2010 and later ("2010 EPA Standards").  Every major U.S. truck manufacturer *except Navistar* chose to meet the 2010 EPA Standards with "Selective Catalytic Reduction" (or "SCR") technology, which treats engine exhaust with a urea-based chemical after it leaves the engine.

**A.  Nature of the Defect**

3.  Navistar's engine strategy bet heavily on unproven EGR technology.  EGR technology was designed to reduce emissions by subjecting engine exhaust to a "second burn" in the engine cylinders.  The EGR system diverted some engine exhaust into an EGR cooler, which used ordinary engine coolant to reduce the exhaust temperature.  The cooled exhaust air was then circulated back into the engine's air intake through EGR valves.

4.  Navistar's emissions system was defective in that the EGR system that Navistar designed (the "Advanced EGR System") recirculated a very large percentage of engine exhaust into the cylinders.  Because of the additional recirculated exhaust, Navistar's EGR system generated far more heat within the engine than in the SCR engines.  This excessive heat and pressure, in turn, leads to broken EGR valves; exhaust leaks that melt and destroy other engine components; EGR cooler failures, which send uncooled exhaust gas back into the engine (causing the computer to shut down the engine); and other types of sudden and accidental physical injury to the Engine.  The defect also causes the EGR cooler to leak coolant through the EGR valves into the engine.  The added stress of pushing non-flammable coolant out of the exhaust valves in the cylinder head destroys the head gasket, which joins the head to the cylinders.  This results in the engine having to be rebuilt.

2

5.      As a result of the Defect, Plaintiffs and Class members also experienced repeated instances of check engine lights illuminating, engine derating, bearing and belt failures, cooling failures, A/C blower and compressor failures, hose/connector clogging and failure, DPF clogging, and other issues that prevented the Navistar Trucks from functioning as warranted and represented and as reasonable purchasers and lessees would expect.

6.      The Defect also rendered the MaxxForce Engines unreasonably dangerous at the time they were purchased or leased.  The Defect can lead to and has led to sudden breakdowns, forcing Trucks, often heavily loaded with cargo, to attempt emergency maneuvers, such as pulling to the side of the road.  The Defect also causes coolant and exhaust fumes to enter the passenger compartment of the Trucks, risking driver poisoning from the fumes.

7.      Navistar sold trucks containing the defective MaxxForce Engines under its International brand name, including, but not limited to, the following models (collectively the "Trucks"):

> a.      International ProStar and Lonestar, which are heavy duty, long haul tractor trailer trucks;
>
> b.      International DuraStar, a heavy duty truck used for various applications, including pick-up and delivery, ambulance services, and construction;
>
> c.      International Transtar, a heavy duty, regional haul truck;
>
> d.      International Workstar and Paystar, severe duty trucks used for construction applications, for example as dump trucks; and
>
> e.      International Loadstar, a severe duty cab forward truck used for various applications, including garbage trucks and airplane refueling trucks.

3

8.    All of the Trucks are Class 7 and 8 "heavy-duty vehicles," as defined by the Environmental Protection Agency (40 C.F.R. § 1037.801).  The Trucks are among the largest, heaviest, and most powerful on the road.

**B.    The Navistar Warranties**

9.    The Navistar Engines are covered by a number of express written warranties, all of which were drafted by Navistar and all of which were non-negotiable and presented to purchasers and lessees on a take-it-or-leave-it basis in documents provided after the sale.

10.    Those warranties include (1) the Navistar Standard Warranty (exemplar attached hereto as Exhibit A);[3] (2) the Navistar Federal Emission System Warranty (*see, e.g.,* "Engine Operation and Maintenance Manual," pp. 7-9, exemplar attached hereto as Exhibit B); (3) the Navistar California Emission System Warranty (*see, e.g.,* "Engine Operation and Maintenance Manual," pp.10-12); and (4) descriptions and affirmations of fact contained in Navistar's "Maintenance Information Guide" (exemplar attached hereto as Exhibit C).

11.    Purchasers and lessees of Navistar Trucks were generally aware that warranties came standard with the Trucks.  Plaintiffs would not have purchased or leased the Trucks if Navistar had not warranted them.  As such, these warranties formed part of the basis of the bargain.

12.    With respect to the Emission System Warranties, such emissions-related warranties are mandated by federal law and cannot be disclaimed.

13.    Federal law sets forth the minimum requirements for an emissions-related warranty, but manufacturers can issue one that is more generous than what federal law requires.

---

[3] The warranty attached as Exhibit A applies to specific models of Navistar trucks, but, on information and belief, the same terms apply to all Engines in the Class.

14.     Navistar's Emissions Warranties go beyond the federal standard by (1) issuing a federal emissions warranty that warrants against defects in design, in addition to warranting against defects in materials and workmanship; and (2) warranting nationwide, to all Plaintiffs and members of the Class, that the Trucks satisfy California's emissions-related warranty requirements, the most stringent emissions-related warranty requirements in the nation. California's emissions-related warranty requirements explicitly require manufacturers to warrant against design defects that cause damage to the engine or otherwise prevent the vehicle from operating.

15.     In addition to the Standard Warranty, Federal Emission System Warranty, and California Emissions System Warranty, Navistar issued a "Maintenance Information Guide" that contained affirmations of fact and descriptions concerning MaxxForce Advanced EGR.  Those affirmations of fact expressly warranted: (i) that the MaxxForce Advanced EGR had "lower operating costs" and "less hassle"; (ii) that the MaxxForce Advanced EGR resulted in "optimal performance and low cost of ownership"; (iii) that the design of MaxxForce Advanced EGR resulted in "better fuel efficiency," "more power to the wheels and less soot out the exhaust," and "improved combustion"; (iv) that the "Dual-path EGR cooling provides optimized cooled EGR … [that] allows long-term system performance"; (v) that the MaxxForce Engine had "Premium Reliability"; (vi) that the "MaxxForce Engine can be counted on to show up for work every day"; and (vii) that the MaxxForce Engine was "Always Performing."  These express affirmations of material fact were woven into every purchase agreement and became part of the basis of the bargain.

16.     Any attempt by Navistar to limit its warranty obligations with respect to the Defect is unconscionable and therefore unenforceable, and any attempt by Navistar to limit or

exclude remedies fails of its essential purpose and is therefore unenforceable, in light of the fact that (i) the Defect in the MaxxForce Engines existed at the time of sale, and manifested both within and outside the warranty period; (ii) Navistar had actual knowledge of the Defect prior to sale, knowledge that Plaintiffs did not have and could not have discovered in the exercise of reasonable diligence prior to purchase or lease; (iii) Navistar unilaterally drafted the express warranties described herein and presented them on a take-it-or-leave-it basis post-sale; and (iv) when presented with Trucks for repair under warranty, Navistar was unable to and did not fix the problem, but merely replaced defective parts/systems with the same or similar defective parts/systems, thereby ensuring additional failures during and after expiration of the warranty period.

### C.    As a Result of the Defect, the Trucks Repeatedly Fail, Uniformly Injuring Proposed Class Members.

17.    Many owners and lessees of Trucks containing the MaxxForce Engines have repeatedly repaired or replaced the EGR systems and/or other parts damaged by EGR system failure, often at their own expense, and often after Navistar failed to properly repair them during the warranty.  Those that have not already failed—and those that have been "repaired" by Navistar under warranty by replacing defective parts/systems with defective parts/systems—are substantially certain to fail well before their intended and expected useful life.

18.    The Defect has caused, and is substantially certain to continue to cause, the MaxxForce Engines to fail repeatedly within their intended and expected useful life.  For this reason, all Class members have been injured uniformly. Among other things, all Class members paid a higher price than the one that would have prevailed in the market had the Engines' Defect been known outside of Navistar.  Damages as a result of this injury include:

a.    Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b.    Receipt of a Truck worth less than a non-Defective truck.

c.    The cost of additional expenditures that Plaintiffs and Class members should not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks were not in service as much as non-Defective trucks would have been.

d.    Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as non-Defective Trucks would have been.

e.    Any other financial loss suffered as a result of the Defect.

19.    This action arises from Navistar's knowledge that the emissions system designed into the MaxxForce Engines has an inherent Defect that leads to repeated failures, and its failure to disclose to, and active concealment from, Plaintiffs and all Class members, of that material fact.  The action also arises from Navistar's failure to properly repair the Defect as required by Navistar's express and implied warranties.  As a direct result, the Trucks equipped with the defective Engines are not as represented by Navistar.  At the time of sale, the Trucks equipped with defective Engines were worth less than the price that Plaintiffs and Class members paid, and worth less than what they would have been had the Engine been free of Defect.  In other words, Plaintiffs and Class members did not get what they paid for.

20.     On behalf of themselves and all Class members, Plaintiffs seek a) a declaratory judgment that Navistar's express warranties cover the Defect and related failures alleged here, and that any/all attempts to limit or exclude remedies or claims contained in those warranties are unconscionable and/or cause them to fail of their essential purpose, and/or b) injunctive relief compelling Navistar to cover this Defect under its express warranties and prohibiting it from enforcing any limitations of remedies or claims contained therein.

21.     On behalf of themselves and all Class members, Plaintiffs also seek an award of compensatory damages against Navistar for intentional, willful, and/or negligent failure to disclose and/or concealment of the inherently defective and dangerous condition posed by the MaxxForce Engines, and Navistar's failure to honor its warranty obligation to properly repair the Defect.

## II.     PARTIES

**A.     Plaintiffs**

**i.  Alabama entities**

**1.  Storey Trucking Company, Inc.**

22.     Plaintiff Storey Trucking Company, Inc. ("Storey Trucking") is an Alabama corporation with its principal place of business in Alabama.

23.     Storey Trucking leased five Navistar ProStar trucks ("Trucks"), one Model Year 2011 and four Model Year 2012, from Plaintiff Lakeside Leasing, Inc.  The Trucks were equipped with MaxxForce 13 Advanced EGR Engines.

24.     Plaintiff Lakeside Leasing, Inc. (see below) purchased the Trucks in 2011 in Tennessee.

25.     At all relevant times, the Trucks and/or the MaxxForce Engines were covered by the Navistar warranties.

26.     Storey Trucking complied with all of its obligations under the Navistar warranty.

27.     The MaxxForce Engines in Storey Trucking's Trucks failed on numerous occasions due to the Defect. These failures included cooler failures and other engine failures and issues related to the faulty EGR technology.

28.     Due to failure of the Engines, the trucks broke down in circumstances and locations that put the driver and the public at risk.

29.     Within the express warranty period, Storey Trucking brought its Trucks to an authorized Navistar repair facility for repair or replacement. Specifically, within 1 year of purchase, the trucks had been taken to the dealer for repairs 31 times.

30.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in the Trucks continued to fail due to the Defect.

31.     Neither Navistar, nor any of its dealers or representatives, informed Storey Trucking that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives told Plaintiff that the MaxxForce Engine did not have the Defect.

32.     Had Storey Trucking been notified of the Defect, it would not have leased the five Navistar vehicles, or it would have paid less for the lease of the trucks.

**2.  Lakeside Leasing, Inc.**

33.     Plaintiff Lakeside Leasing, Inc. ("Lakeside") is an Alabama corporation with its principal place of business in Alabama.

34.     Lakeside purchased five Navistar ProStar Trucks, one Model Year 2011 and four Model Year 2012, and leased them to Plaintiff Storey Trucking.  The Trucks were equipped with MaxxForce 13 Advanced EGR Engines.

35.     The Trucks were purchased in 2011 in Tennessee.

9

36.     At all relevant times, the trucks and/or the MaxxForce Engines were covered by the Navistar warranties.

37.     Lakeside complied with all of its obligations under the Navistar warranties.

38.     The MaxxForce Engines in Lakeside's Trucks failed on numerous occasions due to the Defect. These failures included cooler failures and other engine failures and issues related to the faulty EGR technology.

39.     Due to failure of the Engines, the Trucks broke down in circumstances and locations that put the driver and the public at risk.

40.     Within the express warranty period, Lakeside brought its Trucks to an authorized Navistar repair facility for repair or replacement. Specifically, within one year of purchasing the Trucks, they were taken to the dealer for repairs 31 times.

41.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Lakeside's Trucks continued to fail due to the Defect. These failures included cooler failures and other engine failures and issues related to the faulty EGR technology.

42.     Neither Navistar, nor any of its dealers or representatives, informed Lakeside that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar's representatives told Lakeside that the Engines did not have the Defect.

43.     Had Lakeside been advised of the Defect, it would not have purchased the Trucks, or it would have paid less for them.

44.     As a result of Navistar, Inc. and Navistar International Corporation's misrepresentations and omissions associated with the Defect, both Storey Trucking and Lakeside

10

suffered ascertainable losses.  Storey Trucking and Lakeside seek recovery of all actual damages including, but not limited to direct, incidental and consequential damages such as the following:

a. The payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b. The receipt of Trucks that were worth less than the trucks expressly and impliedly promised by Navistar.

c. The cost of additional expenditures that Storey Trucking and Lakeside should not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks were not in service as much as the trucks expressly and impliedly promised by Navistar would have been.

d. Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the Trucks expressly and impliedly promised by Navistar would have been.

e. Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

45. Storey Trucking's and Lakeside's experiences mirror those of thousands of other owners and lessees of Trucks with the defective Engines.

**ii. Arizona entities**

**1. Southern California Moving, Inc.**

46. Plaintiff Southern California Moving, Inc. ("So. Cal. Moving") is an Arizona corporation with its headquarters in California, and principal places of operation in California, Arizona, and Texas.

11

47.     So. Cal. Moving purchased five Navistar Trucks in Oklahoma.

48.     Each of these trucks was equipped with a MaxxForce 13 Engine.

49.     At all relevant times, these trucks and/or the MaxxForce Engines were covered by a Navistar warranty.

50.     So. Cal. Moving complied with all of its obligations under the Navistar warranties.

51.     The MaxxForce Engines in So. Cal. Moving's vehicles failed on numerous occasions due to the Defect.

52.     Due to failure of the Engines, the trucks broke down in circumstances and locations that put the driver and the public at risk.

53.     Within the express warranty period, So. Cal. Moving's trucks were brought to an authorized Navistar repair facility for repair or replacement.

54.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in So. Cal. Moving's trucks continued to fail due to the Defect.

55.     Neither Navistar, nor any of its dealers or representatives, informed So. Cal. Moving that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect. To the contrary, Navistar representatives told So. Cal. Moving that the MaxxForce Engine did not have the Defect.

56.     So. Cal. Moving has suffered (and continues to suffer) ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. So. Cal. Moving seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

a. The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.

b. The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

c. The cost of additional expenditures that So. Cal. Moving should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

d. Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

e. Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

57. Had So. Cal. Moving been notified of the Defect, it would not have purchased the trucks or, at the very least, paid less for the trucks than it otherwise paid.

58. So. Cal. Moving's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### iii. California entities

### 1. Antioch Building Materials, Co.

59. Plaintiff Antioch Building Materials, Co. ("Antioch") is a California corporation headquartered in Antioch, California.

60.     On or about June 27, 2012, Antioch bought a used 2011 Navistar ProStar Truck with a MaxxForce 13 Advanced EGR Engine for $83,022.00 from Navistar through Fitzgerald Truck Sales, Inc., an authorized agent or broker for Navistar located in Oakland, California.

61.     At all relevant times, the Truck and/or the MaxxForce Engine was covered by the Navistar warranties.

62.     Antioch complied with all of its obligations under the Navistar warranties.

63.     The MaxxForce Engine in Antioch's Truck failed on numerous occasions due to the Defect.  Between June 2012 and the present, Antioch complained to Navistar about the repeated failures of the truck.

64.     Due to failure of the Engine, drivers of the Truck and the public were placed at risk due to the toxic coolant fumes entering the cabin and the constant stress and persistent distraction placed upon drivers when the check engine light came on while travelling with heavy loads.

65.     Within the express warranty period, Antioch brought the Truck to an authorized Navistar repair facility for repair or replacement.

66.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Antioch's Truck continued to fail due to the Defect. These failures included persistent leaking of the coolant system and check engine lights would activate and reveal error codes. Neither Navistar, nor any of its dealers or representatives, informed Antioch that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect. To the contrary, Navistar representatives told Antioch that the MaxxForce Engine did not have the Defect and the issues would be resolved with an updated EGR campaign or release.

67. Navistar told Antioch that it had worked through the problems related to its Trucks and that once Antioch received updated parts, the problems would be resolved. That representation was false.

68. Antioch experienced long wait times to have the Engine repaired. There were not enough technicians or emissions system parts to repair the Defect.

69. Had Antioch been told of the Defect, it would not have purchased the Truck, or it would have paid less for it.

70. Antioch suffered ascertainable losses as a result of Navistar's misrepresentations and omissions associated with the Defect. Antioch seeks recovery of all actual damages including, but not limited to direct, incidental and consequential damages such as the following:

    a. The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Truck been known.

    b. The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

    c. The cost of additional expenditures that Antioch should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

    d. Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

e. Any other financial loss suffered as a result of the fact that the Truck was not as expressly and impliedly promised by Navistar.

71. Antioch's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

**2. Sloan Transport, Inc.**

72. Plaintiff Sloan Transport, Inc. ("Sloan") is a California corporation headquartered in Antioch, California.

73. Between May 2012 through October 2012, Sloan purchased ten used 2011 Navistar ProStar Trucks equipped with MaxxForce 13 Advanced EGR Engines from Navistar through Fitzgerald Truck Sales, Inc., an authorized agent or broker for Navistar located in Oakland, California. The purchase price of each truck was between $73,918.00 and $83,022.00.

74. At all relevant times, these Trucks and/or the MaxxForce Engines were covered by the Navistar warranties.

75. Sloan complied with all of its obligations under the Navistar warranties.

76. The MaxxForce Engines in Sloan's vehicles failed on numerous occasions due to the Defect. Between June 2012 and the present, Sloan complained to Navistar about the repeated failures of the trucks.

77. Due to failure of the Engines, the drivers of the trucks and the public were placed at risk due to the toxic coolant fumes entering the cabin and the constant stress and persistent distraction placed upon drivers when the check engine light came on while travelling with heavy loads.

