**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **In re Navistar MaxxForce Engines** | ) | **Case No. 1:14-cv-10318** |
| **Marketing, Sales Practices and Products** | ) | |
| **Liability Litigation** | ) | **This filing applies to:** |
| | ) | **All Class Cases** |
| | ) | |
| | ) | **Judge Joan B. Gottschall** |
| | ) | |
| | ) | |

**<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL
PRODUCTION OF DOCUMENTS AND ANSWERS TO INTERROGATORIES</u>**

1492032.7

# TABLE OF CONTENTS

**Page**

I.     THE ENGINES AT ISSUE IN THIS CASE ...................................................... 1

     A.     An overview of the relevant emissions technology. .................................. 2

         1.     "EGR rate" is the percentage of exhaust sent back through the engine. .................................................................................... 2

         2.     SCR technology permits engines to use lower EGR rates. ............ 3

     B.     The central engineering issue in this litigation: the Class Engines use extraordinarily high EGR rates. ............................................. 4

     C.     In 2013, Navistar added SCR technology to its engines. ........................... 6

II.     THIS MOTION IMPLICATES TWO CERTIFICATION REQUIREMENTS ............................................................................................ 6

III.     THE DISCOVERY REQUESTS AT ISSUE ...................................................... 7

IV.     LEGAL STANDARD ........................................................................................ 8

V.     ARGUMENT ..................................................................................................... 8

     A.     Navistar should produce submissions to the EPA identifying material design changes to the emissions components of the Class Engines. ............................................................................................... 9

         1.     The EPA documents are critical and non-cumulative. ................... 9

         2.     The EPA documents are not unduly burdensome to produce. ................................................................................... 10

     B.     Navistar should identify changes and factors it argues are material to class certification. ....................................................................... 11

         1.     Navistar put the relevant facts at issue. ...................................... 12

         2.     Navistar's objections to the interrogatories are baseless. ............ 14

     C.     Navistar should be compelled to produce warranty, reliability, dynamometer test results, and sales information for the B718 engines. ............................................................................................. 15

         1.     Each category of information is highly material. ......................... 16

             a.     Warranty and reliability data. ......................................... 16

             b.     Dynamometer testing results. .......................................... 17

             c.     Sales data ........................................................................ 18

**TABLE OF CONTENTS**
**(continued)**

Page

2.    Any argument from Navistar that it is not appropriate to compare the B718 engines with the Class Engines should be rejected. .................................................................................. 18

3.    These requests are not comparable to Navistar's requests for Plaintiffs' paper records about other manufacturers' trucks. ....................................................................................... 19

VI.    CONCLUSION .................................................................................. 20

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013)................................................................................ 6

*Butler v. Sears, Roebuck & Co.*,
   702 F.3d 359 (7th Cir. 2012) (*Butler I*) ..................................................... 7

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) (*Butler II*) ....................................... 1, 7, 12

*City of Indianapolis v. Chase Nat'l Bank of City of N.Y.*,
   314 U.S. 63 (1941)................................................................................ 13

*In re IKO Roofing Shingle Prods. Liab. Litig.*,
   757 F.3d 599 (7th Cir. 2014) ................................................................. 7

*Lindell v. Synthes USA*,
   No. 11-02053, 2013 WL 3146806 (E.D. Cal. June 18, 2013) ................ 13

*Minter v. Wells Fargo Bank, N.A.*,
   No. 07-3442, 2010 WL 11549367 (D. Md. Aug. 13, 2010) ................... 14

*Pappas v. Naked Juice Co. of Glendora*,
   No. 11-8276, 2012 WL 12885109 (C.D. Cal. Dec. 5, 2012)................... 14

*Pella Corp. v. Saltzman*,
   606 F.3d 391 (7th Cir. 2010) ................................................................. 7

*United States ex rel. Tyson v. Amerigroup Ill., Inc.*,
   230 F.R.D. 538 (N.D. Ill. 2005).............................................................. 13

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)................................................................................ 6

*Young v. City of Chicago*,
   No. 13-5651, 2017 WL 25170 (N.D. Ill. Jan. 3, 2017)............................ 8

*Ziemack v. Centel Corp.*,
   No. 92-3551, 1995 WL 729295 (N.D. Ill. Dec. 7, 1995)....................... 13

1492032.7

**TABLE OF AUTHORITIES**
**(continued)**

Page

**RULES**

Fed. R. Civ. P. 23(a)(2) ........................................................................................ 6

Fed. R. Civ. P. 23(b)(3) ........................................................................................ 7

Fed. R. Civ. P. 26(b)(1) ........................................................................................ 8

**REGULATIONS**

40 C.F.R. § 86.079-33 ...................................................................................... 9, 11

40 C.F.R. § 86.091-7 .......................................................................................... 10

40 C.F.R. § 86.094-7 .......................................................................................... 10

**OTHER AUTHORITIES**

Certification Guidance for Engines Regulated Under: 40 CFR Part 86 (On-Highway Heavy-Duty
Engines and 40 CFR Part 89 (Nonroad CI Engines) .......................................... 9, 10

Plaintiffs respectfully file this memorandum in support of their motion to compel. Plaintiffs seek discovery to establish whether: (1) the Navistar engines at issue in this litigation share a sufficiently common design; and (2) a jury can determine whether that design is defective in a single stroke. These are two central issues the Court must address on class certification. *See, e.g.*, *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th Cir. 2013) (*Butler II*). Navistar refuses to produce the information that will answer those questions, or answer interrogatories that would force Navistar to explain its prior statements about them. It has stated that it will not answer such discovery absent court order. *See* Ex. A (Lichtman Decl.) ¶¶ 4-38.