78. Within the express warranty period, Sloan brought its Trucks to an authorized Navistar repair facility for repair or replacement.

16

79.    Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Sloan's vehicles continued to fail due to the Defect.  These failures included persistent leaking of the coolant system and the activation of the check engine light revealing error codes (*i.e.*, EGR failure, EGR low flow).

80.    Sloan experienced long wait times to have the Engines repaired.  There were not enough technicians or emissions system parts to repair the Defect.

81.    Neither Navistar, nor any of its dealers or representatives, informed Sloan that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives told Sloan that the MaxxForce Engine did not have the Defect and the issues would be resolved with an updated EGR campaign or release.

82.    Navistar told Sloan that it had worked through the problems related to its truck and that once Sloan received updated parts, the problems would be resolved.  That representation was false.

83.    Had Sloan been told of the Defect, it would not have purchased the Trucks, or it would have paid less for them.

84.    Sloan suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  Sloan seeks recovery of all actual damages including, but not limited to direct, incidental and consequential damages such as the following:

      a.    The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.

      b.    The receipt of Trucks that were worth less than the trucks expressly and impliedly promised by Navistar.

c.     The cost of additional expenditures that Sloan should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the trucks expressly and impliedly promised by Navistar would have been.

d.     Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the trucks expressly and impliedly promised by Navistar would have been.

e.     Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

85.     Sloan's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### iv.  Idaho entities

#### 1.  David A. Lord

86.     Plaintiff David A. Lord d/b/a Lord AG Transportation ("Lord AG") is an Idaho sole proprietorship with its principal place of business in Idaho.

87.     Lord AG purchased a 2011 International Prostar on or about September 21, 2012 in Idaho.

88.     This truck was equipped with a MaxxForce Engine.

89.     At all relevant times, these trucks and/or the MaxxForce Engines were covered by a Navistar warranty.

90.     Lord AG complied with all of its obligations under the Navistar warranty.

91.     The MaxxForce Engines in Plaintiff's vehicles failed on numerous occasions due to the Defect.

92.     Due to failure of the Engines, the trucks broke down in circumstances and locations that put the driver and the public at risk.

93.     Within the express warranty period, Plaintiff's vehicles were brought to an authorized Navistar repair facility for repair or replacement.

94.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Plaintiff's vehicles continued to fail due to the Defect.

95.     Neither Navistar, nor any of its dealers or representatives informed Plaintiff that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives told Plaintiff that the MaxxForce Engine did not have the Defect.

96.     Had Plaintiff been notified of the Defect, it would not have purchased the trucks, or it would have paid less for them.

97.     Plaintiff has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  Plaintiff seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

> a. The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.
>
> b. The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.
>
> c. The cost of additional expenditures that Plaintiff should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not

in service as much as the truck expressly and impliedly promised by Navistar would have been.

d. Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

e. Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

98.     Plaintiff's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### v.  Illinois entities

### 1.  Carmichael Leasing Co., Inc.

99.     Plaintiff Carmichael Leasing Co., Inc. ("Carmichael") is a family-owned business headquartered in Chicago, Illinois and incorporated in Illinois.  It was founded in 1972 and has been in continuous operation ever since.

100.     Plaintiff Carmichael is a full service and full maintenance truck leasing company, with a strong foothold in providing refrigerated trucks.

101.     Plaintiff Carmichael has a long-standing relationship with Navistar. Up until 2003, Plaintiff Carmichael purchased almost exclusively Navistar vehicles.

102.     Plaintiff Carmichael currently owns 19 Navistar vehicles, Model 8600 Tandem Day Cab Tractors with 13-liter engines, purchased new from Chicago International Truck in Chicago, Illinois.

103.     Plaintiff Carmichael typically owns its trucks for 8 years before needing to replace them.

104.    Plaintiff Carmichael has experienced numerous breakdowns with its Navistar vehicles, most related to the emissions system.  Despite bringing the vehicles to Navistar authorized repair facilities within the express warranty period for repair, the Engines continued to experience the same Defect, often within six months.

105.    Neither Navistar nor any of its dealers or representatives, informed Carmichael of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar's representatives told Carmichael that the 2011 and 2012 Engines did not have the Defect.

106.    Had Carmichael been told of the Defect, it would not have purchased the Trucks, or it would have paid less for them.

107.    As a result of Navistar's misrepresentations and omissions associated with the Defect, Carmichael has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect, including but not limited to:

    a.    The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.

    b.    The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

    c.    The cost of additional expenditures that Emerald Trucking should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

21

d. Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

e. Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

108. Carmichael's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### vi. Indiana entities

#### 1. Binder Trucking, Inc.

109. Plaintiff Binder Trucking, Inc. ("Binder Trucking") is a leased contractor for Federal Express ground, based in Franklin, Indiana.

110. Binder Trucking bought a total of five used International Model Year 2012 Prostar trucks with 13-liter Engines from Navistar, Inc. in Ohio.

111. Binder Trucking experienced numerous breakdowns with its five Prostar vehicles, most related to the emissions system.

112. Binder Trucking complied with all of its obligations under the Navistar warranty.

113. Despite bringing the vehicles to Navistar, Inc. authorized repair facilities within the express warranty period for repair, the Engines continued to experience the same Defect.

114. While under warranty, each vehicle required multiple engine repairs, each of which required the truck to be in the shop for 2 to 3 weeks.

115. Only the Navistar Defendants' technicians could work on the Engines' defective emissions systems. There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

22

116.     Had Binder Trucking known of the Defect, it would not have purchased the Trucks or it would have paid less for them.

117.     Binder Trucking, Inc. has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  Binder Trucking seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

      a.     The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.

      b.     The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

      c.     The cost of additional expenditures that Binder Trucking should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

      d.     Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

      e.     Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

118.     Binder Trucking's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### vii. Iowa entities

#### 1. Joandnas Operations, Inc.

119.    Joandnas Operations Inc. ("Joandnas") is a trucking company with its principal place of business in the state of New Jersey.

120.    Joandnas purchased two used 13-liter 2012 International Prostar Trucks, Model Year 2012 at the Truck Country of Iowa in Dubuque, Iowa at a live auction.

121.    At all relevant times, the trucks and/or the MaxxForce Engines were covered by a Navistar warranty.

122.    Joandnas complied with all of its obligations under the Navistar warranty.

123.    Joandnas's vehicles experienced numerous failures of EGR-related components, which resulted in an inability to employ drivers who will drive its trucks due to these long inoperable periods for repairs.

124.    Despite bringing these vehicles to a Navistar, Inc. authorized repair facility within the express warranty period for repair, the engines continued to experience the same Defect.

125.    Joandnas has incurred significant costs for the replacement repairs required for all of the engine and EGR issues, and these replacements did not repair the Defect, which remained in the Engines after the replacements were done.

126.    Had Joandnas known of the Defect, it would not have purchased the Trucks or it would have paid less for them.

127.    Joandnas has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  Joandnas seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

24

a.    The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.

b.    The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

c.    The cost of additional expenditures that Joandnas should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

d.    Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

e.    Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

128.    Joandnas's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### viii.  Kentucky entities

#### 1.  Fike Logistics, Inc.

129.    Plaintiff Fike Logistics, Inc. ("Fike Logistics") is a Kentucky corporation with its principal place of business in Murray, Kentucky.

130.    In or about May 2013, Fike Logistics purchased a truck with a MaxxForce 13 Engine in Texas, which it used in the operation of its business.

131.    In or about June 2013, Fike Logistics purchased a truck with a MaxxForce 13 Engine in North Carolina, which it used in the operation of its business.

132.    Each of these trucks was equipped with a MaxxForce Engine.

133.    At all relevant times, these trucks and/or the MaxxForce Engines were covered by a Navistar warranty.

134.    Fike Logistics complied with all of its obligations under the Navistar warranty.

135.    The MaxxForce Engines in Fike Logistics' vehicles failed on numerous occasions due to the Defect.  These failures included numerous operational warnings and breakdowns necessitating repair.

136.    Due to failure of the Engines, the trucks broke down in circumstances and locations that put the driver and the public at risk.

137.    Within the express warranty period, Fike Logistics' vehicles were brought to an authorized Navistar repair facility for repair or replacement.

138.    Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Fike Logistics' vehicles continued to fail due to the Defect. The Engines did not function as required and will not do so for the expected life of the vehicles.

139.    Neither Navistar, nor any of its dealers or representatives, informed Fike Logistics that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives told Fike Logistics that the MaxxForce Engine did not have the Defect.

140.    Had Fike Logistics been notified of the Defect, it would not have purchased the trucks.

141.    As a result of Navistar, Inc. and Navistar International Corporation's misrepresentations and omissions associated with the Defect, Fike Logistics suffered

ascertainable losses. Fike Logistics seeks recovery of all actual damages including, but not limited to direct, incidental and consequential damages such as the following:

a. The payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b. The receipt of Trucks that were worth less than the trucks expressly and impliedly promised by Navistar.

c. The cost of additional expenditures that Fike Logistics should not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks were not in service as much as the trucks expressly and impliedly promised by Navistar would have been.

d. Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the Trucks expressly and impliedly promised by Navistar would have been.

e. Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

142. Fike Logistics' experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### ix. Mississippi entities

### 1. Wright Transportation, Inc.

143. Plaintiff Wright Transportation, Inc. ("Wright Transportation") is an Alabama corporation headquartered in Mobile, Alabama. Wright Transportation provided commercial trucking services in Mississippi and throughout the United States.

144.    Wright Transportation purchased or leased more than 100 ProStar tractor-trailers between November 2010 and September 2012, each being equipped with the 13-liter MaxxForce diesel engines manufactured by Navistar.  Plaintiff purchased its vehicles from Ward International Trucks of AL, LLC.

145.    At all relevant times, these trucks and/or the MaxxForce Engines were covered by a Navistar warranty.

146.    Wright Transportation complied with all of its obligations under the Navistar warranty.

147.    The MaxxForce Engines in Plaintiff's vehicles failed on numerous occasions due to the Defect.  These failures included total disablement, manifest poor acceleration, inadequate air conditioning performance, an inability to handle lengthy periods of engine idle, rough idle, chronic difficulty in starting the engine, instances of the engine not starting, chronic engine stall, and loss of power during driving activities.

148.    Due to failure of the Engines, the trucks broke down in circumstances and locations that put the driver and the public at risk.

149.    Within the express warranty period, Wright Transportation repeatedly complained to Navistar, Inc. about the aforementioned engine characteristics and demanded repair of the vehicles.

150.    Within the express warranty period, Navistar, Inc. refused to repair the engines or initiate a responsive effort to repair the Engines consistent with its obligation.  Navistar, Inc. failed to provide the promised warranty benefits for Wright Transportation's vehicles despite Wright Transportation's continuing demand to do so and notwithstanding the earnest need for repairs, the same within the warranty's time and mileage eligibility.

28

151.    Despite Wright Transportation delivering its trucks to Navistar repair centers and an increased effort to monitor and maintain the defective Engines, the engines continued to chronically malfunction and Wright Transportation repeatedly was requested to bring the malfunctioning vehicles to an authorized Navistar, Inc. dealership.  At all relevant times, Navistar, Inc. refused to perform an adequate, suitable or capable repair and/or refused to provide repair services of any sort or type, requiring Wright Transportation to secure rental trucks to meet the needs of its customers.

152.    Despite knowing that Wright Transportation and the members of the Class had bought ProStar vehicles outfitted with Defective Engines that failed to perform wholly, or in substantial part, Navistar, Inc. responded by authorizing minor recalibrations, adjustments and replacement of isolated components that Navistar, Inc. knew would not repair the engines or its related components.  Diesel technicians working on Wright Transportation's vehicles at Navistar, Inc.'s dealerships have repeatedly acknowledged the high and unusual volume of problems inherent in the defective Engines.

153.    Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Plaintiff's vehicles continued to fail due to the Defect.

154.    Neither Navistar, nor any of its dealers or representatives, informed Wright Transportation that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives assured Plaintiff that they had run millions of miles on test tracks and that the defects had been corrected.

155.    Had Wright Transportation been notified of the Defect, it would not have purchased the trucks.

29

156.    Wright Transportation has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  Wright Transportation seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

     a.     The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.

     b.     The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

     c.     The cost of additional expenditures that Wright Transportation should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

     d.     Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

     e.     Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

157.    Wright Transportation's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### x.  North Carolina entities

### 1.  Phifer Trucking, Inc.

158.    Plaintiff Phifer Trucking, Inc. ("Phifer Trucking") is a long-haul trucking company moving general commodities, based in Marshville, North Carolina.

159.    Phifer Trucking bought one used International Model Year 2010 Prostar truck with a 13-liter Engine from Rush International Truck Center in Charlotte, North Carolina.

160.    Phifer Trucking experienced numerous breakdowns with its Prostar vehicle, most related to the emissions system.

161.    Phifer Trucking complied with all of its obligations under the Navistar warranty.

162.    Despite bringing the vehicles to Navistar, Inc. authorized repair facilities within the express warranty period for repair, the Engine continued to experience the same Defect.

163.    While under warranty, the vehicle required multiple engine repairs, each of which required the truck to be in the shop for up to a month.

164.    Only the Navistar Defendants' technicians could work on the Engines' defective emissions systems.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

165.    Had Phifer Trucking known of the Defect, it would not have purchased the Truck or it would have paid less for it.

166.    Phifer Trucking has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  Phifer Trucking seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

      a.    The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Truck been known.

      b.    The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

31

c.   The cost of additional expenditures that Phifer Trucking should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Truck broke down and was not in service as much as the truck expressly and impliedly promised by Navistar would have been.

d.   Loss of profits and revenue, as well as harm to commercial reputation because the Truck was not in service as much as the truck expressly and impliedly promised by Navistar would have been.

e.   Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

167.   Phifer Trucking's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### xi.  Ohio entities

#### 1.  OMCO Enterprises, LLC

168.   OMCO Enterprises, LLC ("OMCO") is an Ohio limited liability company with its principal place of business in North Lima, Ohio.

169.   OMCO is in the business of owning and leasing semi-trucks.

170.   In or about December 2011, OMCO purchased thirteen (13) 2012 International ProStar Premium trucks with 13-liter MaxxForce Engines.  OMCO purchased the trucks in Ohio. These trucks were all leased to Plaintiff B&T Express.

#### 2.  ALJEN Enterprises, LLC

171.   ALJEN Enterprises, LLC ("ALJEN") is an Ohio limited liability company with its principal place of business in North Lima, Ohio.

172.   ALJEN is in the business of owning and leasing semi-trucks.

32

173.     In or about December 2011, ALJEN purchased thirteen (13) 2012 Navistar ProStar Premium trucks with 13-liter MaxxForce Engines.  ALJEN purchased the trucks in Ohio. These trucks were all leased to Plaintiff B&T Express.

### 3.  A.T.T. Trucking, LLC

174.     A.T.T. Trucking, LLC ("A.T.T. Trucking") is an Ohio limited liability company with its principal place of business in North Lima, Ohio.

175.     A.T.T. Trucking is in the business of owning and leasing semi-trucks.

176.     In or about December 2011, A.T.T. Trucking purchased three (3) 2012 Navistar ProStar Premium trucks with 13-liter MaxxForce Engines.  A.T.T. Trucking purchased the trucks in Ohio.  These trucks were all leased to Plaintiff B&T Express.

### 4.  H.J. O'Malley Trucking, LLC

177.     H.J. O'Malley Trucking, LLC ("H.J. O'Malley Trucking") is an Ohio limited liability company with its principal place of business in North Lima, Ohio.

178.     H.J. O'Malley is in the business of owning and leasing semi-trucks.

179.     In or about December 2011, H.J. O'Malley Trucking purchased four (4) 2012 ProStar Premium trucks with 13-liter MaxxForce Engines.  H.J. O'Malley Trucking purchased the trucks in Ohio. These trucks were all leased to Plaintiff B&T Express.

### 5.  Traficanti Trucking, LLC

180.     Traficanti Trucking, LLC ("Traficanti Trucking") is an Ohio limited liability company with its principal place of business in North Lima, Ohio.

181.     Traficanti Trucking is in the business of owning and leasing semi-trucks.

182.     In or about December 2011, Traficanti Trucking purchased two (2) 2012 Navistar ProStar Premium trucks with 13-liter MaxxForce Engines.  Traficanti Trucking purchased the trucks in Ohio. These trucks were all leased to Plaintiff B&T Express.

### 6. B&T Express, Inc.

183.    B&T Express, Inc. ("B&T Express") is an Ohio corporation with its principal place of business in North Lima, Ohio.

184.    In or about December 2011, B&T Express purchased two (2) 2012 ProStar Premium trucks with 13-liter MaxxForce Engines.  B&T Express purchased the trucks in Ohio.

185.    At all relevant times, the trucks purchased by OMCO, ALJEN, A.T.T. Trucking, H.J. O'Malley Trucking, B&T Express and Traficanti Trucking and/or the MaxxForce Engines in the trucks were covered by a Navistar warranty.

186.    At all relevant times, OMCO, ALJEN, A.T.T. Trucking, H.J. O'Malley Trucking, B&T Express and Traficanti Trucking complied with all of their obligations under the Navistar warranty.

187.    After purchase of the Navistar trucks and subsequent lease to B&T Express, the MaxxForce Engines in Plaintiff's vehicles failed on numerous occasions due to the Defect.

188.    Due to failure of the Engines, the trucks broke down in circumstances and locations that put the driver and the public at risk.  These breakdowns occurred while operating on the road, creating a dangerous situation where the driver of a broken down truck would have to navigate the truck and its heavy load safely away from traffic.  The driver and the load would be stranded, sometimes for days.

189.    Relationships between B&T Express and its customers were strained from the repeated late delivery of transportations loads.

190.    Within the express warranty period, Plaintiff's vehicles were brought to an authorized Navistar repair facility for repair or replacement.

34

191.    Despite repeated attempts by authorized Navistar repair facilities to fix the MaxxForce Engines, the trucks continued to break down and become inoperable due to the Defect.