## I.   THE ENGINES AT ISSUE IN THIS CASE

Plaintiffs are trucking companies that purchased trucks manufactured, sold and warranted by Navistar. The trucks are all 2010-2013 model-year trucks equipped with either the 11- or 13-liter Navistar heavy-duty engine known as the "MaxxForce Engine" (the "Class Engines").

The Class Engines are different from every other similarly-sized engine that met (or meets) the government's 2010 emissions standards: Navistar relied on a technology called Exhaust Gas Recirculation ("EGR"), without also employing an industry-standard technology known as Selective Catalytic Reduction ("SCR"). Broadly speaking, this means that the Class Engines recirculated far more exhaust directly back into the engine than was or is recirculated into other engines, whether produced by other manufacturers or by Navistar itself prior to 2010 and after 2013. Plaintiffs intend to show on class certification that this EGR-only technology is the underlined common design at issue in the litigation.

Plaintiffs allege that Navistar's unique design choice in the Class Engines—EGR but no SCR—renders them defective because that design will, among other things, generate too much soot and heat, which leads to repeated engine component failures. *See* Ex. G (Osborne Dep., Ex. 11) at 133390 (███████████████████████████████████

███████████████████████████).  At class certification, Plaintiffs will show that a jury

can determine whether there is a <u>common defect</u> based on this design in a single trial.

### A.  An overview of the relevant emissions technology.

The Class Engines are heavy duty diesel truck engines, known colloquially as "big bore"

engines.  All big bore engines produce emissions, including nitrogen oxide ("NOx"), that are

regulated by the Environmental Protection Agency ("EPA").  *See* Ex. H ("EPA Emissions

Standards").  The EPA limits the amount of NOx any big bore engine can emit.  When

documents in this case refer to ".2 NOx" or ".5 NOx," they refer to such limits.[1]

Big bore engine manufacturers employed two primary systems to limit NOx: Exhaust

Gas Recirculation ("EGR") and Selective Catalytic Reduction ("SCR").  Generally: (1) EGR

cools exhaust and sends it back into the engine, where the cooled exhaust reduces NOx

emissions; (2) SCR adds fluid to the exhaust that aids in reducing NOx emissions.  For clarity,

Plaintiffs refer to engines that rely on EGR without SCR (i.e., the Class Engines) as "EGR-only,"

and engines that use both EGR and SCR (i.e., all other big bore engines) as "SCR engines."

### 1.  "EGR rate" is the percentage of exhaust sent back through the engine.

All modern big bore engines use some amount of EGR to help reduce emissions.  Such

systems work by: (1) siphoning off a percentage of the engine exhaust; (2) cooling that exhaust

in what is called an "EGR cooler"; and (3) recirculating the cooled exhaust into the engine

cylinders through an "EGR valve."  *See* Ex. K (Osborne Dep. Tr.) at 120:22-123:18.[2]  The

---

[1] This case is about whether the Class Engines were reliable, not whether they met emissions
requirements.  For background, however, it is relevant that the Engines never actually met the
2010 requirements, known as .2 NOx.  Ex. I (Bergman Dep. Tr.) at 101:23-102:8.  Instead,
Navistar certified the Class Engines at .5 NOx and used EPA emissions credits to make up the
difference.  Ex. J (Mooney Dep. Tr.) at 13:24-14:10; Ex. I (Bergman Dep. Tr.) at 99:4-22.

[2] EGR coolers work by running the hot exhaust gas through a cooling chamber lined with tubes.
Ex. K (Osborne Dep. Tr.) at 204:10-20; *see also* Ex. L (excerpts of Majewski & Khair, *Diesel
Emissions and Their Control* (2006) ("Majewski")) at 336-37.  Coolant flows through the tubes,

cooled exhaust reduces the combustion temperature in the cylinder, which in turn reduces NOx emissions. *Id.*; *see also* Ex. L (Majewski) at 331 fig. 16.4 (picture of this process). This method generally works because, all else being equal, more NOx forms at higher combustion temperatures than lower ones. *See id.* at 330-31.

Of particular relevance here, EGR-only engines recirculate far higher percentages of exhaust than SCR engines. *See* Ex. J (Mooney Dep. Tr.) at 198:4-14. These percentages are known as the "EGR rate." Ex. K (Osborne Dep. Tr.) at 120:22-122:21, 123:10-15. For example, if an engine is recirculating 8% of its exhaust back into the engine, that engine has an 8% EGR rate. Up to a certain point, the higher the EGR rate, the lower the amount of NOx an engine will produce. *Id.* at 121:16-19. As one Navistar executive testified, however, once the EGR rate exceeds that point, an engine will not "function properly." *Id.* at 121:16-122:11.