192.    Neither Navistar, Inc. nor any of its authorized dealers informed OMCO, ALJEN, A.T.T. Trucking, H.J. O'Malley Trucking, Traficanti Trucking, or B&T Express of the Defect, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives repeatedly represented to Plaintiffs on several occasions that the MaxxForce Engines did not have a Defect and that the engines could be repaired, while knowing such representations were false.

193.    OMCO, ALJEN, A.T.T. Trucking, H.J. O'Malley Trucking, Traficanti Trucking, and B&T Express have suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Plaintiffs seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

     a.    The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.

     b.    The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

     c.    The cost of additional expenditures that Plaintiffs should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

      d.     Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

      e.     Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

194.     If Plaintiffs had been informed of the Defect with the Navistar trucks, they would not have purchased the trucks.

195.     Plaintiffs' experiences with the Navistar trucks are consistent and representative of thousands of other owners and lessees of Navistar trucks with the defective MaxxForce Engines.

### xii. Pennsylvania entities

#### 1. Gettysburg Auto Transport, LLC

196.     Plaintiff, Gettysburg Auto Transport, LLC ("Gettysburg"), is a limited liability company with its principal place of business in Orrtanna, Pennsylvania.

197.     Gettysburg purchased a Navistar 2011 8600 SBA 4x2 Day Cab containing a MaxxForce 13 Engine utilizing the EGR system to reduce diesel exhaust emissions in or about March of 2010.

198.     Gettysburg purchased the Truck from Navistar through its dealer, Central Maryland International Trucks, LLC located at 1301 East Patrick Street in Frederick, Maryland.

199.     Navistar tendered delivery of the Truck to Gettysburg at the dealership in or about June of 2010.

200.     At all relevant times, the Truck and/or the MaxxForce Engine was covered by the Navistar warranties.

201.     Gettysburg complied with all of its obligations under the Navistar warranties.

202.     The MaxxForce Engines in Gettysburg's vehicles failed on numerous occasions due to the Defect.  Soon after purchase, Gettysburg experienced numerous failures with the MaxxForce Engine including warnings, underperformance, break down, overheating, or faltering that required remediation and repair by service technicians.

203.     Specifically, Gettysburg experienced numerous on-board diagnostic warnings associated with the MaxxForce Engine, exhaust leaks, exhaust valve failures, repeated failure of air conditioning systems, belts and harness failures, multiple instances of EGR system failure, exhaust component failures, and other malfunctioning components and system failures that affected the usability of the vehicle as warranted and represented by Navistar and its representatives.

204.     Due to failure of the Engines, the Truck broke down in circumstances and locations that put the driver and the public at risk.

205.     Within the express warranty period, Gettysburg brought its Truck to an authorized Navistar repair facility for repair or replacement.

206.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engine in Gettysburg's vehicle continued to fail due to the Defect. These failures included the same failures identified above.

207.     Neither Navistar, nor any of its dealers or representatives, informed Gettysburg that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives told Gettysburg that the MaxxForce Engine was reliable.

208.     Had Gettysburg been notified of the Defect, it would not have purchased the Truck, or it would have paid less for it.

209. Gettysburg suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect, and seeks recovery of all actual damages including, but not limited to direct, incidental and consequential damages such as the following:

      a.      The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Truck been known.

      b.      The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

      c.      The cost of additional expenditures that Gettysburg should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Truck broke down and was not in service as much as the truck expressly and impliedly promised by Navistar would have been.

      d.      Loss of profits and revenue, as well as harm to commercial reputation because the Truck was not in service as much as the truck expressly and impliedly promised by Navistar would have been.

      e.      Any other financial loss suffered as a result of the fact that the Truck was not as expressly and impliedly promised by Navistar.

210. Gettysburg's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

**2. Randy Klinger**

211. Plaintiff Randy Klinger is a Pennsylvania resident, residing at 310 E. 4th Street, Port Royal, Pennsylvania.

212.    On or about August 2012, Klinger purchased a new truck with a MaxxForce 13 Engine, which he used in the operation of his business.  He purchased the truck in Pennsylvania.

213.    At all relevant times, the trucks and/or the MaxxForce Engine was covered by the Navistar warranties.

214.    The MaxxForce Engines in Klinger's Trucks failed on numerous occasions due to the Defect.  These failures included numerous operational warnings and breakdowns necessitating repair.

215.    Within the express warranty period, Klinger brought his Truck to an authorized Navistar repair facility for repair or replacement.

216.    Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Klinger's Truck continued to fail due to the Defect.

217.    Neither Navistar, nor any of its dealers or representatives, informed Klinger that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.

218.    Had Klinger been notified of the Defect, he would not have purchased the truck, or he would have paid less for it.

219.    Klinger suffered ascertainable losses as a result of Navistar's  misrepresentations and omissions associated with the Defect.  Klinger seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

      a.    The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.

      b.    The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

c.       The cost of additional expenditures that Plaintiff should have not have had

to make or pay for, such as repair costs, towing, and/or the purchase,

rental and maintenance of other vehicles, because the Trucks broke down

and were not in service as much as the truck expressly and impliedly

promised by Navistar would have been.

d.       Loss of profits and revenue, as well as harm to commercial reputation

because the Trucks were not in service as much as the truck expressly and

impliedly promised by Navistar would have been.

e.       Any other financial loss suffered as a result of the fact that the Trucks

were not as expressly and impliedly promised by Navistar.

220.     Klinger's experiences mirror that of thousands of other owners and lessees of

Trucks with the defective Engines.

### xiii.   Tennessee entities

#### 1.   Steven A. Hamilton

221.     Plaintiff Steven A. Hamilton, resides in Buchanan, Tennessee.

222.     Plaintiff provided commercial trucking services within Tennessee and throughout

the United States.

223.     Plaintiff purchased an International ProStar on July 8, 2011, equipped with the

13-liter MaxxForce diesel engine manufactured by Navistar.

224.     Plaintiff's vehicle was purchased from Tri-State International in Murray,

Kentucky.

225.     At all relevant times, the truck and/or the MaxxForce Engine was covered by a

Navistar warranty.

226.     Plaintiff complied with all of his obligations under the Navistar warranty.

40

227. The MaxxForce Engines in Plaintiff's vehicle failed on numerous occasions due to the Defect. These failures included recurring performance and reliability problems such as persistent disablement, poor acceleration, inadequate air conditioning performance, an inability to handle lengthy periods of engine idle, rough idle, chronic difficulty in starting the engine, instances of the engine not starting, chronic engine stall, and loss of power during driving.

228. Due to failure of the Engines, the trucks broke down in circumstances and locations that put the driver and the public at risk.

229. Within the express warranty period, Plaintiff's vehicle was brought to an authorized Navistar repair facility for repair or replacement. Navistar refused to repair the engine or initiate a responsive effort to repair the engine consistent with its obligation. Navistar failed to provide the promised warranty benefits for Plaintiff's vehicle despite Plaintiff's continuing demand to do so and notwithstanding the earnest need for repairs, the same within the warranty's time and mileage eligibility.

230. Despite Plaintiff undertaking some repairs and an increased effort to monitor and maintain the Defective Engine by Navistar dealerships, the engine continued to chronically malfunction and Plaintiff repeatedly was requested to bring the malfunctioning vehicle to an authorized Navistar dealership. At all relevant times, Navistar refused to perform an adequate, suitable or capable repair and/or refused to provide repair services of any sort or type.

231. Despite knowing that Plaintiff and the members of the Class had bought ProStar vehicles outfitted with Defective Engines that failed to perform wholly, or in substantial part, Navistar responded by authorizing minor recalibrations, adjustments and replacement of isolated components that Navistar knew would not repair the engine or its related components. Diesel

technicians working on Plaintiff's vehicles at Navistar, Inc.'s dealerships have repeatedly acknowledged the high and unusual volume of problems inherent in the defective Engines.

232.    Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Plaintiff's vehicles continued to fail due to the Defect.

233.    Neither Navistar, nor any of its dealers or representatives, informed Plaintiff that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives told Plaintiff that the MaxxForce Engine did not have the Defect.

234.    Plaintiff has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Plaintiff seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

> a.    The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.
>
> b.    The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.
>
> c.    The cost of additional expenditures that Plaintiff should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

d.      Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

e.      Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

235.      Had Plaintiff been notified of the Defect, he would not have purchased the truck.

236.      Plaintiff's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### xiv.    Washington entities

#### 1.   Denis Gray Trucking, Inc.

237.      Plaintiff Denis Gray Trucking, Inc. ("Denis Gray Trucking") is a Washington corporation with its principal place of business in Puyallup, Washington.

238.      Denis Gray purchased Navistar vehicles in the State of California.

239.      Between November 2010 and August 2012, Denis Gray Trucking bought a total of 6 used Navistar International Corporation ProStar trucks with MaxxForce 13 Advanced EGR Engines, Model Years 2010-2012.

240.      At all relevant times, these trucks and/or the MaxxForce Engines were covered by a Navistar warranty.

241.      Denis Gray Trucking complied with all of its obligations under the Navistar warranty.

242.      The MaxxForce Engines in Plaintiff's vehicles failed on numerous occasions due to the Defect.

243.      Due to failure of the Engines, the trucks broke down in circumstances and locations that put the driver and the public at risk.

43

244.     Within the express warranty period, Plaintiff's Trucks were brought to authorized Navistar repair facilities for repair or replacement of their Advanced EGR systems and emissions systems.

245.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Plaintiff's vehicles continued to fail due to the Defect.

246.     Neither Navistar, nor any of its dealers or representatives, informed Plaintiff that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives told Plaintiff that the MaxxForce Engine did not have the Defect.

247.     Denis Gray Trucking experienced long wait times to have its Engines repaired. Only Navistar technicians could work on the Engines' defective emissions systems.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

248.     Denis Gray has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Denis Gray seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

>  a.     The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.
>
>  b.     The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.
>
>  c.     The cost of additional expenditures that Denis Gray should have not have had to make or pay for, such as repair costs, towing, and/or the purchase,

rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

d. Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

e. Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

249. Had Denis Gray Trucking been told of the Defect, it would not have purchased the Trucks or it would have paid less for them.

250. Denis Gray Trucking's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### 2. Par 4 Transport, LLP

251. Plaintiff Par 4 Transport, LLP ("Par 4") is a limited liability partnership having its principal place of business in Rochester, Washington.

252. In 2011, Par 4 purchased ten (10) 13-liter MaxxForce diesel engine tractor trailer trucks from Navistar through Navistar's sales agent, Husky Trucks of Seattle, Washington, and leased an additional three (3) 13-liter MaxxForce diesel engine tractor trailer trucks from Navistar through the financing facilities of General Electric Capital Corporation.

253. At all relevant times, these trucks and/or the MaxxForce Engines were covered by a Navistar warranty.

254. Plaintiff complied with all of its obligations under the Navistar warranty.

255. The MaxxForce Engines in Plaintiff's vehicles failed on numerous occasions due to the Defect. These failures included repeated disablement, poor acceleration, inadequate air

45

conditioning performance, an inability to handle lengthy periods of engine idle, rough idle, chronic difficulty in starting the engine, instances of the engine not starting, chronic engine stall, and loss of power during driving. These disabilities were the result of the Defect.

256.    Due to failure of the Engines, the trucks broke down in circumstances and locations that put the driver and the public at risk.

257.    Plaintiff repeatedly complained to Navistar about the aforementioned engine characteristics and demanded repair of the vehicles.

258.    Within the express warranty period, Plaintiff's vehicles were brought to an authorized Navistar repair facility for repair or replacement.

259.    Despite some minor repairs by Plaintiff and increased efforts to monitor and maintain the Defective Engines, the engines continued to malfunction and Plaintiff repeatedly was requested to bring the malfunctioning vehicles to an authorized Navistar dealership for repairs. At all relevant times, Navistar refused to perform an adequate, suitable or capable repair and/or refused to provide repair services of any sort or type. Diesel technicians working on Plaintiff's vehicles at Navistar dealerships have repeatedly acknowledged the high and unusual volume of problems inherent in the Defective Engines.

260.    Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Plaintiff's vehicles continued to fail due to the Defect.

261.    Neither Navistar, nor any of its dealers or representatives, informed Plaintiff that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.

262.    Had Plaintiff been notified of the Defect, it would not have purchased the trucks.

263.    Par 4 has suffered ascertainable losses as a result of the Navistar Defendants'
misrepresentations and omissions associated with the Defect. Par 4 seeks recovery of all actual
damages (including direct, incidental, and consequential damages), including but not limited to:

a.    The payment of a higher price at the point of purchase than would have
prevailed in the market had the true nature of the Trucks been known.

b.    The receipt of a Truck that was worth less than the truck expressly and
impliedly promised by Navistar.

c.    The cost of additional expenditures that Par 4 should have not have had to
make or pay for, such as repair costs, towing, and/or the purchase, rental
and maintenance of other vehicles, because the Trucks broke down and
were not in service as much as the truck expressly and impliedly promised
by Navistar would have been.

d.    Loss of profits and revenue, as well as harm to commercial reputation
because the Trucks were not in service as much as the truck expressly and
impliedly promised by Navistar would have been.

e.    Any other financial loss suffered as a result of the fact that the Trucks
were not as expressly and impliedly promised by Navistar.

264.    Plaintiff's experiences mirror that of thousands of other owners and lessees of
Trucks with the defective Engines.

### xv.  Wisconsin entities

### 1.  Emerald Trucking LLC

265.    Emerald Trucking LLC ("Emerald Trucking") is a Limited Liability Company
with its principal place of business in Wisconsin.

266.     Emerald provides refrigerated freight and general commodities transport to and from California, Washington, Florida, Louisiana and Wisconsin.

267.     Emerald Trucking purchased a new 13-liter 2011 International Prostar Truck, Model Year 2011, and a new 13-liter 2013 International Prostar, Model Year 2013, from Mid-State Truck Service Inc. in Wisconsin.

268.     At all relevant times, the trucks and/or the MaxxForce Engines were covered by a Navistar warranty.

269.     Emerald Trucking complied with all of its obligations under the Navistar warranty.

270.     Emerald Trucking's vehicles experienced numerous failures of EGR-related components.

271.     Despite bringing these vehicles to a Navistar, Inc. authorized repair facility within the express warranty period for repair, the Engines continued to experience the same defect.

272.     Emerald has incurred significant costs for the repairs required for all of the engine and EGR issues.

273.     Had Emerald Trucking not purchased a new and different truck which it could use to conduct its business, the company would likely have failed.

274.     Emerald Trucking has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  Emerald Trucking seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

a.     The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.

48

b. The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

c. The cost of additional expenditures that Emerald Trucking should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

d. Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

e. Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

275. Neither Navistar, nor any of its dealers or representatives, informed Emerald Trucking that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect. To the contrary, Navistar representatives told Emerald Trucking that the MaxxForce Engine did not have the Defect.

276. Had Emerald Trucking been told of the Defect, it would not have purchased the Trucks, or it would have paid less for them.

277. Emerald Trucking's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

**2. G&G Specialized Carriers LLC**

278. Plaintiff G&G Specialized Carriers LLC ("G&G") is a Wisconsin limited liability company with its principal place of business located at S82 W19480 Apollo Drive, Muskego, Wisconsin, that conducts business within Wisconsin.

49

279. On or about November 2012, Plaintiff G&G purchased a new truck with a MaxxForce 13 Engine, which it used in the operation of its business. Plaintiff purchased the vehicle in Wisconsin.

280. At all relevant times, the truck and/or the MaxxForce Engine was covered by a Navistar warranty.

281. G&G complied with all of its obligations under the Navistar warranty.

282. The MaxxForce Engine in Plaintiff's vehicle failed on numerous occasions due to the Defect. These failures included numerous operational warnings and breakdowns necessitating repair.

283. Due to failure of the Engine, the truck broke down in circumstances and locations that put the driver and the public at risk.

284. Within the express warranty period, Plaintiff's vehicle was brought to an authorized Navistar repair facility for repair or replacement.

285. Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engine in Plaintiff's vehicle continued to fail due to the Defect.

286. Neither Navistar, nor any of its dealers or representatives, informed Plaintiff that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.

287. Had Plaintiff been notified of the Defect, it would not have purchased the truck, or it would have paid less for it.

288. Plaintiff G&G has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Plaintiff seeks

recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

    a.    The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.

    b.    The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.

    c.    The cost of additional expenditures that Plaintiff should have not have had to make or pay for, such as repair costs, towing, and/or the purchase, rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

    d.    Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

    e.    Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

289.    Plaintiff's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### 3. Michael Jackson, Sr.

290.    Plaintiff Michael Jackson, Sr. is a Wisconsin resident, residing at 3725 North 50th Street, Milwaukee, Wisconsin.

291.    Jackson purchased a Navistar International Prostar truck with a MaxxForce 13 Engine, which he used in the operation of his business. He purchased the truck from a Freightliner dealership in Grand Rapids, Michigan.

51

292.     At all relevant times, the truck and/or the MaxxForce Engine was covered by the Navistar warranty.

293.     The MaxxForce Engine in Jackson's Truck failed on numerous occasions due to the Defect.  These failures included numerous operational warnings and breakdowns necessitating repair.

294.     Within the express warranty period, Jackson brought his Truck to an authorized Navistar repair facility for repair or replacement.

295.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Jackson's Truck continued to fail due to the Defect.

296.     Neither Navistar, nor any of its dealers or representatives, informed Jackson that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.

297.     Had Jackson been notified of the Defect, he would not have purchased the truck, or he would have paid less for it.

298.     Jackson suffered ascertainable losses as a result of Navistar's misrepresentations and omissions associated with the Defect.  Jackson seeks recovery of all actual damages (including direct, incidental, and consequential damages), including but not limited to:

> a.     The payment of a higher price at the point of purchase than would have prevailed in the market had the true nature of the Trucks been known.
>
> b.     The receipt of a Truck that was worth less than the truck expressly and impliedly promised by Navistar.
>
> c.     The cost of additional expenditures that Plaintiff should have not have had to make or pay for, such as repair costs, towing, and/or the purchase,

rental and maintenance of other vehicles, because the Trucks broke down and were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

d.     Loss of profits and revenue, as well as harm to commercial reputation because the Trucks were not in service as much as the truck expressly and impliedly promised by Navistar would have been.

e.     Any other financial loss suffered as a result of the fact that the Trucks were not as expressly and impliedly promised by Navistar.