## 2. SCR technology permits engines to use lower EGR rates.

Prior to the EPA's 2010 emissions requirements, many big bore manufacturers used EGR technology exclusively. *See* Ex. L (Majewski) at 329; Ex. H (EPA Emissions Standards). In 2010, however, all manufacturers other than Navistar added SCR technology to their engines to meet the new standards (Navistar ultimately discontinued the Class Engines and began using this technology as well). *See* Ex. J (Mooney Dep. Tr.) at 55:2-23 (explaining that SCR engines use both EGR and SCR together). SCR technology works by spraying the exhaust with a substance called urea. Ex. L (Majewski) at 423-24. Mixing urea with the exhaust and then catalyzing the mixture reduces the NOx level in the exhaust. Ex. J (Mooney Dep. Tr.) at 54:5-55:23; *cf.* Ex. L (Majewski) at 424 fig. 19.18 (diagram of SCR system). This permits SCR engines to use much

---

absorbing the exhaust heat and disbursing it outside the cooling chamber. *Id.* Cooled exhaust is then sent back into the engine's cylinders, where it lowers the combustion temperature. The higher the combustion temperatures, the more NOx forms, so the cooled exhaust reduces NOx emissions. *Id.* at 330-31.

lower EGR rates to achieve a given level of NOx emissions than are possible in EGR-only engines. Ex. J (Mooney Dep. Tr.) at 54:5-55:23.

**B.** **The central engineering issue in this litigation: the Class Engines use extraordinarily high EGR rates.**

Navistar was the only manufacturer that did not use SCR technology to meet the 2010 EPA Emissions Standards. Ex. K (Osborne Dep. Tr.) at 41:22-42:2; Ex. J (Mooney Dep. Tr. at 53:3-6). Without SCR, Navistar was forced to use significantly higher EGR rates in the Class Engines than in SCR engines. *See* Ex. J (Mooney Dep. Tr. at 198:4-14).

An engine's EGR rate is not constant—generally, the EGR rate increases as the engine is asked to do more work. In particular, the EGR rate varies based on the engine's revolutions per minute ("RPM") and the load placed on the engine (measured in foot-pounds of torque). Navistar measured its EGR rates relative to these two variables by testing its engines on machines called dynamometers. *Id.* at 298:17-299:6. Such testing produces charts of EGR rates, called "EGR maps." EGR maps show EGR rates at different RPM-torque combinations. *Id.* For example:



Ex. M (479668) at p. 4. The above EGR rates—over ██ on average, with a maximum of nearly ██—are substantially higher than the EGR rates in engines that also use SCR. *See* Ex. J (Mooney Dep. Tr.) at 198:4-14.

These extremely high EGR rates caused two primary problems. First, the Class Engines generated twice as much soot as Navistar's predecessor engines. Ex. J (Mooney Dep. Tr.) at 149:6-8; Ex. N (Mooney Dep., Ex. 14) at 551437. This clogged emissions system components like the EGR valve and EGR cooler. Ex. K (Osborne Dep. Tr.) at 142:5-144:22, 255:15-256:12. Second, Navistar's high EGR rates required the cooling systems to handle a significant amount of heat, due to a process called "heat rejection." *Id.* at 197:24-200:4; *see also id.* at 190:5-196:7. Navistar's engines had higher heat rejection demands than their emissions components could handle, which caused parts of the emissions system to fail. *Id.*[3]

Together, these two problems caused staggering failure rates in the Class Engines. One major emission component, the EGR valve, had a failure rate as high as ██████ in 2012. Ex. R at 104135. By 24 months in service, half of 2013 model-year Class Engines' EGR coolers required repair or replacement. Ex. J (Mooney Dep. Tr.) at 58:1-63:10. And that was just the start: these EGR system failures caused a cascading chain of failures in other engine components, leading to significant downtime (and even full engine replacement). Ex. K (Osborne Dep. Tr.) at 117:9-119:4, 183:15-184:12, 190:5-14, 194:13-195:1, 196:3-7, 199:5-200:4, 201:15-19; 242:18-243:14; 252:23-253:17, 256:3-258:8; Ex. S (Bergman Dep., Ex. 31) at 2. As one senior executive put it, the "████████████████" Ex. T at 478935.

---

[3] Navistar engineers were candid in internal discussions that increasing the EGR rate increased heat rejection and soot. *See, e.g.,* Ex. Q (470009) at slide 3 (████████████████████ ██████████████████████████████). Dennis Mooney, Navistar's then-VP of Vehicle Powertrain & Global Engineering, Ex. J (Mooney Dep. Tr.) at 17:17-23, pointed to heat and soot as the result of "████████████████" and the ultimate root cause of the defects. Ex. P (Mooney Dep., Ex. 17) at 494275; *see also* Ex. Q (Mooney Dep., Ex. 18) at 494799-494800; Ex. K (Osborne Dep. Tr.) at 118:2-7 ████████████████████████████████████████ ████████████████████████████████████████████"). Soot and heat damaged two components of the EGR system in particular: the EGR cooler and the EGR control valve. *See* Ex. G (Osborne Dep. Tr., Ex. 11) at 133390 ████████████████ ████████████████████████████████████████████████).