299.    Jackson's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

**B.     Defendants**

300.    Defendant Navistar International Corporation is a parent company whose subsidiary Navistar, Inc. produces, among other things, heavy-duty commercial trucks.

301.    Defendant Navistar, Inc. is a wholly-owned subsidiary of Navistar International Corporation.  Navistar, Inc. manufactures International brand heavy-duty commercial trucks and MaxxForce brand diesel engines.

302.    Navistar International Corporation and Navistar, Inc. are corporations organized under the laws of the State of Delaware.  Both Navistar Defendants have the same principal place of business: 2701 Navistar Drive, Lisle, Illinois 60532.

303.    Navistar, Inc. is an alter ego and/or agent of Navistar International Corporation. As such, they will be referred to as "Navistar" or "the Navistar Defendants" throughout this complaint.

### i. Defendant Navistar, Inc. is an Alter Ego for Defendant Navistar International Corporation, and the Two Companies Have Abused the Corporate Form

### 1. Defendant Navistar International Corporation has financial interest, ownership and control over Defendant Navistar, Inc.

304.     Defendant Navistar International Corporation has claimed that it is a wholly-owned subsidiary of a "holding" company, Defendant Navistar International Corporation.

305.     Defendant Navistar, Inc.'s income is reported on a consolidated return with Defendant Navistar International Corporation to the SEC and other entities, presumably the Internal Revenue Service.

306.     Defendant Navistar, Inc.'s income is funneled directly to Defendant Navistar International Corporation as income from a subsidiary.

307.     $8.6 billion of Navistar International Corporation's $11.5 billion net sales worldwide in 2009 was derived from the North American truck and engines market.  Class 8 trucks, including those at issue here, comprise a substantial majority of Navistar International Corporation's truck and engine revenue.  For example, in 2009, Navistar, Inc. delivered 181,800 units in the North American truck market, of which 119,400 were Class 8 trucks, representing a 32% retail delivery market share.  Navistar, Inc.'s Class 8 engine offerings include 11-, 13-, and 15-liter diesel engines.

308.     The financial benefit of Defendant Navistar, Inc.'s actions accrues solely to the shareholders of Defendant Navistar International Corporation, and the NIC Board "establishes broad corporate policies, sets strategic direction and oversees management, which is responsible for [Defendant Navistar International Corporation's] day-to-day operations."

309.    Thus, Defendant Navistar International Corporation has financial interest, ownership and control over Defendant Navistar, Inc.[4]

### 2. There is such unity between the two corporations that the separateness of the two corporations has ceased.

310.    Navistar International Corporation and Navistar, Inc. share common officers and common offices.

311.    Defendant Navistar International Corporation's most recent quarterly report, filed with the SEC on March 3, 2015, states that Navistar's principal operating entities are Defendant Navistar, Inc. and Navistar Financial.

312.    Navistar International Corporation is operated by Navistar, Inc. employees. According to pleadings in a separate litigation, Defendant Navistar International Corporation has "no operational employees," including any management employees, but is instead operated by its subsidiary employees.

313.    Based on Navistar International Corporation's public statements and official filings with the U.S. Securities and Exchange Commission ("SEC"), all or most of the officers of Navistar International Corporation also hold positions as officers and/or directors of Navistar, Inc., and has at times claimed that Navistar International Corporation has no operational employees, and has had only one "employee": the CEO of Navistar International Corporation, who is also the CEO of Navistar, Inc.

314.    The "officers" of Defendant Navistar International Corporation comprise the same officers of Defendant Navistar, Inc.  According to pleadings in a separate litigation,

---

[4] Navistar, Inc., an Illinois corporation, was organized in 1988, while Navistar International Corporation, the parent company, was organized in Delaware in 1993, according to Navistar's own website.  Navistar, Inc. appears to have acquired or absorbed several companies in existence prior to Navistar, Inc., including International Truck and Engine Corporation.

Defendant Navistar International Corporation's only officers are also officers of Defendant Navistar, Inc., and share the same titles.

315.    Navistar International Corporation's investor relations department—dealing with Navistar International Corporation's shareholders, market analysts, and the media—is staffed solely by Navistar, Inc. employees.

316.    Even Defendant Navistar, Inc.'s own employees, both former and current, do not know the difference between the two companies.  In a separate litigation, Navistar International Corporation and Defendant Navistar, Inc.'s produced a "common" corporate representative for deposition.  During that deposition, the vice-president of customer support for Defendant Navistar, Inc., testified that "if the employees of [Navistar] don't [know the distinction and the difference between Navistar International Corporation and Navistar, Inc.], I wouldn't expect the customers to…."  The corporate representative further testified that the subsidiary's officers speak on behalf of the parent company, although he does not understand under what authority they do so.

317.    In a separate litigation, one of Navistar, Inc.'s dealer principals testified that he didn't understand the difference between the two companies and he wouldn't expect customers to know the difference.

318.    Navistar, Inc. and its financial activities—manufacturing engines and trucks and selling those through its "Dealer Network"—are solely for the benefit of Navistar International Corporation.

319.    Navistar International Corporation's most recent quarterly reports show that the majority of Defendant Navistar International Corporation's gross revenues come from Defendant Navistar, Inc.

56

320.     When Navistar International Corporation's "officers" discuss sales of trucks to customers on earnings calls, in press releases, and in analyst presentations—sales made presumably by Navistar, Inc.—it is "our engine volumes" and "our trucks and parts business" that they discuss.

321.     However, the "loss" [or presumably gain] that the shareholders of Defendant Navistar International Corporation have is directly related, and is almost solely created, by the subsidiary Defendant Navistar, Inc.

322.     Navistar International Corporation and Navistar, Inc. act in complete cooperation with each other and with knowledge of the other's actions when they deliver information to the public.  For example, the "navistar.com" website—including information from and about Navistar International Corporation—contains information regarding both truck sales and sales of shares to investors.

### 3.  Holding only Defendant Navistar, Inc. or Defendant Navistar International Corporation liable—without the other—would result in grave injustice to Plaintiffs and the Class.

323.     On information and belief, one or the other of the Defendants may be inadequately capitalized.

324.     Clearly, the corporate form utilized by Defendants here is a sham to perpetrate a fraud.  This is a shell game where common officers of the parent and subsidiary make presentations to analysts and investors in order to gain media/customer attention, but—when customers or investors attempt to hold the parent company accountable for those very statements and the direct benefit the parent company and its shareholders obtained from those sales—the parent company points to the subsidiary, which now has inadequate capital alone to withstand the warranty and other obligations that were the direct result of the fraud to begin with.

57

325.     Defendants' combined failure to fully and completely disclose to their shareholders, investors, dealers, and customers (i) the extent of the problems it knew it was experiencing with the EGR technology; (ii) the resulting defects to the equipment being sold to the public; and (iii) their escalating inability to correct those defects, while assuring the public and their customers that the equipment sold was of a high quality and any problems had been and were being solved, is actionable actual fraud, common law fraud, and fraud by nondisclosure.

### III.     JURISDICTION AND VENUE

326.     This Court has original subject matter jurisdiction over this Class Action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2).  Plaintiffs are citizens of Alabama, Arizona, California, Idaho, Illinois, Indiana, Iowa, Kentucky, Mississippi, North Carolina, Ohio, Pennsylvania, Tennessee, Washington, and Wisconsin.  Navistar International Corporation and Navistar, Inc. are corporations organized under the laws of Delaware, with their principal place of business in Illinois.  As a result, the named Plaintiffs, Class members, and Navistar are citizens of different states within the meaning of 28 U.S.C. §§ 1332(c), 1332(d)(2)(A), and 1332(d)(10).

327.     On information and belief, the proposed Class exceeds 100 persons.  Pursuant to 28 U.S.C. § 1332(d)(6), the aggregate amount of the Class members' claims substantially exceeds $5,000,000, and thus, exceeds the requisite amount in controversy set forth in 28 U.S.C. § 1332(d)(2).  The "local controversy exception" and "home state exception" to jurisdiction under 28 U.S.C. § 1332(d)(2), as set forth under 28 U.S.C. § 1332(d)(4)(A) and (B), do not apply here.

328.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), (b) and (c) on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

## IV.     CHOICE OF LAW

329.     Navistar is headquartered in and conducted all relevant business related to these claims in and from Illinois.  As a result, the claims of Plaintiffs and all Class members have substantial contacts with Illinois, such that application of Illinois law to these claims is neither arbitrary nor unfair.  Illinois has a substantial relationship to the claims of all Class members, and Illinois has a greater interest than any state in the claims asserted here.

330.     In the alternative, the law of each state in which Plaintiffs and Class members purchased or leased the Trucks, and/or in which they reside, can be applied to Plaintiffs and Class members.

## V.     FACTUAL ALLEGATIONS

### A.     Background

331.     On January 18, 2001, the U.S. Environmental Protection Agency ("EPA"), pursuant to its authority under The Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*, issued new emissions standards for heavy-duty highway engines and vehicles.  E.P.A. Final Rule, 66 Fed. Reg. 5002 (Jan. 18, 2001) (codified at 40 C.F.R. pts. 69, 80, and 86), hereinafter, "2010 EPA Standards."  The Standards required manufacturers to, among other things, reduce nitrogen oxide ("NOx") emissions to 0.20 grams per brake horsepower-hour (g/bhp-hr).  Compliance would be measured on a percent-of-sales basis, *i.e.*, for model years 2007, 2008, and 2009, 50% of a manufacturer's heavy-duty engine and vehicle sales had to comply with the new standard, and for model year 2010, 100% of a manufacturer's sales had to be compliant.  The Standards also required manufacturers' emission control systems to be integrated with on-board diagnostic

59

systems that could detect and identify malfunctions in all monitored emission-related engine systems.

332.     Pursuant to Section 7541 of The Clean Air Act, manufacturers are required to "warrant to the ultimate purchaser and each subsequent purchaser" that the manufacturer's vehicles and engines comply with the EPA's emissions standards.

333.     Every manufacturer selling commercial trucks in the U.S., except Navistar, chose to meet the 2010 EPA Standards predominantly with Selective Catalytic Reduction ("SCR") technology, which treated engine exhaust with a urea-based chemical after it left the engine.

334.     Navistar chose a different technology, Exhaust Gas Recirculation ("EGR"), to meet the 2010 EPA Standards.  EGR technology attempts to reduce emissions by subjecting exhaust flowing out of the engine to a second burn in the cylinders.  Navistar's Advanced EGR system, an integral part of the MaxxForce Engine's design, diverted some of the exhaust into an EGR cooler, which used ordinary engine coolant to lower the exhaust temperature.  The cooled exhaust was then fed back into the engine's air intake through the EGR valves.  The Advanced EGR system, however, created a large amount of pressure and heat that ultimately caused engine damage as well as damage to other parts of the Navistar vehicle.

335.     Navistar International Corporation and its officers and directors, including its then-President and CEO, Daniel Ustian, insisted that Navistar, Inc. use an EGR system in the Engines rather than an SCR system to meet 2010 EPA Standards over objections from Navistar, Inc. employees.  At all relevant times, Navistar International Corporation knew the MaxxForce Engines were defective.  Navistar International Corporation directly interfered with and exercised control over Navistar, Inc.'s decision making, and Navistar, Inc. was no longer free to

utilize its own expertise.  Navistar International Corporation therefore directly participated in the harm caused to Plaintiffs and the Class.

336.    Ultimately, Navistar was unable to design the Engines so that they would comply with the emissions standards set forth by the EPA.  Accordingly, in order to sell the Engines, Navistar had to pay non-conformance penalties ("NCPs") to the EPA.

**B.    Navistar's Authorized Dealers**

337.    Navistar provides a package of goods and services to buyers of International trucks with MaxxForce engines by manufacturing and distributing its products through a nationwide network of authorized dealers (the "Navistar Network").

338.    Authorized dealers in the Navistar Network have actual authority from Navistar to act as agents for Navistar in connection with the marketing, advertising and selling of International trucks with MaxxForce engines.

339.    Upon information and belief, dealers in the Navistar Network rely almost exclusively on materials and training received from Navistar when making representations about International trucks and MaxxForce engines to their customers.

340.    Navistar regularly provides authorized dealers with International and MaxxForce branded literature, signage, and training materials for use in promoting, selling and financing the purchase or lease of their trucks to customers.

341.    In addition, Navistar routinely holds training seminars for authorized dealers in the Navistar Network.

342.    During these seminars, Navistar coaches dealers in the Navistar Network and their sales staff on the best ways to sell International trucks to customers, including providing detailed comparisons of competing manufacturers' products and outlining the specific information dealers should emphasize when pursuing a sale.

343.    In areas where they lack knowledge, dealers in the Navistar Network are encouraged to visit the "navistar.com" website for additional information regarding both Defendants.

344.    Potential customers are also encouraged to visit the "navistar.com" website when seeking information about International trucks and the MaxxForce engine.

345.    The "navistar.com" website contains informational materials and statements to aid dealers and induce the customer to purchase or lease Navistar products.

346.    In addition, Navistar furnishes the actual specifications of each truck, including fuel efficiency information, rather than relying on the dealers to generate those details for customers interested in purchasing International trucks.

347.    Upon information and belief, Navistar provides the above-described training and information with the intention that the dealers in the Navistar Network rely almost exclusively on information provided by Navistar when making representations to potential customers and inducing customers to purchase or lease International trucks with MaxxForce engines.

348.    Upon information and belief, in exercise of the authority granted to them by, and at the direction of Navistar, authorized dealers relied upon such training and information when they marketed and sold the Trucks to Class members, including in the course of making the misrepresentations and omissions associated with the Defect, as detailed herein.

**C.      The Navistar Defendants Concealed the Defect.**

349.    Navistar made numerous, repeated false public statements that their engines would meet the 2010 EPA Standards, that Advanced EGR was a "proven technology" that would provide a "no-hassle emissions solution," that the Engines would be just as reliable and durable as their earlier engines, and that Trucks equipped with Advanced EGR would have a "much higher residual value" on the used truck market than trucks equipped with SCR.

62

350. At the same time Navistar was making these false public statements, its officers were outspoken critics of SCR. For example, Jim Hebe, Senior Vice President of North American Sales Operations frequently criticized competitors' SCR offering, and was quoted as saying SCR "could be the biggest false-start in trucking history." Dee Kapur, President of the Truck Group, called SCR a "marooned technology" that would ultimately be abandoned by all manufacturers in favor of Advanced EGR.

**D.    The Navistar Defendants Knew About the Defect at Least as Early as 2004.**

351. Navistar knew that the EGR system was seriously flawed at least as early as 2004, when Navistar's 6.0-liter diesel engines were used in various 2004 Model Year Ford vehicles. Ford faced an unprecedented number of complaints with Navistar's 6.0-liter diesel engine, leading to Ford suing Navistar, Inc. for supplying this defective engine. These problems persisted throughout the production life of those engines. Navistar's next diesel engine produced for Ford, the 6.4-liter engine, also had an EGR system, and also was plagued with problems throughout its production life in model years 2008 through 2010, leading Ford to begin producing its own diesel engines after Model Year 2010, rather than having them supplied by Navistar. For Model Year 2010, Ford went to an SCR system.

352. Shockingly, despite seeing first-hand the problems with the EGR system from 2004 through 2010, and despite losing Ford as a customer for its EGR-based diesel engines, Navistar continued producing EGR-based engines and selling them to their customers, including the MaxxForce Engines at issue here.

353. In addition, according to industry standards, heavy-duty commercial truck engines are extensively tested for years before public distribution.

354. Manufacturers of heavy-duty commercial truck engines run the engines in controlled conditions for thousands of hours in order to simulate actual driving conditions.

355. As a result of this extensive testing, manufacturers obtain huge amounts of data regarding problems associated with engine performance.

356. Navistar was able to use the aforementioned data to accurately predict the exact types of problems that would occur with 13-liter MaxxForce engines.

357. A complaint filed on October 10, 2013 against Navistar International Corporation demonstrates that Navistar was aware of the Defect and the negative results that resulted from its tests of the Engine's design. The complaint alleged securities violations[5] and listed several "Confidential Witnesses" ("CWs"), many of whom discussed problems with EGR technology that were made known to the Navistar Defendants.[6] For example:

   a. CW2, identified in the complaint as a former "Chief Engineer for the Engine Group on several Navistar truck and engine launches," noted problems with, and expressed concerns about, the EGR technology, and presented these concerns to Navistar International Corporation's then-President and CEO, Daniel Ustian.

   b. CW3, identified in the complaint as "a project development team lead for Navistar in its Fort Wayne, Indiana facility," claims to have been asked to assist in developing a fallback SCR solution in case the EGR solution was unsuccessful. However, Navistar Inc. executives issued an order to cease and desist development of the SCR backup plan.

---

[5] Construction Workers Pension Trust Fund – Lake County and Vicinity v. Navistar Int'l Corp., Civ. No. 1:13-cv-2111 (N.D. Ill.), Docket Entry 66.