C.    **In 2013, Navistar added SCR technology to its engines.**

In 2013, Navistar abandoned its EGR-only strategy and added SCR to its engine (making an engine it termed the B718).  *Id.* at 125:9-17.  ***It made no other physical changes to the engine***.  Ex. I (Bergman Dep. Tr.) at 197-98 ("Q: "[W]hat was the difference?  A: Adding SCR and the calibration associated with doing that.  Q: And everything else stayed the same? . . . . A: Everything that I recall, there were no changes in the engine hardware."); Ex. K (Osborne Dep. Tr.) at 125:9-17 ("                              ").

Because of this single change: (1) the average EGR rate in the B718 engine is approximately 1/5th the average EGR rate in the Class Engines,  Ex. M (479668) at p. 4; Ex. U at 133413 ("                              "), and (2) the average soot production in the B718 engine is 50 percent lower than in the Class Engines, Ex. U at 133413; *see also* Ex. V at 1090787; Ex. M (479668) at p. 2.  And the new engines experienced dramatically decreased failure rates compared to the Class Engines.  *See* Ex. W at 630853-54.

## II.    **THIS MOTION IMPLICATES TWO CERTIFICATION REQUIREMENTS**

Plaintiffs will ask this Court to certify a Rule 23(b)(3) class.  At that time, they will be required to show six prerequisites to class certification.  *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013).  The at-issue discovery requests implicate two of those requirements, "commonality" and "predominance."

Commonality.  Plaintiffs will need to show that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  In particular, Plaintiffs must show that there is at least one common question such that "a classwide proceeding [can] generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted).  In a product defect class action, the key factual issues going to commonality are (1) whether the products share a common design, and (2) whether a jury can

determine "in a single stroke" whether that design contains a common defect. *See Butler v. Sears*, *Roebuck & Co.*, 702 F.3d 359, 361-62 (7th Cir. 2012) (*Butler I*) (analyzing whether asserted design differences defeated class certification); *see also Butler II*, 727 F.3d at 798 (affirming class certification even though the defendant argued that "a number of design modifications" made "different models [] differently defective," where none "of the design changes eliminated the [] problem, only [] diminished it").

Predominance. Plaintiffs must also show that common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance requires an assessment of "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Butler II*, 727 F.3d at 801 (citation omitted). In a product defect case, certification is appropriate where, even though there may be differences in how individuals used a product, "[t]here is a single, central, common issue of liability." *Id*; *see also In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 601-03 (7th Cir. 2014).

## III.   THE DISCOVERY REQUESTS AT ISSUE

Plaintiffs seek three categories of discovery addressing: (1) whether the Class Engines share a common design; and (2) whether a jury can determine if that common design is defective in a single trial, the two questions that generally determine commonality and predominance in a product defects class action. *See, e.g.*, *Butler I*, 702 F.3d at 361-62 (certifying class where defendant "made five design changes" that "reduced the [defect's] incidence or gravity," because "[t]he basic question in the litigation—were the machines defective[]—is common to the entire [] class"); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) ("[T]here is an economy to class treatment of the question whether the [products] suffer from a basic design defect . . . .").

In particular, Plaintiffs seek:

- Specific forms (if any) that Navistar provided the EPA, in which Navistar was required to detail *all* material changes to the Class Engines that affected the emissions system. Such forms are mandated by 40 CFR Part 86.

- Responses to two interrogatories in which Plaintiffs asked Navistar to explain its previous statements regarding any design changes or use/maintenance factors it contends defeat class certification.

- Specific warranty, reliability, testing, and sales information about the "B718" engine. As explained above, the B718 is *exactly* the same as the Class Engines except that it includes SCR technology and thus does not include the alleged defect.[4]

## IV.  LEGAL STANDARD

Parties "may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). The "party opposing discovery has the burden of showing the discovery is overly broad, unduly burdensome, or not relevant." *Young v. City of Chicago*, No. 13-5651, 2017 WL 25170, at *9 (N.D. Ill. Jan. 3, 2017) (citation omitted).

## V.  ARGUMENT

Plaintiffs are entitled to learn what Navistar told the federal government were material changes to the design of the Class Engines' emissions-related components that affected emissions and durability. They are also entitled to know what differences Navistar *now* contends render class certification inappropriate. And they are entitled to information about the engine—the B718—Navistar made to replace the allegedly-defective Class Engines, an engine materially identical, but for the fact that it does not contain the alleged defect.

---

[4] Navistar compared the Class Engines to the B718 in the ordinary course of its business. *See* Ex. W at 630848 (chart comparing reliability of 2010-2013 Class Engines and 2013-2014 B718 engines).