[6] *The Construction Workers Pension Trust Fund* complaint does not differentiate between Navistar International Corporation and Navistar, Inc. with respect to the employment of the confidential witnesses.

c. CW5, identified in the complaint as a former "Navistar . . . Chief Engineer," allegedly told his supervisors that the EGR technology was not achievable given fuel economy and performance parameters; the stage of EGR development at the time; and that the entire engineering community was saying that the physics of EGR was not possible.

d. CW8, identified in the complaint as a "Project Manager and Senior Project Manager at Navistar from 1997 through 2007," noted problems with a diesel particulate filter in the EGR engines that would "stop up and shut down the engine as more exhaust flowed through the engine." This increase in exhaust gas recirculation also lowered fuel economy, decreased durability, and increased cooling demands on the engine.

e. CW12, identified in the complaint as "Navistar's Senior Vice President, North American Sales Operations," claims that Mr. Ustian told him directly not to discuss an alternate solution to the EGR technology or he would be fired.

f. CW13, identified in the complaint as a "Navistar" employee from July 2008 to April 2013 and holding various Vice President and Manager roles throughout that time period, claims that "[b]y mid-2011, the EGR solution engines were experiencing significant warranty issues." Mr. Ustian and other management had access to these reports detailing the warranty issues.

g. CW16, identified in the complaint as a "Navistar" employee from 2007 until 2012, claims that it became apparent in 2011 that Navistar was

65

experiencing an increase in failure of components of the EGR engines. The increase in failures was linked to an increase in exhaust gas flowing through the engine, and the resulting soot buildup.

h. CW18, identified as a "Navistar" employee since July 2001, stated that the warranty problem was initially believed to be related to the EGR valve. However, even after the EGR valve's fix, warranty issues persisted through 2012, allegedly as a result of failure of the EGR cooler.

358. Accordingly, Navistar knew the MaxxForce Engines were defective before the first truck equipped with a MaxxForce Engine was ever sold. Nonetheless, Navistar failed to disclose the problems with the MaxxForce Engines.

**E.      Navistar's Representations Regarding the MaxxForce Engines**

359. Despite Navistar's knowledge of the Defect, it failed to inform Plaintiffs and the Class of the Defect, and it represented that the MaxxForce Engines; were free of defects; were fit for heavy-duty trucking, and that any problems experienced with the Engines would be repaired by an authorized Navistar service center.

360. Navistar press releases regarding the MaxxForce Engines quoted Ramin Younessi, group vice president of product development and business strategy, as stating that the MaxxForce Engines were "some of the cleanest and most energy-efficient diesel engines ever produced."

361. Navistar press releases also quoted Jim Hebe as stating that the MaxxForce 15 engine with Advanced EGR "gives customers the ultimate combination in durability and power."

362. Navistar press releases represented that the MaxxForce Advanced EGR Engines were a "no-hassle, business-as-usual solution that will deliver lower total operating costs for customers." The press releases also stated that prior to launching sales of Navistar vehicles with

66

Advanced EGR solutions, Navistar test vehicles had "logged millions of driving miles in real-world conditions."

363. Navistar marketing materials state that "MaxxForce Engines deliver: Reliability; Durability; Power; Performance; [and] Fuel Economy" and that the Engines are a "no-hassle" solution that "eliminate the hassle of … additional maintenance …."

364. Navistar also made a number of public statements regarding the lower cost of ownership and superior fuel economy of the Engines, when compared to other engines equipped with an SCR system. Those statements include, but are not limited to, the following:

  a. At a conference call for investors, analysts, and media representatives on December 22, 2010, Ustian stated, "The fuel economy of [the MaxxForce 13-liter engine] will be better and there will be no change in the heat rejection at the same time, so this product will be even better."

  b. At a conference call for investors, analysts, and media representatives on January 25, 2011, Allen stated, "Well, the facts are now out, our products are out there and they're delivering actually a little bit better than what we said on fuel economy, durability, the whole thing…The MaxxForce 7 is doing phenomenal. We're seeing 9% better fuel economy than the prior model. The MaxxForce 13, as I've said the fuel economy is at parity or better than anything in the market and we'll be applying for our 0.2 certification here in the next couple of months."

  c. In a *Transport Topics* article published on July 29, 2010 and a *Fleet Owner* article published on July 20, 2010, representatives of Navistar were quoted making claims about the MF ProStars' "fluid economy"

saying "The test results were clear. In the comparison of fluid economy, the International ProStar+ with MaxxForce 13 Advanced EGR consistently outperformed the competing trucks 1% to 2.5%."

d. In a *Fleet Owner* article published on July 20, 2010, Jim Hebe was quoted as saying "If liquid urea SCR trucks can't compete on fluid economy, then why would customers want to deal with the cost and hassle of adding and maintaining after-treatment equipment, finding and filling up with liquid urea and retraining technicians?"

365. Navistar also made a number of public statements regarding Truck reliability, maintenance and repairs. Those statements include, but are not limited to, the following:

a. At a conference call for investors, analysts, and media representatives on March 9, 2011, Ustian stated, "Since we were the only ones out there, there is a lot coming at us with oh, this can't work. And of course, now were out in the marketplace, and that's over. That argument's over. We're out there in the marketplace. We're exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over."

b. At a conference call for investors, analysts, and media representatives on June 7, 2011, Ustian stated, "We haven't heard any signs of—any even discussion on it, other than the benefits that we get from EGRs, lower weights, and not having to deal with urea. But as far as any discussion on SCR versus EGR, those things were passed a long time ago."

      c.      At a conference call for investors, analysts, and media representatives on September 7, 2011, Cederoth stated, "This technology is proving extremely viable providing fuel economy and performance on par with the best SCR competitors….As we develop 0.20g NOx capability our goal of continuing to improve performance and fuel economy at this emissions level is being realized."

      d.      At a conference call for investors, analysts, and media representatives on December 20, 2011, Ustian stated, "We compete against everyone that's out there on a product, not on a technology.  So as long as our product performs as well or better, we can price it not based on cost, but based on vehicle and that's exactly what we have been able to do."

      e.      At a conference call for investors, analysts, and media representatives on February 1, 2012, Allen stated, "We are providing equal or better performance than the SCR systems without any of the cost, without the maintenance or without the hassle of SCR."

366.    Other representations regarding the MF ProStars' reliability and outstanding performance were published to Plaintiffs via the "navistar.com" website.

367.    Navistar also made representations regarding Engine reliability in Navistar brochures.  For example, Navistar's "Maintenance Information Guide"  stated: (i) that the MaxxForce Advanced EGR had "lower operating costs" and "less hassle"; (ii) that the MaxxForce Advanced EGR resulted in "optimal performance and low cost of ownership"; (iii) that the design of MaxxForce Advanced EGR resulted in "better fuel efficiency," "more power to the wheels and less soot out the exhaust," and "improved combustion"; (iv) that the

"Dual-path EGR cooling provides optimized cooled EGR … [that] allows long-term system performance"; (v) that the MaxxForce Engine had "Premium Reliability"; (vi) that the "MaxxForce Engine can be counted on to show up for work every day"; and (vii) that the MaxxForce Engine was "Always Performing."

368.    Upon information and belief, Plaintiffs assert that Navistar made representations regarding reliability, performance, and operating costs to all Plaintiffs and Class members, directly and/or through its authorized dealer network, with the intention of inducing Plaintiffs and Class members to purchase or lease the Trucks.

369.    According to its public filings, Navistar spends close to $30 million per year on advertising intended to reach customers and induce them to purchase or lease Defendants' products.

**F.      The Defect Is Widespread and Harms the Class.**

370.    Contrary to Navistar's representations regarding the fitness, durability, and low operating costs of MaxxForce Engines, Plaintiffs and the Class experienced numerous repeated breakdowns related to the Defect.  Upon information and belief, Navistar was aware of numerous complaints regarding the EGR system, the potential dangers related to the EGR system, how the exhaust pipes between the EGR valve and exhaust manifold leak, allowing exhaust fumes into the cab, and how Navistar failed to repair the problem despite the Truck operators' repeated complaints to and visits at Navistar service centers.  These Defect-related breakdowns, and subsequent periods of attempted repair by Navistar service centers, harmed Plaintiffs and the Class since they were unable to operate their trucks for several days.

371.    Complaints by owners of the Trucks demonstrate how widespread the Defect is, how the Defect manifests without warning, that Navistar is and has long been aware of the Defect, and how potentially dangerous the defective condition is.  As evidenced by comments

appearing on internet sites such as http://www.thetruckersreport.com/truckingindustryforum/

trucks-eighteen-wheelers/83372-maxxforce-13-a.html, which based upon information and belief

are monitored by Navistar's agents and/or employees, Navistar has been aware of complaints

about the Defect since at least June 2009.

372.     The MaxxForce Engine exhaust pipes between the EGR valve and exhaust

manifold leak, allowing exhaust fumes into the cab.  This was the subject of a complaint filed

with the NHSTA on 10/11/2011:

> THERE IS A STAINLESS STEEL EXHAUST FLEX PIPE UNDER THE CAB,
> RIGHT SIDE, JUST AFTER THE REGEN DOSER THAT IS WRAPPED IN A
> FLEX SHEATHING.  THE INSIDE OF THE PIPE CRACKS AND WHITE
> EXHAUST FLOWS OUT AND INTO THE CAB WHEN THE ENGINE GOES
> THRU A REGEN CYCLE.  WE HAD SEVERAL DRIVERS COMPLAIN OF
> THIS ISSUE, UPON INSPECTION YOU CAN NOT FIND ANY VISIBLE
> CRACKS IN THE EXHAUST.  SEVERAL DRIVERS WERE HAVING TO
> PUT THE WINDOWS DOWN IN ORDER TO ELIMINATE THE FUMES
> INSIDE THE CABIN WHILE DRIVING.  AFTER SENDING TO THE
> DEALER, THEY ADVISED THAT THE PIPE WAS CRACKED
> INTERNALLY BEHIND THE SHEATHING AND NEEDED TO BE
> REPLACED.  THEY ADVISED ON THE PROCEDURE TO CHECK FOR
> THIS SYMPTOM, YOU HAVE TO USE THE ENGINE SOFTWARE AND
> FORCE A REGEN SESSION.  ONCE YOU DO THAT, YOU CAN SEE THE
> WHITE FUEL SMOKE AND SMELL RAW FUEL.  THIS IS THEN DRAWN
> UP THRU THE HVAC DUCT AND PUTS IT INSIDE THE CABIN.  THE
> REPAIR IS A 500.00 PIPE PLUS LABOR FOR A TOTAL OF 800.00.  WE
> HAVE 2 OF 5 PROSTAR TRUCKS SO FAR THAT HAVE HAD TO HAVE
> THIS PIPE REPLACED, BOTH DRIVERS WITH SAME COMPLAINT.

373.     Complaints of exhaust leaks into the cab were very common on the internet as

well.  *See, e.g.*, http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-

wheelers/126451-maxx-force-13-engines-4.html, accessed May 11, 2015.

374.     While paying hundreds of millions of dollars in warranty claims to replace

defective parts with equally defective parts on their MaxxForce EGR Engines, Navistar

continued to tout its EGR technology as the future of emissions technology and omitted to

disclose that the Defect was not fixable.  Navistar blamed the Defect and warranty claims on

manufacturing problems (which they claimed to have resolved), and continued to portray the Engines as reliable.

375.    Moreover, these were the same problems experienced with Navistar's EGR-based diesel engines since 2004, and Navistar knew they would continue as long as they stayed with the EGR system.

376.    On information and belief, Plaintiffs allege that Navistar failed to disclose to customers that coolant consumption caused by the Defect was outside the normal range.

377.    Commercial trucks are not earning money for their owners and lessees if they are sitting in the shop for repairs.  The owners and lessees suffer not only a loss of use of the truck itself, but also suffer a loss of use of other tangible property, including, but not limited to, trailers and other equipment which cannot be used when the truck is out of service.  The relationships between Plaintiffs and their customers were harmed because the Navistar Engines were defective and prevented Plaintiffs from providing reliable service to their customers.  Navistar's customers who bought Trucks equipped with the MaxxForce Engines in reliance on Navistar's representations were financially devastated by the MaxxForce Engines' repeated failures.

378.    In July 2012, Navistar finally announced that it was abandoning Advanced EGR and adopting for the 2013 model year the same SCR technologies that their competitors had been using.

379.    Even after announcing the switch to SCR technology, Navistar continued to sell the Engines and omitted to disclose to buyers that resale market demand for vehicles equipped with those Engines would be weak.

380.    In August 2012, discussing Navistar's announcement that beginning in March 2013 it would equip their International Trucks with SCR and abandon Advanced EGR, the

Commercial Carrier Journal quoted Jack Allen, North American Truck Group President

downplaying any problems with the Advanced EGR engine Trucks:

> Customers should not be hesitant to purchase an EGR-only MaxxForce-equipped
> truck between now and March, Allen said.  And likewise, he predicted concerns
> over the resale value of EGR-only MaxxForce-equipped trucks will prove to be
> temporary.

> "The judge didn't void the trucks," he said of [an appellate court ruling involving
> whether the EPA followed proper procedures in implementing a certain policy].[7]
> "Check out the Website about trucks sold under interim rule.  Nothing will
> happen.  And as for used truck values? We feel the secondary market will be very
> receptive to a truck built without SCR.  Our MaxxForce fuel economy is great.
> Our performance is great.  And we have more than 50,000 of those engines out
> there."[8]

381.    The trucking industry is now well aware of the problems with the Engines.  Not

only were the Trucks equipped with these Engines worth far less at the time of purchase or lease

than they would have been with an engine free from defects, the Trucks have a significantly

diminished value on the resale market compared with competitors' trucks with similar mileage

and are very difficult to sell.  Customers who bought the Trucks with MaxxForce Engines are

now stuck with an unfixable Defect, dwindling or expired warranties, and a greatly diminished

market for resale or trade-in of the used Trucks.

## VI.    TOLLING OF STATUTES OF LIMITATIONS

382.    Discovery Rule.  Plaintiffs' claims accrued upon discovery that the EGR

emissions system designed into the MaxxForce Engines was defective in that it led to the

repeated failure of various truck parts, and the Defect could not be repaired.  While Navistar

knew, and concealed, the fact that the Engines have a Defect that causes failures, Plaintiffs and

---

[7] *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95 (D.C. Cir. 2013).

[8] http://www.ccjdigital.com/navistar-devises-plan-to-counter-losing-egr-gamble/, accessed May
11, 2015.

Class members could not and did not discover this fact through reasonable diligent investigation until after they experienced failures, could reasonably exclude other potential causes of the failures, learned that warranty "repairs" by Navistar did not solve the problem, and discovered that the Engines themselves caused the failures.

383. <u>Active Concealment Tolling.</u>  Any statutes of limitations are tolled by Navistar's knowing and active concealment of the fact that the Engines suffered from an inherent design Defect.  Navistar kept Plaintiffs and all Class members ignorant of vital information essential to the pursuit of their claim, without any fault or lack of diligence on the part of Plaintiffs.  The details of Navistar's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery. Plaintiffs could not reasonably have discovered the fact that their Engines suffered from an inherent design Defect that would cause repeated and significant failures.

384. <u>Estoppel.</u>  Navistar was and is under a continuous duty to disclose to Plaintiffs and all Class members the true character, quality, and nature of the Engines.  At all relevant times, and continuing to this day, Navistar knowingly, affirmatively, and actively misrepresented and concealed the true character, quality, and nature of the Engines.  The details of Navistar's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery.  Plaintiffs reasonably relied upon Navistar's affirmative misrepresentations and knowing, affirmative, and/or active concealment.  Based on the foregoing, Navistar is estopped from relying upon any statutes of limitation in defense of this action.

385. <u>Equitable Tolling.</u>  Navistar took active steps to conceal the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold,

and/or leased the Trucks with the defective EGR System in the Engines. The details of Navistar's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Navistar fraudulently concealed its above-described wrongful acts. Should such be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## VII.  CLASS ALLEGATIONS

386.    The named Plaintiffs bring this action as a Class Action pursuant to Rules 23(a), 23(b)(1)(A), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

### A.    Class Definitions

387.    The Classes are defined as follows:

#### a.    Nationwide Declaratory and/or Injunctive Relief Class

All persons and entities residing in the United States who own (not for resale) or who lease a vehicle equipped with a 2010-2013 model year[9] MaxxForce Advanced EGR diesel engine who (a) have not experienced failures related to the vehicle's EGR system or (b) have experienced failures related to the vehicle's EGR system, but have not received service sufficient to prevent EGR system-related failures from recurring in the future.

#### b.    Nationwide Damages Class

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in the United States.

---

[9] Owners and lessees of trucks equipped with MaxxForce Engines will be able to determine the engine model year since it is printed on the emission label on top of the high pressure charge air cooler.

c. **Damages Sub-Classes**

(i) **Alabama Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Alabama.

(ii) **California Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in California.

(iii) **Idaho Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Idaho.

(iv) **Illinois Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Illinois.

(v) **Iowa Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Iowa.

(vi) **Kentucky Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Kentucky.

(vii) **Maryland Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Maryland.

(viii)    **Michigan Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Michigan.

(ix)    **North Carolina Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in North Carolina.

(x)    **Ohio Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Ohio.

(xi)    **Oklahoma Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Oklahoma.

(xii)    **Pennsylvania Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Pennsylvania.

(xiii)    **Tennessee Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Tennessee.

(xiv)    **Texas Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Texas.

(xv)    **Washington Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Washington.

(xvi) **Wisconsin Damages Sub-Class**

All persons and entities residing in the United States who purchased, not for resale, or leased a vehicle equipped with a 2010-2013 model year MaxxForce Advanced EGR diesel engine in Wisconsin.

388.    Excluded from the Class definitions are Navistar, their agents, affiliates, and employees; federal government entities; the Judge(s) assigned to this matter; and any member of the Judge(s)' staff and immediate family.

389.    Claims for personal injury are specifically excluded from the Class definitions.

**B.    The Prerequisites of Rule 23(a) Are Satisfied.**

390.    *Numerosity*.  The requirements of Rule 23(a)(1) are satisfied in that there are too many Class members for joinder of all of them to be practicable.  On information and belief, this Class includes over one thousand members.  This Class, as defined above, meets the numerosity requirement.