**A.** **Navistar should produce submissions to the EPA identifying material design changes to the emissions components of the Class Engines.**

Plaintiffs asked Navistar to produce the specific forms it submitted to the EPA in which it identified changes to the Class Engines' emissions components. In particular, the EPA required Navistar to submit a specific document—called a "running change submission"—each time it made a change to the Class Engines' emission-related components, including changes that affected the durability of the system. *See* 40 C.F.R. § 86.079-33; EPA Certification Guidance for Engines Regulated Under: 40 CFR Part 86 (On-Highway Heavy-Duty Engines and 40 CFR Part 89 (Nonroad CI Engines) ("EPA Guidance") at 9-11.[5] Running change submissions must include a description of the change, the reasons for making them, and may, at the discretion of the EPA, include testing data. *Id.*; *see also* Ex. B (Greszler Decl.) ¶¶ 7-9.

Navistar never disputed the clear relevance of these documents. Yet it refuses to produce them on the basis that they are cumulative of other documents and burdensome to produce. Neither argument is persuasive.

### 1. The EPA documents are critical and non-cumulative.

The running change submissions are critical because they identify the important design changes (if any) that Navistar made and the reasons it made them, as Navistar itself identified them during the development process. In other words, the running change submissions identify the design changes that Navistar's engineers deemed important *at the time the changes were made*, in contrast to design tweaks that Navistar may now conjure as part of litigation strategy.

---

[5] Plaintiffs requested "Documents Relating to Navistar's submissions to the EPA for the Engines, including Parts 1, 2, and running change submissions under 40 C.F.R. Part 86[.]" Ex. C (Plaintiffs' Second Set of Requests for Production) at 15-16 (RFP No. 17). Navistar agreed to produce the original certification application documents for the Class Engine (i.e., documents submitted with the Class Engines' initial design), but not the running change submissions. Ex. D (Navistar, Inc.'s Responses and Objections) at 18. In a meet-and-confer, Navistar reiterated its refusal, claiming the documents are both burdensome to produce and cumulative of other documents produced. Lichtman Decl. ¶¶ 9-13.

The submissions also identify *why the changes were made*, and thus are a real-time account of Navistar's thinking.  The submissions specifically encompass "[c]hanges that affect the durability of the emission control system"—in other words, the central issue in this case.  EPA Guidance at 9.

Running change submissions are not cumulative of other documents about design changes.  While other documents in Navistar's production may identify certain design changes, the EPA submissions are different because they:

- Specifically identify changes to the emissions-related components that "that affect the durability of the emission control system."  EPA Guidance at 9-10.  The durability of that system is the central issue in this case because Plaintiffs allege (and the evidence discovered so far supports) that the EGR-only strategy resulted in an emission control system that was not durable.

- Require a narrative explanation of each change and the reason for it, e.g., improvements in durability.  *Id.*  This explanation is not available in other Navistar documents.  It will go directly to the heart of Navistar's arguments that design changes were material to performance and reliability to such an extent that class certification is inappropriate.

- Provide a contemporaneous account of the changes Navistar made and why they were made.  They will allow Plaintiffs and the Court to analyze whether any changes Navistar now argues defeat class certification are truly material, or whether they are litigation posturing.

## 2.    The EPA documents are not unduly burdensome to produce.

Navistar's claims of burden are not credible.  EPA regulations specifically require Navistar to store running change documents for 8 years and to keep them readily accessible for that period of time.  *See* 40 C.F.R §§ 86.094-7, 86.091-7.  Indeed, the EPA could shut down Navistar's manufacturing operation *entirely* if Navistar does not comply with 40 C.F.R. § 86.079-33.  Large truck manufacturers generally have specific departments dedicated to filing such submissions with the EPA.  Ex. B (Greszler Decl.) ¶¶ 5, 10-11.

In one meet-and-confer, Navistar claimed that running change documents are difficult to locate because they are not stored in one place. *See* Lichtman Decl. ¶ 9. This statement is implausible in light of the fact that the EPA specifically requires Navistar to maintain the records in a readily accessible format. Additionally, in a subsequent meet-and-confer conference, Navistar's attorneys stated that they had not undertaken (and would not undertake) any effort to learn where the running change documents were located. Lichtman Decl. ¶ 12. Given that Navistar's counsel has not tried to determine where the documents are located, they cannot credibly represent that the documents are difficult to find.

Regardless, any burden of simply locating responsive documents is outweighed by the importance of this information to the Court's certification analysis.

### B. **Navistar should identify changes and factors it argues are material to class certification.**

Plaintiffs served Interrogatories seeking the design changes and other factors that Navistar contends make class certification inappropriate. These Interrogatories require Navistar to explain what it meant in prior briefing and argument by claims that such changes and "factors" render class certification inappropriate.

Specifically, Plaintiffs' Interrogatory No. 2 requested that Navistar:

Identify any changes to the EGR Only System that You contend impacted performance or reliability of the engines as it relates to the alleged EGR defect, the date of any such change, and explain why each such change impacted performance or reliability of the engines as it relates to the alleged EGR defect.

Ex. E (Plaintiffs' First Set of Interrogatories) at 10.

Similarly, Plaintiffs' Interrogatory No. 3 requested that Navistar:

Identify any factors, other than the design of the EGR Only System itself, that You contend were responsible for failures within the EGR Only System.