391.    *Commonality*.  The claims of the Class members raise numerous common issues of fact and/or law, thereby satisfying the requirements of Rule 23(a)(2).  These common legal and factual questions—the answers to which will drive resolution of the litigation—may be determined without the necessity of resolving individualized factual disputes concerning any Class Member, including, but not limited to, the following questions:

<u>**Questions of Fact**</u>

a.    Whether the MaxxForce Advanced EGR Engines contain the latent defect alleged in this complaint;

b.    Whether the complained-of defect caused the damages of Plaintiffs and other members of the Class;

c.    Whether the MaxxForce Advanced EGR Engines are defectively designed and/or manufactured such that they are not suitable for their intended use;

78

d.     Whether the MaxxForce Advanced EGR Engines suddenly and

dangerously fail;

e.     Whether the latent defect is a necessary cause of the sudden and dangerous

failure of the Engines and resulting damages;

f.     Whether the MaxxForce Advanced EGR Engines are substantially likely

to fail before the end of their intended useful life as a result of their

defective design and/or manufacture;

g.     Whether Navistar had actual or imputed knowledge of the Defect but

failed to disclose it to Plaintiffs or the Class;

h.     Whether Navistar has a pattern and practice of attributing damages

claimed by Plaintiffs and the Class to misuse or improper maintenance or

other causes rather than the complained-of Defect;

i.     Whether Navistar has a pattern and practice of denying Plaintiffs' and the

Class's claims as "out of warranty" and not due to the complained-of

Defect;

j.     Whether Navistar fraudulently concealed from and/or failed to disclose to

Plaintiffs and Class members that MaxxForce Advanced EGR Engines

were inherently defective and dangerous and prone to fail prematurely;

k.     Whether Navistar failed to adequately warn Plaintiffs and Class members

of the inherent defects and dangers posed by the MaxxForce Advanced

EGR Engines;

79

l. Whether Navistar dealerships were unable to properly repair the Defect, such that Navistar failed to honor its warranty obligation to properly repair the Engine during the warranty period;

m. Whether Plaintiffs and other members of the Class have been damaged and, if so, what is the proper measure of damages; and

n. Whether Navistar has acted or refused to act on grounds generally applicable to the Class.

**Questions of Law**

a. Whether this Court should grant the declaratory relief requested herein;

b. Whether EGR system-related failures are covered by the Navistar Standard Warranty, the Navistar Federal Emission System Warranty, and the Navistar California Emission System Warranty;

c. Whether limitations on the Navistar warranties are invalid or unenforceable;

d. Whether statements contained in the Maintenance Information Guide constitute warranties made by Navistar to Plaintiffs and members of the Class;

e. Whether Navistar had duty to disclose to Plaintiffs and all Class members the true character, quality, and nature of the Engines and the Defect;

f. Whether Navistar's conduct in manufacturing, marketing, and selling Engines it knew to be defective, including misrepresentations and/or omissions concerning the defective Engine, constitutes consumer fraud and/or common law fraud;

g.     Whether Navistar engaged in unfair or deceptive acts or practices when it concealed the inherent defective conditions and dangers of the MaxxForce Engines and failed to warn Plaintiffs and the Class members of same;

h.     Whether Navistar was unjustly enriched by its conduct; and

i.     Whether Navistar breached obligations to Plaintiffs and the Class members imposed by express and implied warranties, implied contracts, and other common law doctrines.

392.    *Typicality*.  The claims of the named Plaintiffs are typical of the unnamed Class members because they have a common factual source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Rule 23(a)(3).  For example, the named Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class members were injured or damaged by the same wrongful practices in which Navistar engaged, namely the manufacture and sale of the inherently defective and dangerous MaxxForce Advanced EGR Engines, the intentional concealment of those defects, and Navistar's inability to repair the Defect.

393.    *Adequacy of Representation*.  The requirements of Rule 23(a)(4) are satisfied in that each named Plaintiff has a sufficient stake in the litigation to prosecute its claims vigorously on behalf of the Class members, and each named Plaintiff's interests are aligned with those of the proposed Class.  There are no defenses of a unique nature that may be asserted against any Plaintiff individually, as distinguished from the other members of the Class, and the relief sought is common to the Class.  No Plaintiff has any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and no Plaintiff has any conflict with any other member of the Class.  Plaintiffs have retained competent counsel experienced in class action

litigation, including product defect and, specifically, vehicle defect class actions, to represent them and the Class members in this litigation.

394.    In addition to meeting the requirements specified in Rule 23(a), the Classes are easily ascertainable through a combination of the use of Navistar's, purchasers', and lessees' records, publication of notice, visual inspection of the Engine and/or its label, and verification by photograph.  Upon information and belief, Navistar, its authorized dealers, and its service centers keep records of purchasers, service records, and warranty claims data.  Where the records of Navistar, its authorized dealers, and its service centers may be insufficient, provision of notice can supplement class identification efforts, and purchasers or lessees responding to the class notice can verify that they are class members through their purchase records, maintenance and repair records, and a photograph of the emission label, located on top of the high pressure charge air cooler, which indicates the model year of the engine.

**C.    The Prerequisites of Rule 23(b)(1) and (b)(2) Are Satisfied.**

395.    *Rule 23(b)(1)*.  With respect to Plaintiffs' claim for declaratory relief, the requirements of Rule 23(b)(1)(A) are satisfied since individual litigation of the claims of all Class members would create a risk of inconsistent or varying adjudications that would, in turn, establish incompatible standards of conduct for Navistar.  For example, one court might decide that the challenged actions are illegal and enjoin them, while another court might decide that those same actions are not illegal.  Similarly, inconsistent rulings regarding the issue of whether the Defect is present in all MaxxForce Engines equipped with the Advanced EGR system would cause Navistar to respond to warranty claims in an inconsistent manner.

396.    *Rule 23(b)(2)*.  Class members who might need future repairs to or replacement of the Engine seek a declaration that there is an inherent design flaw in the Engine, that the warranties extend to them, and that they are entitled to final equitable relief, or to specific

performance of the warranty when any future EGR system-related failure occurs. The requirements of Rule 23(b)(2) are satisfied since the claim for declaratory relief is based upon Navistar's systemic policies and practices, making final declaratory relief, with respect to the class as a whole, appropriate.

397.     Navistar's actions are generally applicable to the Class as a whole, and Plaintiffs seek, among other things, equitable remedies with respect to the class as a whole.

**D.      The Prerequisites of Rule 23(b)(3) Are Satisfied.**

398.     *Rule 23(b)(3): Predominance*. The Rule 23(b)(3) predominance requirement is satisfied because the common factual and legal issues identified above are sufficiently cohesive to warrant adjudication by representation and predominate over questions affecting only individual members of the Class. The central issues in this litigation are the same for all class members: whether the Engines suffered from an inherent defect when they left the factory, whether Navistar knew of the Defect, and the scope and applicability of Navistar's warranties. These common issues predominate over any individual issues.

399.     *Rule 23(b)(3): Superiority*. The Rule 23(b)(3) superiority requirement is also satisfied. Class action treatment is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable. The expense of individual Class members prosecuting separate claims is large, and even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases. Individual litigation would also present the potential for varying, inconsistent or contradictory judgments while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation. As a result, it is desirable to concentrate litigation in this forum. Plaintiffs

know of no difficulty to be encountered in the management of this action that would preclude its

maintenance as a class action. Relief concerning Plaintiffs' rights under the laws herein alleged

and with respect to the Class is proper.

## VIII.   CAUSES OF ACTION

**A.      Claims Brought on Behalf of the Nationwide Class**

### FIRST CAUSE OF ACTION
### CLAIM FOR DECLARATORY AND/OR INJUNCTIVE RELIEF
#### Asserted on behalf of all Plaintiffs and the Nationwide Class

400.    Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully

set forth herein.

401.    As illustrated in the foregoing allegations, there is an actual controversy between

Navistar and Plaintiffs concerning: (1) whether the Engines have an inherent design Defect that

causes failures; (2) whether Navistar knew, or should have known, of that design Defect; (3)

whether Navistar knew, or should have known, that the Defect would impact Engine

performance and Truck parts; (4) whether Navistar knew, or should have known, that no amount

of warranty service would cure the Defect; (5) whether Navistar improperly asserted

maintenance, misuse, and other defenses to otherwise valid warranty claims; (6) whether the

limitations in the applicable warranties (*i.e.*, the Navistar Standard Warranty, the Navistar

Federal Emission System Warranty, the Navistar California Emission System Warranty, and the

descriptions and affirmations of fact contained in the Navistar "Maintenance Information

Guide," each of which are hereto as Exhibits A-C) were drafted solely by Navistar and were non-

negotiable; and (7) whether the time, mileage, or other limitations and disclaimers in Navistar's

warranties are unconscionable and/or invalid.

402.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court may

"declare the rights and legal relations of any interested party seeking such declaration, whether

or not further relief is or could be sought," provided that the declaratory relief requested does not fall within any of the exemptions set forth in the Act.

403.    Accordingly, Plaintiffs pray this Court declare that:

    a.  The MaxxForce Engines equipped with Advanced EGR suffer from a design Defect that is material and warrants disclosure since that design Defect leads to repeated, sudden, and accidental failures, which might occur outside the warranty period;

    b.  All members of the Declaratory Relief Class are to be provided the best practicable notice of the Defect, which cost shall be borne by Navistar;

    c.  Navistar warranted the Engines under the Navistar Standard Warranty, the Navistar Federal Emission System Warranty, and the Navistar California Emission System Warranty.  It also warranted the Engines according to descriptions and affirmations of fact contained in the Navistar "Maintenance Information Guide."  Those warranties failed of their essential purpose.

    d.  Because Navistar knew of the Defect when it first manufactured the Engines, any repairs made to remedy EGR system-related failures were insufficient to remediate the Defect known by Navistar to exist. Therefore, any time, mileage or other limitations on the applicable warranties are invalid and unenforceable.  Navistar shall provide notice to all persons covered by those warranties of the removal of the time, mileage, and other limitations; and

85

    e.    Navistar shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims regarding EGR system-related failures.

404.    The declaratory relief requested does not fall within any of the exemptions set forth in the Declaratory Judgment Act.

405.    The requested declaratory relief will generate common answers that will resolve controversies that lie at the heart of this litigation and would make it significantly likely that Plaintiffs will obtain relief that directly redresses the injury suffered. There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

## SECOND CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
**Asserted on behalf of all Plaintiffs and the Nationwide Class**
**Or, in the alternative, on behalf of all Plaintiffs and all State Sub-Classes**

406.    Plaintiffs adopt and incorporate herein the allegations set forth above.

407.    The Navistar Defendants sold Trucks equipped with defective Engines to Plaintiffs and members of the Class.

408.    In consideration of and as part of each sale, Navistar warranted that the Trucks conformed to (1) the Navistar Standard Warranty (attached hereto as Exhibit A); (2) the Navistar Federal Emission System Warranty (*see, e.g.*, "Engine Operation and Maintenance Manual," pp. 7-9, attached hereto as Exhibit B); (3) the Navistar California Emission System Warranty (*see, e.g.*, "Engine Operation and Maintenance Manual," pp.10-12); and (4) descriptions and affirmations of fact that were contained in Navistar's "Maintenance Information Guide" (attached hereto as Exhibit C).

409. Such warranties formed the basis of the bargain when Plaintiffs purchased or leased the Navistar Trucks.

410. With respect to the emissions-related warranties, such warranties are mandated and regulated by federal and state law. They cannot be disclaimed.

411. Federal law sets forth the minimum requirements for an emissions-related warranty, but manufacturers can issue one that is more generous than what federal law requires.

412. Navistar's Emissions Warranties go beyond the federal standard by (1) issuing a federal emissions warranty that warrants against defects in design, in addition to warranting against defects in materials and workmanship; and (2) warranting nationwide, to all Plaintiffs and members of the Class, that the Trucks satisfy California's emissions-related warranty requirements, which are more rigorous than what is required under federal law.

413. In addition to the Standard Warranty, Federal Emission System Warranty, and California Emissions System Warranty, Navistar issued a "Maintenance Information Guide" that contained affirmations of fact and descriptions concerning MaxxForce Advanced EGR. Those affirmations of fact expressly warranted the following: (i) that the MaxxForce Advanced EGR had "lower operating costs" and "less hassle"; (ii) that the MaxxForce Advanced EGR resulted in "optimal performance and low cost of ownership"; (iii) that the design of MaxxForce Advanced EGR resulted in "better fuel efficiency," "more power to the wheels and less soot out the exhaust," and "improved combustion"; (iv) that the "Dual-path EGR cooling provides optimized cooled EGR … [that] allows long-term system performance"; (v) that the MaxxForce Engine had "Premium Reliability"; (vi) that the "MaxxForce Engine can be counted on to show up for work every day"; and (vii) that the MaxxForce Engine was "Always Performing."

414.   It was in this manner that Navistar expressly warranted its Engines—all the while knowing that those Engines were designed with a material Defect that was present at the time of sale and lease to Plaintiffs and Class members.

415.   When manufacturers and merchants such as Navistar sell goods with express warranties, they are obligated to provide goods that conform to those warranties.  As detailed in the foregoing allegations, Navistar's Trucks and Engines did not conform to its express warranties.

416.   Plaintiffs met all of their obligations under the express warranty.  Plaintiffs used the Engines in a manner consistent with their intended use.  When the Defect, which was not known to Plaintiffs, caused repeated failures in Plaintiffs' Trucks, Plaintiffs brought their Trucks to Navistar service centers for repeated repairs.  Plaintiffs have performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Navistar or by operation of law in light of Navistar's unconscionable conduct described throughout this Complaint.

417.   Pursuant to the express warranties, Navistar was obligated to pay for or reimburse Plaintiffs and the Class members for costs incurred in replacing the defective Engines.

418.   Pursuant to the express warranties, Navistar also was obligated to properly repair the Defect.

419.   Navistar breached (and continues to breach) the above-described express warranties by (i) failing and refusing to conform the Engines to the express warranties, (ii) failing and refusing to properly repair or replace the defective Engines in Plaintiffs' and Class members' Trucks when Plaintiffs and Class members presented the Trucks for repair, and/or (iii)

purportedly "repairing" the Engines that needed servicing by replacing them with Engines that contained the same Defect and were equipped with the same Advanced EGR system.

420.     Plaintiffs provided Navistar with actual notice of the breach of the express warranties.

421.     Navistar had actual knowledge of, and/or received timely notice regarding, the Defect at issue in this litigation and, notwithstanding such knowledge and notice, failed and refused to offer an effective remedy.

422.     Upon information and belief, Navistar has received thousands of complaints and other notices from customers advising them of the Defect at issue in this litigation.

423.     Any attempt by Navistar to limit its express warranties in a manner that would exclude or limit coverage for the Engines, with respect to claims based upon the Defect is unconscionable since (i) the Defect was present as of the time of sale or lease; (ii) Navistar knew about the Defect prior to offering the Engines for sale; and (iii) Navistar concealed and did not disclose the Defect, and did not remedy the Defect prior to sale or lease (or afterward).  Any attempt to limit these warranties to defects in "material and workmanship" in such a way as to exclude defective design is also unconscionable.  Any effort by Navistar to disclaim or otherwise limit liability for the Defect at issue is, therefore, null and void.

424.     Accordingly, Plaintiffs and Class members suffered damages caused by Navistar's breach of the express warranties and are entitled to recover damages as set forth herein.  Those damages include, but are not limited to, general damages (*i.e.*, the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted); incidental damages; and consequential damages.

B.    **Claims Brought on Behalf of State Sub-Classes**

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**Asserted on behalf of all Plaintiffs and all State Sub-Classes**

425.    Plaintiffs adopt and incorporate herein the allegations set forth above.

426.    Navistar is and was at all relevant times a merchant with respect to the Engines.

427.    Navistar was and is in actual or constructive privity with all Plaintiffs and all
Class members.

> a.    Plaintiffs had and continue to have sufficient direct dealings with Navistar
> and/or its authorized dealers, franchisees, representatives, and agents to
> establish any required privity of contract.  Navistar's authorized dealers,
> franchisees, representatives, and agents were not intended to be the
> ultimate consumers of the Engines and have no rights under the warranty
> agreements provided with the Engines.  The warranty agreements were
> designed for and intended to benefit only the ultimate Truck purchasers
> and lessees, *i.e.*, Plaintiffs and Class members.

> b.    Privity is not required to assert this claim because Plaintiffs and the Class
> members are intended third-party beneficiaries of contracts between
> Navistar and its dealers, franchisees, representatives, and agents.

> c.    By extending express written warranties to end-user purchasers and
> lessees, Navistar brought itself into privity with all Plaintiffs and Class
> members.

428.    At all times relevant hereto, applicable law imposed upon Navistar a duty that the
Engines be fit for the ordinary purposes for which Engines are used and that they pass without
objection in the trade under the contract description.

90

429.     Navistar has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

430.     The Engines were defective at the time they left the possession of Navistar, as set forth above.  Navistar knew of this Defect at the time the purchase and lease transactions occurred.  Thus, the Engines, when sold and at all times thereafter, were not in merchantable condition or quality because they are not fit for their ordinary intended purpose and they do not pass without objection in the trade under the contract description.

431.     Plaintiffs and Class members used the Engines in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Navistar or by operation of law in light of Navistar's unconscionable conduct.

432.     Navistar had actual knowledge of, and received timely notice regarding, the Defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

433.     In addition, Navistar received, on information and belief, thousands of complaints and other notices from customers advising of the Defect associated with the Engines.

434.     By virtue of the conduct described herein and throughout this Complaint, Navistar breached the implied warranty of merchantability.

435.     As a direct and proximate result of Navistar's breach of warranties, Plaintiffs and Class members suffered economic damage, including loss attributable to the diminished value of their Engines, loss of use of the Trucks and other tangible property, as well as the monies spent and to be spent to repair and/or replace their Engines.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### Asserted on behalf of all Plaintiffs and all State Sub-Classes

436.     Plaintiffs adopt and incorporate herein the allegations set forth above.

437.     Plaintiffs and Class members entered into agreements to purchase or lease Engines with Navistar or otherwise were in contractual privity with Navistar as a result of the express warranties described herein.

438.     The contracts and warranties were subject to the implied covenant that Navistar would conduct business with Plaintiffs and Class members in good faith and would deal fairly with them.

439.     Navistar breached those implied covenants by failing to disclose that any repair or replacement of defective parts in Plaintiffs' and Class members' Engines, would not cure the defect.