*Id.*[6]

### 1.    Navistar put the relevant facts at issue.

Navistar has stated that design changes among the Class Engines, and variations in owners' use and/or maintenance, render class certification inappropriate. In particular, Navistar submitted a sworn declaration from a former senior executive supporting its arguments that "considerable variations within each type of engine" and "post-launch continuous improvement efforts . . . greatly exacerbate the variations in the engines at issue." Dkt. 269 at 4. Navistar vaguely cited, as an example "improved parts, manufacturing processes and calibrations" from one model year to another. *Id.* at 4-5. Navistar also apparently intends to argue that, even if there is a common design, class treatment is inappropriate because "the individual maintenance and usage practices and habits of Plaintiffs and each member of the proposed classes," Dkt. 135 (Answer) ¶ 287, swamp common issues.

Plaintiffs are entitled to know what changes and factors Navistar contends are relevant so that they can test those contentions in fact discovery and address them in class certification briefing. *See, e.g.*, *Butler II*, 727 F.3d at 798-99 (explaining that the mere "possibility" that design differences among the class products might affect the scope or degree of the alleged defect was "not an obstacle to certification"). Navistar apparently worked feverishly to identify the root cause of the high failure rates among the Class Engines, eventually concluding what it

---

[6] Navistar responded with a host of objections. Navistar claimed it could not understand the concepts ████████████████████████ Ex. F (Navistar, Inc.'s Responses and Objections) at 7-9. Navistar objected that the interrogatories were "████████████████████████████" and that ████████████████████████████████████████ *Id.* at 8, 9. As to design changes, Navistar suggested ████████████████████████████████████████████ ████████████████" *Id.* at 8. As to other factors, Navistar answered that ████████████████ and "████████████ ████████████████████████████" *Id.* at 10. Finally, Navistar stated that its investigation was ongoing and it would supplement the responses as necessary. *Id.* at 8, 11.

knew or should have known back in 2008: EGR-Only engines required EGR rates too high to produce a reliable engine. *See* Ex. P (Mooney Dep., Ex. 17) at 494275. Navistar apparently intends to argue that these efforts resulted in some design changes during the class period. Yet Navistar refuses to identify them now. Navistar also apparently intends to argue that certain use and maintenance factors are material, but refuses to identify those either. These refusals are inappropriate. *City of Indianapolis v. Chase Nat'l Bank of City of N.Y.*, 314 U.S. 63, 69 (1941) (Frankfurter, J.) ("Litigation is the pursuit of practical ends, not a game of chess.").

Plaintiffs stress that the information they are seeking is not the work of experts created for the purposes of trial: it is factual information within Navistar's possession created as part of the development and testing of the products at issue at the time.[7] It is for this reason that the "general policy" to defer contention interrogatories until the very end of discovery does not apply to these particular requests. *Ziemack v. Centel Corp.*, No. 92-3551, 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995). *Plaintiffs' interrogatories seek facts Navistar already ascertained, about which it has already submitted a sworn declaration.* And courts grant motions to compel responses to contention interrogatories where, as here, they seek information about a party's specific, factual assertions regarding class certification. *See Lindell v. Synthes USA*, No. 11-02053, 2013 WL 3146806, at *5 (E.D. Cal. June 18, 2013) (granting motion to compel, and explaining that "[t]hese Contention Interrogatories ask Defendants to explain the contentions presented in Defendants' Answer, i.e., that this action cannot be maintained as a class action.

---

[7] Plaintiffs' interrogatories are thus different than some of the interrogatories Navistar served on Plaintiffs. Navistar demanded, for example, that Plaintiffs identify the reason they contend each engine failure resulted from the defect, information requiring expert technical knowledge and analysis. *Cf. United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 230 F.R.D. 538, 540 (N.D. Ill. 2005) (denying motion to compel answers to interrogatories requesting description of "theories and . . . methods for calculating damages").

Presumably, Defendants had, and continue to have, a basis for making the allegations in their Answer").[8]

### 2. Navistar's objections to the interrogatories are baseless.

Navistar makes specific objections to the interrogatories, none valid.

*First*, Navistar objects to virtually every term in the interrogatories as impermissibly vague. The interrogatories are clear. As indicated above, Plaintiffs will show on class certification that a jury can determine whether the Class Engines are defective because of their EGR-only technology in a single trial. Navistar has made specific statements that "design changes" and "other factors" such as use and maintenance prevent Plaintiffs from making that showing. The interrogatories require Navistar to provide the factual basis for these statements. Nothing about them is so unclear that Navistar cannot answer them. For example, Navistar states that it cannot understand the terms "performance or reliability" and "failures." Navistar performed extensive reliability analysis of the Class Engines, identifying the failure rates. *See* Ex. W at 630853-54. Navistar used these terms in the ordinary course of its business, and they have the same meaning here.