440.     As a direct and proximate result of Navistar's breach of its implied covenants, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### Asserted on behalf of all Plaintiffs and all State Sub-Classes

441.     Plaintiffs adopt and incorporate herein the allegations set forth above.

442.     Navistar manufactured, distributed, and sold to Class members the Engines that they knew contained an inherently dangerous or defective condition.

443.     Navistar continued to manufacture, distribute, and sell to Class members the Engines after receiving substantial complaints of systematic product failure due to the dangerous or defective condition.

92

444. Navistar did not disclose this dangerous or defective condition to potential and actual purchasers and lessees, and the condition was not easily discoverable by them.

445. Navistar omitted this information to induce Plaintiffs and Class members to purchase or lease its Trucks, which were equipped with the defective Engines.

446. Navistar made affirmative representations, as detailed in the foregoing allegations, regarding the Engines' reliability, performance, and operating costs, with the intent to induce Plaintiffs and the Class to purchase or lease its Trucks, which were equipped with the defective Engines.

447. Plaintiffs and the Class justifiably relied on Navistar's omissions and misrepresentations in that Plaintiffs and the Class paid more for the Engines than they would have had Navistar, Inc. disclosed the defective condition and its effect on reliability, performance, and operating costs, or Plaintiffs and the Class would have purchased or leased different vehicles altogether.

448. Plaintiffs and Class members were harmed by Navistar's misrepresentations regarding the dangerous and defective condition of the Engines and are entitled to damages as a result in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**
**Asserted on behalf of all Plaintiffs and all State Sub-Classes**

449. Plaintiffs adopt and incorporate herein the allegations set forth above.

450. Navistar omitted an existing fact about the Engines when it failed to disclose information regarding the Engines' dangerous and defective condition.

451. The omission is material because the defective condition poses a serious safety issue to Engines' owners and to the public.

452.     The omission rendered Navistar's representations regarding the Engines false because the Engines were in fact defective.

453.     Navistar manufactured, distributed, and sold the Engines despite having knowledge of their defective and dangerous condition.

454.     Navistar intended that purchasers and lessees would rely on Navistar's omissions regarding safety, reliability, and resale value of the Engines to bolster sales.

455.     Plaintiffs and Class members were not aware of the defective condition and could not reasonably have discovered the defective condition.

456.     Plaintiffs relied on Navistar's omission in that they paid more for the Engines than the Engines would have been worth had Navistar disclosed the defective condition, or they would have purchased or leased different vehicles altogether.

457.     Plaintiffs had the right to rely on Navistar's omissions that created the false impression that the Engines were safe and reliable based on reasonable purchaser and lessee expectations that the Engines would not be designed such that they fail under normal conditions of use or would be substantially certain to fail before the end of their useful life.

458.     Navistar had an affirmative duty to disclose the defective condition of the Engines to potential and actual purchasers and lessees because it was in a superior position to know the true state of the defective Engines.  Navistar knew of the defective and dangerous condition and the condition was not easily discoverable by potential or actual purchasers and lessees.  Navistar breached its duty by failing to disclose the condition.

459.     Navistar fraudulently concealed the defective condition of the Engines, causing damages to Plaintiff in the form of repairs, replacement, and other costs, as well as lost income from idled trucks and trailers.

## SEVENTH CAUSE OF ACTION
## FRAUD IN THE INDUCEMENT
### Asserted on behalf of all Plaintiffs and all State Sub-Classes

460.     Plaintiffs adopt and incorporate herein the allegations set forth above.

461.     As detailed in the foregoing allegations, Navistar made false and material misrepresentations regarding the Engines' quality, reliability, performance, and operating costs.

462.     Navistar knew or should have known that these misrepresentations were false when it made them.

463.     Navistar intended that purchasers and lessees, including Plaintiffs and Class members, would rely on Navistar's misrepresentations regarding quality, reliability, performance, and operating costs when determining whether to enter into contracts to purchase or lease the Trucks.

464.     Plaintiffs and Class members did not know that the misrepresentations were false and justifiably and reasonably relied on Navistar's misrepresentations when determining whether to enter into contracts to purchase or lease the Trucks.

465.     Plaintiffs and Class members relied on Navistar's misrepresentations by entering into contracts to purchase or lease, and actually purchasing or leasing, the trucks equipped with the defective Engines.

466.     Plaintiffs and Class members would not have entered into contracts to purchase or lease the defective Engines, or would have paid less to purchase or lease the trucks, but for the fraudulent misrepresentations made by Navistar.

467.     Navistar's false representations, which fraudulently induced Plaintiffs and Class members into entering into contracts to purchase or lease the Engines, caused harm to Plaintiffs.

Plaintiffs seek affirmance of the contract with damages, or in the alternative, rescission with return of the Trucks in exchange for the full purchase or lease price.

### EIGHTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### Asserted on behalf of all Plaintiffs and all State Sub-Classes

468.    Plaintiffs adopt and incorporate herein the allegations set forth above.

469.    Navistar has been unjustly enriched by the sale of vehicles containing the defective MaxxForce Engines to Plaintiffs and the Class members.

470.    Plaintiffs and the Class members conferred a benefit on Navistar, but Navistar failed to disclose its knowledge that Plaintiffs did not receive what they paid for and misled Plaintiffs and Class members regarding the qualities of the MaxxForce Engines, and the vehicles containing these Engines, while profiting from this deception.

471.    Navistar also continues to be unjustly enriched by benefitting from, *inter alia*, (i) the saved cost of manufacturing a properly performing and safe EGR System in the Engines, (ii) the shifted risk and expense of the defective and dangerous EGR System in the Engines to Plaintiffs and Class members, and (iii) the return on investment on all above-described amounts.

472.    It would be inequitable, unconscionable, and unjust to permit Navistar to retain the benefit of these profits that it unfairly obtained from Plaintiffs and the Class members.

473.    Plaintiffs and the Class members, having been injured by Navistar's conduct, are entitled to restitution or disgorgement of profits as a result of the unjust enrichment of Navistar to the detriment of Plaintiffs and Class members.

### NINTH CAUSE OF ACTION
### NEGLIGENCE
### Asserted on behalf of all Plaintiffs and all State Sub-Classes

474.    Plaintiffs adopt and incorporate herein the allegations set forth above.

475. Navistar owed Plaintiffs and the other Class members the duty to design and manufacture the Engines in such a way as to ensure that the emissions system would not fail and the Defect would not occur.

476. Navistar breached this duty by negligently designing and/or manufacturing the Engines, including, but not limited to, the negligent design and/or manufacture of the Engines' EGR system as more fully described in this Complaint.

477. As a direct and proximate result of Navistar's negligence, Plaintiffs and the other Class members have sustained damages, including lost income from idle trucks and trailers.

**C.    Claims Brought on Behalf of the California Sub-Class**

**TENTH CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW**
**BUS. & PROF. CODE §§ 17200, *ET SEQ.***
**Asserted on behalf of Antioch, Sloan, Denis Gray Trucking**
**and the California Sub-Class**

478. Plaintiffs adopt and incorporate herein the allegations set forth above.

479. Plaintiffs Antioch, Sloan, and Denis Gray Trucking (the "California Plaintiffs") bring this claim on behalf of themselves and members of the California Sub-Class.

480. The California Plaintiffs and Sub-Class members are natural persons and legal entities and, as such, constitute "persons" as defined by Bus. & Prof. Code § 17201.

481. By its plain terms, Bus. & Prof. Code § 17200 provides a private right of action for any person who is injured in his or her business or property by an unfair and/or deceptive act or practice.

482. By the conduct described in detail above and incorporated herein, Navistar engaged in unfair, unlawful, and fraudulent business practices in violation of Bus. & Prof. Code § 17200 *et seq.*

97

483.     Navistar intentionally concealed or failed to disclose that the Engines were defectively designed and/or manufactured, posed a significant and dangerous risk to the general public, would suddenly and dangerously fail before the end of their useful life, and were not suitable for their intended use.  These omissions were contrary to Navistar's representations regarding the Engines' reliability, performance, and operating costs.

484.     The facts regarding the Defect, which were intentionally concealed or not disclosed by Navistar to the California Plaintiffs and Sub-Class members, are material facts that a reasonable person would have considered in deciding whether or not to purchase or lease (or to pay the same price for) the Engines.  Because such facts were in the exclusive possession of Navistar, Navistar owed a duty to the California Plaintiffs and Sub-Class members to disclose those facts.

485.     Navistar intended that the California Plaintiffs and Sub-Class members rely on their misrepresentations and omissions concerning the defective Engines, so that the California Plaintiffs and Sub-Class members would lease or purchase vehicles containing the Engines.

486.     The California Plaintiffs and Sub-Class members viewed Navistar's material misrepresentations prior to the purchase or lease of their Trucks, and the California Plaintiffs and Sub-Class members justifiably acted or relied to their detriment upon those misrepresentations (and related omissions of fact concerning the Defect), as evidenced by the California Plaintiffs and Sub-Class members' purchase or lease of the defective Engines.

487.     Had Navistar disclosed all material information regarding the defective Engines to the California Plaintiffs and Sub-Class members, they would not have purchased or leased vehicles containing the Engines or they would have paid less for them.

98

488.     Navistar's unfair, unlawful, and fraudulent business practices have deceived the California Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the members of the California Sub-Class.

489.     By engaging in the above-described acts and practices, Navistar has committed one or more acts of unfair competition within the meaning of Business and Professions Code § 17200, *et seq.*

490.     Navistar knowingly sold the California Plaintiffs and Sub-Class members with defects that have rendered the Engines essentially unusable for the purposes for which they were sold.

491.     The injuries to the California Plaintiffs and Sub-Class members greatly outweigh any alleged countervailing benefit to Plaintiffs and the Sub-Class or to competition under all of the circumstances.  Moreover, in light of Navistar's exclusive knowledge of the defects, the injury is not one the California Plaintiffs and Sub-class members could have reasonably avoided.

492.     Navistar's acts and practices are unlawful because they violate Cal. Code §§ 1668, 1709, 1710, and Cal. Commercial Code § 2313.

493.     As a direct and proximate cause of Navistar's unfair or deceptive acts or practices, the California Plaintiffs and Sub-Class members have suffered actual damages and are entitled to recover such damages together with all other relief allowed under Section 17200, *et seq.*, plus interest, attorneys' fees and costs of suit.

**D.     Claims Brought on Behalf of the Idaho Sub-Class**

**ELEVENTH CAUSE OF ACTION**
**VIOLATIONS OF IDAHO CONSUMER PROTECTION ACT,**
**IDAHO CODE §§ 48-601 *ET SEQ.***
**Asserted on behalf of Lord AG and the Idaho Sub-Class**

494.     Plaintiffs adopt and incorporate herein the allegations set forth above.

99

495.    Plaintiff Lord AG ("the Idaho Plaintiff") brings this claim on behalf of itself and members of the Idaho Sub-Class.

496.    The Idaho Plaintiff and Sub-Class members are natural persons and legal entities and, as such, constitute "persons" as defined by Idaho Code § 48-602(1).

497.    By its plain terms, Idaho Code § 48-603(17) declares that it is unlawful to engage "in any act or practice which is otherwise misleading, false, or deceptive to the consumer."

498.    Idaho Code § 48-608(1) provides a private cause of action to "any person who purchases or leases goods or services and thereby suffers ascertainable loss of money or property as a result of a method, act or practice declared unlawful."

499.    By the conduct described in detail above and incorporated herein, Navistar engaged in unlawful practices in violation of Idaho Code §§ 48-601 *et seq.*

500.    Navistar intentionally concealed or failed to disclose that the Engines were defectively designed and/or manufactured, posed a significant and dangerous risk to the general public, would suddenly and dangerously fail before the end of their useful life, and were not suitable for their intended use.  These omissions were contrary to Navistar's representations regarding the Engines' reliability, performance, and operating costs.

501.    The facts regarding the Defect, which were intentionally concealed or not disclosed by Navistar to the Idaho Plaintiff and Sub-Class members, are material facts that a reasonable person would have considered in deciding whether or not to purchase or lease (or to pay the same price for) the Engines.  Because such facts were in the exclusive possession of Navistar, Navistar owed a duty to the Idaho Plaintiff and Sub-Class members to disclose those facts.

502.     Navistar intended that the Idaho Plaintiff and Sub-Class members rely on their misrepresentations and omissions concerning the defective Engines, so that the Idaho Plaintiff and Sub-Class members would lease or purchase vehicles containing the Engines.

503.     The Idaho Plaintiff and Sub-Class members viewed Navistar's material misrepresentations prior to the purchase or lease of their Trucks, and the Idaho Plaintiff and Sub-Class members justifiably acted or relied to their detriment upon those misrepresentations (and related omissions of fact concerning the Defect), as evidenced by the Idaho Plaintiff and Sub-Class members' purchase or lease of the defective Engines.

504.     Had Navistar disclosed all material information regarding the defective Engines to the Idaho Plaintiff and Sub-Class members, they would not have purchased or leased vehicles containing the Engines or they would have paid less for them.

505.     Navistar's unlawful practices have deceived the Idaho Plaintiff, and those same practices have deceived or are likely to deceive members of the consuming public and the members of the Idaho Sub-Class.

506.     By engaging in the above-described acts and practices, Navistar has committed one or more acts of unfair competition within the meaning of Idaho Code §§ 48-601 et seq.

507.     Navistar knowingly sold the Idaho Plaintiff and Sub-Class members with defects that have rendered the Engines essentially unusable for the purposes for which they were sold.

508.     The injuries to the Idaho Plaintiff and Sub-Class members greatly outweigh any alleged countervailing benefit to Idaho Plaintiff and the Sub-Class or to competition under all of the circumstances.  Moreover, in light of Navistar's exclusive knowledge of the defects, the injury is not one the Idaho Plaintiff and Sub-class members could have reasonably avoided.

509.     As a direct and proximate cause of Navistar's unlawful practices, the Idaho

Plaintiff and Sub-Class members have suffered economic damages as well as actual damages and

are entitled to recover all relief allowed under Idaho Code § 48-608 plus interest, attorneys' fees

and costs of suit.

**E.     Claims Brought on Behalf of the Illinois Sub-Class**

**TWELFTH CAUSE OF ACTION**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE**
**PRACTICES ACT, 815 ILCS 505/1, *ET SEQ*.**
**Asserted on behalf of Carmichael and the Illinois Sub-Class**

510.     Plaintiffs adopt and incorporate herein the allegations set forth above.

511.     The Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA")

prohibits "unfair and deceptive practices."

512.     Plaintiff Carmichael (the "Illinois Plaintiff") brings this claim on behalf of itself

and members of the Illinois Sub-Class.

513.     The Illinois Plaintiff and Sub-Class members are consumers as defined in 815

ILCS 505/1(c) & (e).

514.     Navistar had knowledge of the defective Engines at all relevant times herein.

515.     Despite this knowledge, Navistar has failed to disclose the existence of this

material information to the Illinois Plaintiff and Sub-Class members at the time each of them

purchased or leased the vehicles containing the defective Engines, and/or at the time they made

warranty claims related to the defective Engines.  To the contrary, Navistar made affirmative

representations regarding the reliability, performance, and operating costs of the Engines.

516.     The Illinois Plaintiff and Sub-Class members reasonably expected that their

Trucks would not have defective Engines that caused their Trucks to repeatedly and inevitably

fail, leading to, among other things, their inability to use the Trucks for their intended purpose,

102

lost revenue, deflated resale value, repair costs, and towing costs to the Illinois Plaintiff and Sub-Class members.

517.    Navistar intended, and continues to intend, that the Illinois Plaintiff and Sub-Class members rely on Navistar's material misrepresentations and omissions of material facts.

518.    Navistar's misconduct, including the misrepresentations and the omissions of material facts, took place in the course of trade or commerce in Illinois, and arose out of transactions that occurred in Illinois.

519.    In so doing the above, Navistar has engaged in an unfair or deceptive act prohibited by the ICFA.

520.    If not for Navistar's deceptive and unfair acts of concealing from the Illinois Plaintiff and Sub-Class members the material facts as alleged herein, they would not have purchased or leased the Trucks, or would have paid significantly less for them.

521.    Navistar, at all relevant times, knew or should have known that the Illinois Plaintiff and Sub-Class members did not know and could not have reasonably discovered the defective Engines prior to their purchases or leases.

522.    As a direct and proximate result of Navistar's violations of the ICFA, the Illinois Plaintiff and Sub-Class members suffered damages in the form of, among other things, lost revenue, loss of use of the Trucks and other tangible property, deflated resale value, repair costs, towing costs, and other expenses.

523.    Navistar's violation of the ICFA entitles the Illinois Plaintiff and the Sub-Class members to statutory and actual damages, punitive damages, injunctive relief, attorney's fees and costs, and all other relief allowed under the ICFA.

103

F.      **Claims Brought on Behalf of the North Carolina Sub-Class**

### THIRTEENTH CAUSE OF ACTION
### VIOLATIONS OF THE NORTH CAROLINA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, N.C. GEN. STAT. § 75-1, *ET SEQ.*
### Asserted on behalf of Fike Logistics, Phifer Trucking, and the North Carolina Sub-Class

524.    Plaintiffs adopt and incorporate herein the allegations set forth above.

525.    Plaintiffs Fike Logistics and Phifer Trucking (the "North Carolina Plaintiffs") bring this claim on behalf of themselves and the North Carolina Sub-Class.

526.    The North Carolina Deceptive and Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1, makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

527.    Navistar engaged in unlawful, deceptive acts in violation of N.C. Gen. Stat. § 75-1.1 in selling and warranting the MaxxForce Engines.  Navistar misrepresented the characteristics of the Engines and Trucks and failed to give the North Carolina Plaintiffs and the North Carolina Sub-Class members sufficient notice or warning regarding the defects in the Engine, even though Navistar knew or reasonably should have known about the Defect.  Navistar intended that the North Carolina Plaintiffs and the Class rely upon the Navistar's omissions and misrepresentations when purchasing vehicles containing the Engines.  the North Carolina Plaintiffs and the North Carolina Sub-Class members were deceived by Navistar's concealment of the Defect.