*Second*, Navistar says that (as to the design changes), "an analysis of the engines in Plaintiffs' trucks . . . would reveal much of the information sought in the Interrogatory." Not so. The interrogatory seeks to learn what design changes *Navistar* contends are relevant. No analysis by Plaintiffs could reveal Navistar's thinking. Additionally, the vast majority of Plaintiffs have five or fewer class trucks, meaning that there may well be changes Navistar

---

[8] *See also Pappas v. Naked Juice Co. of Glendora*, No. 11-8276, 2012 WL 12885109, at *8 (C.D. Cal. Dec. 5, 2012) (granting motion to compel interrogatory "to the extent this interrogatory inquiries into the factual basis of plaintiffs' contentions supporting class certification"); *cf. Minter v. Wells Fargo Bank, N.A.*, No. 07-3442, 2010 WL 11549367, at *5 (D. Md. Aug. 13, 2010) (denying motion to compel interrogatories "neither tailored to the four requirements of class certification nor necessary for resolution of class certification").

deems material that Plaintiffs could not ascertain from their own trucks. Lichtman Decl. ¶¶ 1-2. And the burden on Plaintiffs to reverse-engineer an analysis of truck design far outweighs the burden on Navistar, the manufacturer who made the changes and *already* conducted an analysis to determine what changes mattered (or did not). In any event, many Plaintiffs have sold their class trucks (or had them repossessed). *Id.* ¶ 3.

*Third*, Navistar says that use/maintenance factors that affect reliability "are too numerous to quantify and/or identify." Perhaps so, but Plaintiffs did not ask for that information. Plaintiffs asked Navistar to state which factors it contends exacerbate or mitigate the effects of the alleged defect, such that, Navistar argues, grouping together Plaintiffs who did and did not follow a particular use or maintenance is not appropriate. Whether that list is empty or 100 items long, Navistar must disclose it and must have a factual basis for so asserting. Saying there are too many to list and then refusing to list any leaves Plaintiffs guessing what Navistar will argue against class certification (at which point, presumably, Navistar will make such a list). Plaintiffs are entitled to know those factors now to test them through discovery.

### C. Navistar should be compelled to produce warranty, reliability, dynamometer test results, and sales information for the B718 engines.

In several requests for production, and as narrowed during subsequent meet and confers, Plaintiffs sought specific information about the first two model years of the B718 engines. In particular, they seek: (1) production of the information in Navistar's warranty database about these engines; (2) documents sufficient to compare the number of days of downtime in B718 engines with the Class Engines; (3) Documents summarizing or compiling engine dynamometer test results for the B718 engines; and (4) sales data about these engines.[9]

---

[9] Ex. C (Plaintiffs' Second Set of Requests for Production of Documents) at 9-12 (RFP Nos.1-5), 17 (RFP No. 22). Plaintiffs agreed to narrow RFPs 4 and 5 to databases, spreadsheets and presentations. Lichtman Decl. ¶ 32. Plaintiffs further agreed to limit these requests to (1) the

The requested documents are plainly relevant. The 2013 and 2014 B718 engines are identical to the Class Engines, except that Navistar added an SCR system to them (and thus reduced the EGR rates). Navistar's witnesses have admitted this specifically. *See* Ex. I (Bergman Dep. Tr.) at 197-98 ("Q: "[W]hat was the difference? A: Adding SCR and the calibration associated with doing that. Q: And everything else stayed the same? . . . . A: Everything that I recall, there were no changes in the engine hardware."); Ex. K (Osborne Dep. Tr.) at 125:9-17 ("███████████████████").

### 1. Each category of information is highly material.

#### a. Warranty and reliability data.

These documents permit Plaintiffs to make a direct comparison between the allegedly-defective Class Engines and the otherwise identical non-defective engines Navistar manufactured to replace the Class Engines, which is relevant to both liability and damages. Warranty data (RFP 3) and reliability data (RFPs 4 and 5) will allow for a fulsome comparison of the failure rates of the B718 engine compared to the Class Engines.[10] The few documents Navistar has produced show a dramatic difference:

---

Class Engines and (2) the model-year 2013-14 B718 engines. *Id.* at ¶¶ 32-33. Navistar has generally been willing to produce this information for the Class Engines, but refuses to do so for the B718. *See* Ex. D (Navistar, Inc.'s Responses and Objections) at 12-14, 18-20, 37-38.

[10] RFP 5 seeks any comparisons Navistar made between downtime of the Class Engines with *any* other engine, including those from other manufacturers. Plaintiffs have not agreed to narrow this to the B718 engine, but, for the purposes of this Motion, seek to compel only documents related to the B718 engine.



Ex. W at 630853-54.[11]  While this chart is probative, it is insufficient, without more, for the

needs of this case for two reasons.  First, this chart (and a few other similar charts) only show

data from 16 months into B718 production, and Plaintiffs need data from a longer time period to

make a fuller comparison.  Second, this chart only shows a summary, and Plaintiffs' experts need

to analyze the underlying data.

### b.      Dynamometer testing results.

Navistar employs a type of testing called dynamometer testing, which is required by the

EPA.  *See* 40 C.F.R. 86.1816-18(a)(1).  Dynamometer testing measures data (including NOx

levels, EGR rates, and soot production) at various load and RPM points.  Ex. L (Majewski) at

---

[11]

176-78; Ex. I (Bergman Dep. Tr.) at 169:5-13 (Navistar performed "dyno testing").