528.    Navistar also engaged in unlawful and deceptive practices in violation of N.C. Gen. Stat. § 75-1, *et seq.*, when it failed to provide the full cost to repair or replace the MaxxForce Engines after being notified of defects and problems by the North Carolina Plaintiffs and North Carolina Sub-Class members.

529.    Navistar's conduct was in commerce and affected commerce.

104

530.    As a direct and proximate result of these unfair, willful, unconscionable, and deceptive commercial practices, the North Carolina Plaintiffs and the North Carolina Sub-Class have been damaged and are entitled to recover actual and treble damages as well as attorneys' fees and costs and all other relief allowed under N.C. Gen. Stat. §§ 75-16 and 75-16.1.

**G.    Claims Brought on Behalf of the Ohio Sub-Class**

**FOURTEENTH CAUSE OF ACTION**
**VIOLATIONS OF OHIO DECEPTIVE TRADE PRACTICES ACT**
**OHIO REV. CODE ANN. § 4165.01, *ET SEQ.***
**Asserted on behalf of Binder Trucking, B&T Express, A.T.T. Trucking, ALJEN, H.J.**
**O'Malley Trucking, OMCO, Traficanti and the Ohio Sub-Class**

531.    Plaintiffs adopt and incorporate herein the allegations set forth above.

532.    Plaintiffs Binder Trucking, B&T Express, A.T.T. Trucking, ALJEN, H.J. O'Malley Trucking, OMCO, and Traficanti (the "Ohio Plaintiffs") bring this claim on behalf of themselves and members of the Ohio Sub-Class.

533.    The Ohio Deceptive Trade Practices Act ("DTPA") is codified at Ohio Rev. Code Ann. § 4165.01, *et seq.*  The statute permits a "person" who is injured or who is likely to be injured as a result of a deceptive practice to bring an action under the DTPA.  Ohio Rev. Code Ann. § 4165.03(A)(1)-(2).

534.    The DTPA defines a "person" broadly to include, *inter alia*, a corporation, business trust, partnership, unincorporated association, and limited liability company.  Ohio Rev. Code Ann. § 4165.01(D).  As such, the Ohio Plaintiffs and Sub-Class members are "persons" within the meaning of the DTPA.

535.    Navistar violated the DTPA by doing the following in the course of their business:

a.    Causing a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods;

b.      Causing a likelihood of confusion or misunderstanding as to affiliation,

connection, or association with, or certification by, another;

c.      Representing that goods or services have sponsorship, approval,

characteristics, ingredients, uses, benefits, or quantities that they do not

have or that a person has a sponsorship, approval, status, affiliation, or

connection that the person does not have; and

d.      Representing that goods or services are of a particular standard, quality, or

grade, or that goods are of a particular style or model, if they are of

another.

536.    As a direct and proximate result of Navistar's violations of the DTPA, the Ohio

Plaintiffs and Sub-Class members have been injured and suffered actual damages and are entitled

to recover such damages together with all other relief allowed under the DTPA.

**FIFTEENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY IN TORT (BASED ON OHIO LAW)**
**Asserted on behalf of Binder Trucking, B&T Express, A.T.T. Trucking, ALJEN, H.J.**
**O'Malley Trucking, OMCO, Traficanti and the Ohio Sub-Class**

537.    Plaintiffs adopt and incorporate herein the allegations set forth above.

538.    The Ohio Plaintiffs bring this claim on behalf of themselves and members of the

Ohio Sub-Class.

539.    The Engines contained a dangerous design defect as detailed above that caused

the vehicles to lose power.

540.    The design, manufacturing, and/or assembly defect existed at the time these

Engines left the hands of Navistar.

541.    Based upon the dangerous Defect and its certainty to occur, Navistar failed to

meet the expectations of a reasonable consumer.  The Engines failed their ordinary, intended use.

The EGR system Defect presents a serious danger to Plaintiffs and the other Class members that cannot be eliminated without significant and expensive repairs.

542.     The design defect in the Engines was the direct and proximate cause of economic damages to the Ohio Plaintiffs, as well as damages incurred or to be incurred by each of the other Ohio Sub-Class members.  The Ohio Plaintiffs and members of the Ohio Sub-Class are entitled to recover such damages along with all other relief allowed under applicable Ohio common law.

**H.     Claims Brought on Behalf of the Oklahoma Sub-Class**

**SIXTEENTH CAUSE OF ACTION**
**VIOLATIONS OF THE OKLAHOMA CONSUMER PROTECTION ACT, OKLA.**
**STAT. ANN. TIT. 15, § 751 ET SEQ.**
**Asserted on behalf of So. Cal. Moving and the Oklahoma Sub-Class**

543.     Plaintiffs adopt and incorporate herein the allegations set forth above.

544.     Plaintiff So.  Cal. Moving ("Oklahoma Plaintiff") brings this claim on behalf of itself and members of the Oklahoma Sub-Class.

545.     The Oklahoma Consumer Protection Act ("OCPA") is codified at Okla. Stat. Ann. tit. 15, § 751 et seq.

546.     By its plain terms, the OCPA provides a private right of action for "an aggrieved consumer" where "[t]he commission of any act or practice declared to be a violation of the Consumer Protection Act [] render[s] the violator liable to the aggrieved consumer."  A "person", which includes, inter alia, a corporation, trust, partnership, incorporated or unincorporated association, or any other legal entity, violates the OCPA when it engages in deceptive and unfair trade practices in consumer transactions.   Okla. Stat. Ann. tit. 15, § 752.

547.     The OCPA applies to the claims of Plaintiff and all Oklahoma Sub-Class members because the conduct which constitutes violations of the OCPA by Navistar occurred within the State of Oklahoma.

548.     Navistar had knowledge or reason to know of the defective Engines at all relevant times herein.

549.     Despite this knowledge, Navistar violated the OCPA, by doing the following, among other things, in the course of their business:

a.     Making false or misleading representations as to the source, sponsorship, approval or certification of goods;

b.     Making false or misleading representations as to the affiliation, connection, association with, or certification by another of goods;

c.     Making a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of the subject of a consumer transaction or making a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith; and

d.     Representing that the goods are of a particular standard, style or model, if they are of another.

550.     As a direct and proximate result of Navistar's violations of the OCPA, the Oklahoma Plaintiff and Sub-Class members suffered damages in the form of, among other things, lost revenue, deflated resale value, repair costs, towing costs, and other expenses.

551.     Navistar's violation of the OCPA entitles the Oklahoma Plaintiff and Sub-Class members to damages and costs of litigation including attorneys' fees and such other relief allowed under the OCPA.

I.     **Claims Brought on Behalf of the Texas Sub-Class**

**SEVENTEENTH CAUSE OF ACTION**
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER**
**PROTECTION ACT, TEXAS BUS. & COM. CODE § 17.00, *ET SEQ.***
**Asserted on behalf of Fike Logistics and the Texas Sub-Class**

552.     Plaintiffs adopt and incorporate herein the allegations set forth above.

553.     Plaintiff Fike Logistics brings this claim on behalf of itself and members of the Texas Sub-Class.

554.     Fike Logistics and the Texas Sub-Class Members are "consumers" protected under the Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") since they are individuals, partnerships, corporations, that have assets less than $25 million and since they are not owned or controlled by a corporation or entity with assets of $25 million or more.  Tex. Bus. & Com. Code § 17.45(4).  The Navistar Defendants are both "persons" governed by the Texas DTPA.  Tex. Bus. & Com. Code § 17.45(3).

555.     As detailed in the foregoing allegations, Navistar knowingly and intentionally made representations regarding the reliability, performance, and operating costs of the Engines, despite knowing that such representations were false, given the nature of the Defect.  Navistar knowingly and intentionally omitted material information concerning the Engines by failing to inform Fike Logistics and the Texas Sub-Class of the Defect.  Navistar then sold and/or leased Trucks with the defective Engines.

556.     Navistar's sale and/or lease of Trucks containing the Defect to those who had no knowledge of the Defect constitutes an unconscionable action in violation of the Texas DTPA. Tex. Bus & C. Code §17.50(a)(3).  Navistar's actions took advantage of the lack of knowledge possessed by Fike Logistics and the Texas Sub-Class and the resulting unfairness is glaringly noticeable, flagrant, complete and unmitigated.

557.    Navistar's above-described knowing and intentional unconscionable actions and/or unconscionable course of action, inaction and/or omissions directly and/or proximately caused them to suffer economic damages and other actual injury and harm, and collectively constitute violations of the Texas DTPA.  Tex. Bus. & C. Code § 17.50(a)(3).  Had Navistar not engaged in such knowing and intentional unconscionable actions and/or unconscionable course of action, inaction and/or omissions, Fike Logistics and the Texas Sub-Class members would not have overpaid to purchase and/or lease Trucks with the defective EGR System in the Engines, or would not have purchased or leased the Trucks.

558.    Plaintiffs and Class Members, therefore, are entitled to recover their economic damages and other actual injury and harm, under Section 17.50 of the Texas Business and Commerce Code.

559.    The Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.00, *et seq.*, makes unlawful "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

560.    Navistar engaged in unlawful, deceptive acts in violation of V.T.C.A., Bus. & C. § 17.00, *et seq.*, in selling and warranting the MaxxForce Engines.  Navistar failed to give Fike Logistics and Texas Sub-Class members any kind of sufficient notice or warning regarding the Defect in the MaxxForce Engine, of which Navistar knew or reasonably should have known, intending that Fike Logistics and the Texas Sub-Class members rely upon the Navistar's omission when purchasing vehicles containing the MaxxForce Engines.  Fike Logistics and the Texas Sub-Class members were deceived by Navistar's concealment that its MaxxForce Engines contained the Defect.

561.     As a direct and proximate result of these unfair, unconscionable, and deceptive commercial practices, Fike Logistics and the Texas Sub-Class members have been damaged and are entitled, pursuant to the Texas DTPA, to recover damages as well as attorneys' fees and costs and all other relief allowed under the Texas DTPA.

**J.     Claims Brought on Behalf of the Washington Sub-Class**

**EIGHTEENTH CAUSE OF ACTION**
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**RCW 19.86.020, *ET SEQ.***
**Asserted on behalf of Par 4 and the Washington Sub-Class**

562.     Plaintiffs adopt and incorporate herein the allegations set forth above.

563.     Plaintiff Par 4 (the "Washington Plaintiff") brings this claim on behalf of itself and members of the Washington Sub-Class.

564.     The Washington Plaintiffs and Sub-Class members are natural persons and legal entities and, as such, constitute "persons" as defined by the Washington Consumer Protection Act (the "Washington CPA") and fall within the meaning of the term "any person" as contained in the Washington CPA.  RCW 19.86.010; 19.86.090.

565.     By its plain terms, the Washington CPA provides a private right of action for any person who is injured in his or her business or property by an unfair and/or deceptive act or practice.

566.     By the conduct described in detail above and incorporated herein, Navistar engaged in unfair and deceptive acts and practices in violation of F.S.A. § 501.204.

567.     Navistar's unfair and deceptive acts and practices occurred in the conduct of "trade" or "commerce" as those terms are defined in the Washington CPA.

568.    Navistar's unfair and deceptive acts and practices have an impact on the public interest since they involve the sale of goods that were defective, posed safety hazards, and were sold to members of the public who had no knowledge of the Defect.

569.    Navistar's omissions regarding the Defect, and the related representations regarding the Engines' reliability, performance and operating costs, are material facts that a reasonable person would have considered in deciding whether or not to purchase or lease (or to pay the same price for) the Engines.

570.    The Washington Plaintiff and Sub-Class members justifiably acted or relied to their detriment upon Navistar's misrepresentations (and related omissions of fact concerning the Defect), as evidenced by the Washington Plaintiff and Sub-Class members' purchase or lease of the defective Engines.

571.    Had Navistar disclosed all material information regarding the defective Engines to the Washington Plaintiff and Sub-Class members, and had they refrained from making material misrepresentations regarding the reliability, performance and operating costs of the Engines, the Washington Plaintiff and Sub-Class members would not have purchased or leased vehicles containing the Engines or would have paid less.

572.    Navistar's representations and omissions have deceived the Washington Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the members of the Washington Sub-Class.

573.    In addition to being deceptive, the business practices of Navistar were unfair since Navistar knowingly sold the Washington Plaintiff and Sub-Class members with defects that have rendered the Engines essentially unusable for the purposes for which they were sold.  The injuries to the Washington Plaintiff and Sub-Class members are substantial and greatly outweigh

any alleged countervailing benefit to the Washington Plaintiff and the Sub-Class or to competition under all of the circumstances. Moreover, in light of Navistar's exclusive knowledge of the defects, the injury is not one the Washington Plaintiff and Sub-class members could have reasonably avoided.

574.    As a direct and proximate result of these unfair and deceptive commercial practices, the Washington Plaintiff and Sub-Class members have been damaged and are entitled to recover actual damages, as well as attorneys' fees and costs, and all other relief available under the Washington CPA.

**K.    Claims Brought on Behalf of the Wisconsin Sub-Class**

**NINETEENTH CAUSE OF ACTION**
**VIOLATIONS OF WISCONSIN DECEPTIVE TRADE PRACTICES ACT**
**WIS. STAT. § 100.18, *ET SEQ.***
**Asserted on behalf of G&G, Emerald Trucking, and the Wisconsin Sub-Class**

575.    Plaintiffs adopt and incorporate herein the allegations set forth above.

576.    The Wisconsin Deceptive Trade Practices Act ("DTPA") prohibits making untrue, deceptive, or misleading representations to the public with intent to sell, distribute, and increase the consumption of products.

577.    G&G and Emerald Trucking (the "Wisconsin Plaintiffs") and the Wisconsin Sub-Class members are members of the public within the meaning of Wisconsin DTPA.

578.    The Wisconsin Plaintiffs and Sub-Class members reasonably expected that their Navistar vehicles would not have defective Engines that caused their vehicles to repeatedly and inevitably fail, leading to, among other things, their inability to use the vehicles for their intended purpose, lost revenue, deflated resale value, repair costs, and towing costs to the Wisconsin Plaintiffs and Sub-Class members.

579.    Navistar's misconduct, including the omissions of material facts, took place in the course of trade or commerce in Wisconsin, and arose out of transactions that occurred in Wisconsin.

580.    Navistar had knowledge of the defective Engines at all relevant times herein.

581.    Despite this knowledge, Navistar made affirmative representations, as detailed in the foregoing allegations, regarding the Engines' reliability, performance, and operating costs, with the intent to induce the Wisconsin Plaintiffs' and Sub-Class members' purchase or lease.

582.    In so doing the above, Navistar has made untrue, deceptive, and misleading representations to the public prohibited by the DTPA.

583.    If not for Navistar's untrue, deceptive, and misleading representations of the material facts as alleged herein, they would not have purchased or leased the Navistar vehicles, or would have paid significantly less for them.

584.    Navistar, at all relevant times, knew or should have known that the Wisconsin Plaintiffs and Sub-Class members did not know and could not have reasonably discovered the defective Engines prior to their purchases or leases.

585.    As a direct and proximate result of Navistar's violations of the DTPA, the Wisconsin Plaintiffs and Sub-Class members suffered damages in the form of, among other things, lost revenue, deflated resale value, repair costs, towing costs, and other expenses.

586.    Navistar's violation of the DTPA entitles the Wisconsin Plaintiffs and Sub-Class members to statutory and actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, on behalf of themselves and all others similarly situated, Plaintiffs demand judgment against Navistar on each Count of the Complaint and pray for the following relief:

1.     Issue an Order certifying the Classes and/or any Subclasses the Court deems appropriate, appointing Plaintiffs and their counsel to represent the Classes, and directing that reasonable notice of this action be given by Navistar to all Class members;

2.     Grant any reasonable request to amend this Class Action Complaint to conform to the discovery and evidence obtained in this Class Action;

3.     Empanel a jury to try this matter;

4.     Grant Plaintiffs and members of the Declaratory Relief Class the declaratory judgment and/or injunctive relief requested herein;

5.     Award to Plaintiffs and the Class members all compensatory damages provided for and consistent with their claims for relief;

6.     Award to Plaintiffs and the Class members all appropriate damages and equitable relief that the Court deems appropriate;

7.     Award to Plaintiffs and the Class members all exemplary and/or punitive damages allowed by law that the Court deems appropriate;

8.     Grant Plaintiffs and Class members their reasonable attorneys' fees and costs incurred in this litigation as allowed by law;

9.     Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

10.     Award pre-and post-judgment interest as allowed by law; and

11.     Grant Plaintiffs and Class members such further relief as the Court may deem just and proper.


Dated: May 11, 2015

By: /s Adam J. Levitt

        Adam J. Levitt

Adam J. Levitt
    alevitt@gelaw.com
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 2350
Chicago, Illinois  60602
Telephone:  (312) 214-0000
Facsimile:  (312) 214-0001

*Interim Co-Lead Counsel*


By: /s William M. Audet

        William M. Audet

William M. Audet
    waudet@audetlaw.com
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco California  94105
Telephone:  (415) 568-2555
Facsimile:  (415) 568-2556

*Interim Co-Lead Counsel*

Roberta D. Liebenberg
    rliebenberg@finekaplan.com
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, Pennsylvania  19107
Telephone:  (215) 567-6565
Facsimile:  (215) 568-5872

*Chair of the Master Complaint Committee*

By: /s Jonathan D. Selbin

        Jonathan D. Selbin

Jonathan D. Selbin
    jselbin@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN
250 Hudson Street, 8th Floor
New York, New York  10013
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

*Interim Co-Lead Counsel*


By: /s Laurel G. Bellows

        Laurel G. Bellows

Laurel G. Bellows
    lbellows@bellowslaw.com
THE BELLOWS LAW GROUP, P.C.
209 South LaSalle Street, #800
Chicago, Illinois  60604
Telephone:  (312) 332-3340
Facsimile:  (312) 332-1190

*Liaison Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2015, a copy of the foregoing document was filed electronically using the CM/ECF System. Notice of this filing will be sent by operation of the Court's electronic filing system to all Parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By: /s/ Adam J. Levitt
Adam J. Levitt