Dynamometer test results (RFP 22) will show how the Class Engines differ from the B718 in

crucial respects, for example EGR rate, soot production, and EGR cooler heat rejection.  *Cf.* Ex.

M (███████████████████████████).  These are the factors that made

Class Engines fail.  The B718 engine, according to deposition testimony and emails among

Navistar employees, had a far lower EGR rate and soot production.  *See* Ex. V at 1090789-90;

Ex. M (479668) at pp. 3-4; Ex. U at 133413.  Rather than rely on this scattered evidence,

Plaintiffs need the entire set of test results for the B718 engine so that they can compare those

results to the Class Engines.

c.       **Sales data**

Navistar has extensive sales data regarding the B718 engines and the trucks containing

those engines both in the sense of knowing how many of these trucks it sold and the sales price

of at least some of those trucks (e.g., Navistar owns a number of dealers).  Such information will

be extremely important for Plaintiffs' class damages calculations because it will allow Plaintiffs

to directly compare trucks equipped with Class Engines with trucks that have otherwise identical

engines without the alleged defect.  Both the initial sales price and the relationship between that

price and the price of the Class Engines in the used market are highly relevant because one of

Plaintiffs' classwide damages claims is "loss of resale value," and such a claim will compare a

statistically significant group of Class Trucks to a statistically significant group of trucks without

the alleged defect.

2.       **Any argument from Navistar that it is not appropriate to compare the
B718 engines with the Class Engines should be rejected.**

Navistar may argue that unspecified design improvements over the course of 2013 and

2014 render Plaintiffs' request improper.  This should be rejected for three reasons.  First, two

Navistar witnesses testified specifically that the *only* difference between the B718 engine and the Class Engine is the inclusion of SCR (and thus lower EGR rates).  *See* Ex. I (Bergman Dep. Tr.) at 197-98; Ex. K (Osborne Dep. Tr.) at 125:9-17.

Second, the available evidence indicates that this one change fixed the defect because it resulted in significantly lower EGR rates, which reduced heat and soot.

Third, Navistar's own engineers and leadership found it feasible and apt to compare the B718 engine to the Class Engines.  Ex. W at 630853-54 (███████████); Ex. U at 133413 (██████████████████████████████████████████████████████████████████████ ████████████████████████" and "███████████████████████████████████████ ███████████████████████████").  Whatever arguments Navistar may plan to make in the future, Plaintiffs have demonstrated that they are entitled to the information they requested about the B718 engines.

### 3.    These requests are not comparable to Navistar's requests for Plaintiffs' paper records about other manufacturers' trucks.

Plaintiffs note that this request for documents is critically different than Navistar's request for documents regarding all of Plaintiffs' non-class trucks, for two reasons.  First, Plaintiffs narrowed their requests to Navistar such that they ask Navistar to produce four discrete types of documents, and only to the extent that these documents are stored in databases, spreadsheets, presentations, and test results.  All of this information should be relatively accessible—Navistar has already located and produced similar documents for the Class Engines. For example, Navistar has a specific warranty database and Plaintiffs would like Navistar to produce additional fields of data from it.  Navistar, on the other hand, demands Plaintiffs undertake an extraordinarily burdensome collection of all *paper* documents having anything to do with every truck each Plaintiff own or owned.

-19-

Second, Plaintiffs narrowed their request to Navistar to seek only systematic information about the B718 engine—an engine that is *identical* to the Class Engines except that it does not include the alleged defect. Ex. W at 630853-54. Navistar asks Plaintiffs to produce records of anecdotal experiences with other companies' trucks, information that has no relevance to this case. For example, if a particular Plaintiff was unlucky enough to have purchased a "lemon" from Freightliner, that could not somehow make Navistar's Class Engines any less defective.

## VI. <u>CONCLUSION</u>

Plaintiffs respectfully ask this Court to compel Navistar to (1) produce the EPA running change submissions requested by RFP 17; (2) answer interrogatories 2 and 3; (3) produce the warranty data, reliability data, documents summarizing or compiling engine dynamometer test results, and sales data for the B718 engine as requested by RFPs 1-5 and 22 and narrowed in subsequent meet & confer conferences.

Dated: January 16, 2018                    Respectfully submitted,

                                           By: */s Jonathan D. Selbin*

Laurel G. Bellows                          Jonathan D. Selbin
THE BELLOWS LAW GROUP, P.C.                LIEFF CABRASER HEIMANN
209 South LaSalle Street, #800                & BERNSTEIN, LLP
Chicago, Illinois 60604                    250 Hudson Street, 8th Floor
312.332.3340                               New York, New York 10013
                                           212.355.9500

Adam J. Levitt                             William M. Audet
DiCELLO LEVITT & CASEY LLC                 AUDET & PARTNERS, LLP
Ten North Dearborn Street, 11th Floor      711 Van Ness Avenue, Suite 500
Chicago, Illinois 60602                    San Francisco California 94102
312.214.7900                               415.568.2555

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 16, 2018, I served the foregoing on all counsel of record via

ECF.


　　　　　　　　　　　　　　　　　/s/ *Andrew R. Kaufman*