**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In re Navistar MaxxForce Engines** | ) | **Case No. 1:14-cv-10318** |
| **Marketing, Sales Practices and Products** | ) | |
| **Liability Litigation** | ) | **This filing applies to:** |
| | ) | **All Class Cases** |
| | ) | |
| | ) | **Judge Joan B. Gottschall** |

<u>**JURY TRIAL DEMANDED**</u>

<u>**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**</u>

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................................ 1

    A.   Nature of the Defect .................................................................... 2

    B.   The Navistar Warranties ............................................................ 5

    C.   As a Result of the Defect, the Trucks Repeatedly Fail, Uniformly Injuring Proposed Class Members ............................ 7

II.   PARTIES ................................................................................................ 9

    A.   Plaintiffs .................................................................................... 9

    B.   Defendants .............................................................................. 52

III.  JURISDICTION AND VENUE ............................................................. 57

IV.  CHOICE OF LAW ............................................................................... 58

V.   FACTUAL ALLEGATIONS ................................................................ 58

    A.   Background .............................................................................. 58

    B.   Navistar's Authorized Dealers ................................................ 60

    C.   The Navistar Defendants Concealed the Defect. .................... 61

    D.   The Navistar Defendants Knew About the Defect at Least as Early as 2004 ........... 62

    E.   Navistar's Representations Regarding the MaxxForce Engines ............................. 65

    F.   The Defect Is Widespread and Harms the Class. .................... 69

VI.  TOLLING OF STATUTES OF LIMITATIONS .................................. 73

VII. CLASS ALLEGATIONS ...................................................................... 74

    A.   Class Definitions ..................................................................... 74

    B.   The Prerequisites of Rule 23(a) Are Satisfied. ...................... 76

    C.   The Prerequisites of Rule 23(b)(1) and (b)(2) Are Satisfied. ................................. 80

    D.   The Prerequisites of Rule 23(b)(3) Are Satisfied. .................. 81

VIII.   CAUSES OF ACTION ......................................................................................... 82

    A.   Claims Brought on Behalf of the Nationwide Class .................................... 82

    B.   Claims Brought on Behalf of State Sub-Classes ......................................... 88

    C.   Additional Claims Brought Under Arkansas Law ....................................... 96

    D.   Additional Claims Brought Under California Law ...................................... 97

    E.   Additional Claims Brought Under Florida Law ....................................... 100

    F.   Additional Claims Brought Under Idaho Law ......................................... 102

    G.   Additional Claims Brought Under Illinois Law ....................................... 104

    H.   Additional Claims Brought Under New Jersey Law ............................... 106

    I.   Additional Claims Brought Under North Carolina Law ......................... 109

    J.   Additional Claims Brought Under Ohio Law .......................................... 110

    K.   Additional Claims Brought Under Texas Law ......................................... 112

    L.   Additional Claims Brought Under Washington Law ............................... 114

    M.   Additional Claims Brought Under Wisconsin Law ................................. 116

PRAYER FOR RELIEF ........................................................................................ 118

Plaintiffs Dulce Alvarez, representing the interests of A-Rapid Logistics/Alka Trucking, Inc.; Binder Trucking, Inc.; Carmichael Leasing Co., Inc.; Cesar Calderone, representing the interests of C & T Transport; Charles Keplinger; David A. Lord d/b/a Lord AG Transportation; Ferraro Foods, Inc.; Fike Logistics, Inc.; G&G Specialized Carriers LLC; GT Expedited, Inc./Go To Logistics, Inc./ToGo Express, Inc.; Jenkins Unlimited, Inc.; Joandnas Operations, Inc.; Killer B Trucking, LLC; Lance R. Edwards; Leonard Butler; Michael Jackson, Sr.; Peninsular Transfer Inc.; Phifer Trucking, Inc.; Randy Quick; Robert Constantine; Robert Grieser; Ronald L. Anderson/RLA Holdings, LLC/A&K Development Co.; Stephen Slough; Steven A. Hamilton; Storey Trucking Company, Inc./Lakeside Leasing, Inc.; The Cross Express; Two Star Trucking, Inc.; Deanna and Natali Garcia, representing the interests of Vera Transport, LLC; and Victor Caballero ("Plaintiffs"), on behalf of themselves and all other similarly-situated persons and entities, by and through their designated attorneys, bring this class action complaint against Navistar International Corporation and its subsidiary Navistar, Inc.[1] (together, "Navistar") and allege as follows:

## I.  NATURE OF THE ACTION

1.  Plaintiffs bring this class action for declaratory judgment and/or injunctive relief, as well as money damages against Navistar for: unfair, unlawful, and fraudulent business practices; breach of express and implied warranties; and related claims, on behalf of themselves and all persons or entities residing in the United States who purchased, not for resale, or leased a 2011-2014 model year vehicle equipped with a MaxxForce 11- or 13-liter engine certified to

---

[1] Navistar International Corporation and Navistar, Inc., as alter ego entities, and/or agents of one another, will be referred to hereinafter as "Navistar" or "the Navistar Defendants."

meet EPA 2010 emissions standards without selective catalytic reduction technology (the "Class Vehicles," "MaxxForce Engines" or "Engines") (the "Class" or "Classes").

2.        Navistar sold or leased the Class Vehicles to Plaintiffs equipped with a defectively-designed integrated emissions system (the "Defect"). The emissions system Defect resulted from Navistar's election to use "Exhaust Gas Recirculation" (or "EGR") emissions technology with the MaxxForce Engines to comply with the Environmental Protection Agency ("EPA") emissions standards for trucks manufactured with model years 2010 and later ("2010 EPA Standards"). Every major U.S. truck manufacturer *except Navistar* chose to meet the 2010 EPA Standards with "Selective Catalytic Reduction" (or "SCR") technology, which treats engine exhaust with a urea-based chemical after it leaves the engine.

**A.        Nature of the Defect**

3.        Navistar's emissions strategy overstretched the limits of an older technology, EGR, to try to meet new, more stringent nitrogen oxide ("NOx") emission standards. EGR technology involves first cooling and then recirculating a portion of an engine's exhaust gas back into the engine cylinders. The cooled exhaust lowers in-cylinder temperatures during combustion, which reduces the amount of NOx formed. Navistar's system cooled the engine exhaust with an EGR cooler. The cooled exhaust gas was then circulated back into the engine's air intake through EGR valves.

4.        Heavy-duty diesel engine manufacturers have used EGR for years to lower NOx emissions. However, when the emission standards were lowered for 2010, every manufacturer other than Navistar recognized that trying to use EGR alone, without adding an SCR system[2] to

---

[2] An SCR system uses three main components to reduce NOx emissions. The first adds urea into the exhaust to reduce NOx. Combined with a diesel oxidation catalyst and a diesel particulate

remove NOx from the exhaust after it leaves the engine, would result in unreliable engines. The reason for that is the extremely high percentage of exhaust gas recirculation needed to meet the lower NOx standards.

5.      Navistar's emissions system was defective in that the EGR system that Navistar designed (the "EGR Only System") recirculated a very large percentage of engine exhaust, known as the EGR rate, into the cylinders. High EGR rates cause two problems.  The higher the EGR rate, the more particulate matter, or soot, the engine generates.  That soot plugs and clogs emissions system components. High EGR rates also increase the heat rejection to the cooling system, which is the heat that the EGR cooler must remove. The more exhaust that the cooler cools, the more heat the cooling system must reject to the atmosphere. Navistar's EGR Only System had higher heat rejection than the emissions components could handle, leading to the failure of those components.

6.      Navistar's EGR Only System generated far more heat rejection and soot within the engine than in competitors' SCR engines because of the high EGR rate. SCR engines did not need to rely on high EGR rates alone to lower NOx because they used urea injection to remove NOx from the exhaust after it leaves the engine.

7.      The EGR Only System's excessive heat rejection and soot production leads to plugged and cracked EGR coolers, plugged and cracked EGR valves, failed turbochargers, diesel particulate filter ("DPF") clogging, and other types of sudden and accidental physical damage to the Engine. EGR cooler leaks can send uncooled exhaust gas back into the engine (causing the computer to shut down the engine). The defect also causes the EGR cooler to leak coolant

filter, this system is highly effective at reducing NOx emissions without increasing particulates (soot).

through the EGR valves into the engine.  The added stress of pushing non-flammable coolant out of the exhaust valves in the cylinder head destroys the head gasket, which seals the head to the block and cylinders.  This results in the engine having to be rebuilt. Also, EGR cooler cracking could lead to coolant in the oil. This oil contamination led to many failures, some necessitating complete engine replacement.

8. As a result of the Defect, Plaintiffs and Class members also experienced repeated instances of check engine lights illuminating, engines shutting down or losing power, EGR cooler and valve failures, turbocharger failures, DPF clogging, and other issues that led to excessive downtime and prevented the Navistar Trucks from functioning as warranted and represented and as reasonable purchasers and lessees would expect.

9. The Defect also rendered the Engines unreasonably dangerous at the time they were purchased or leased.  The Defect can lead to and has led to sudden breakdowns, forcing Trucks, often heavily loaded with cargo, to attempt emergency maneuvers, such as pulling to the side of the road.  The Defect can also cause coolant and exhaust fumes to enter the passenger compartment of the Trucks, risking driver poisoning from the fumes.

10. Navistar sold trucks containing the defective MaxxForce Engines under its International brand name, including, but not limited to, the following models (collectively the "Trucks"):

      a.    International ProStar and LoneStar, which are heavy duty, long haul tractor trailer Trucks; and

      b.    International TranStar, a heavy duty, regional haul Truck.

4

11.     All of the Trucks are "heavy-duty vehicles," as defined by the Environmental Protection Agency (40 C.F.R. § 1037.801).  The Trucks are among the largest, heaviest, and most powerful on the road.

**B.     The Navistar Warranties**

12.     The Navistar Engines are covered by a number of express written warranties, all of which were drafted by Navistar and all of which were non-negotiable and presented to purchasers and lessees on a take-it-or-leave-it basis in documents provided after the sale.

13.     Those warranties include (1) the Navistar Standard Warranty (exemplar attached hereto as Exhibit A);[3] (2) the Navistar Federal Emission System Warranty (*see, e.g.,* "Engine Operation and Maintenance Manual," pp. 7-9, exemplar attached hereto as Exhibit B); (3) the Navistar California Emission System Warranty (*see, e.g.,* "Engine Operation and Maintenance Manual," pp.10-12); and (4) descriptions and affirmations of fact contained in Navistar's "Maintenance Information Guide" (exemplar attached hereto as Exhibit C).

14.     Purchasers and lessees of Navistar Trucks were generally aware that warranties came standard with the Trucks.  Plaintiffs would not have purchased or leased the Trucks if Navistar had not warranted them.  As such, these warranties formed part of the basis of the bargain.

15.     With respect to the Emission System Warranties, such emissions-related warranties are mandated by federal law and cannot be disclaimed.

16.     Federal law sets forth the minimum requirements for an emissions-related warranty, but manufacturers can issue one that is more generous than what federal law requires.

---

[3] The warranty attached as Exhibit A applies to specific models of Navistar trucks, but, on information and belief, the same terms apply to all Engines in the Class.

17.     Navistar's Emissions Warranties go beyond the federal standard by (1) issuing a federal emissions warranty that warrants against defects in design, in addition to warranting against defects in materials and workmanship; and (2) warranting nationwide, to all Plaintiffs and members of the Class, that the Trucks satisfy California's emissions-related warranty requirements, the most stringent emissions-related warranty requirements in the nation. California's emissions-related warranty requirements explicitly require manufacturers to warrant against design defects that cause damage to the engine or otherwise prevent the vehicle from operating.

18.     In addition to the Standard Warranty, Federal Emission System Warranty, and California Emissions System Warranty, Navistar issued a "Maintenance Information Guide" that contained affirmations of fact and descriptions concerning the EGR Only System.  Those affirmations of fact expressly warranted: (i) that the Engines had "lower operating costs" and "less hassle"; (ii) that the EGR Only System resulted in "optimal performance and low cost of ownership"; (iii) that the design of the EGR Only System resulted in "better fuel efficiency," "more power to the wheels and less soot out the exhaust," and "improved combustion"; (iv) that the "Dual-path EGR cooling provides optimized cooled EGR … [that] allows long-term system performance"; (v) that the Engine had "Premium Reliability"; (vi) that the "MaxxForce Engine can be counted on to show up for work every day"; and (vii) that the Engine was "Always Performing."  These express affirmations of material fact were woven into every purchase agreement and became part of the basis of the bargain.

19.     Any attempt by Navistar to limit its warranty obligations with respect to the Defect is unconscionable and therefore unenforceable, and any attempt by Navistar to limit or exclude remedies fails of its essential purpose and is therefore unenforceable, in light of the fact

6

that (i) the Defect in the MaxxForce Engines existed at the time of sale, and manifested both within and outside the warranty period; (ii) Navistar had actual knowledge of the Defect prior to sale, knowledge that Plaintiffs did not have and could not have discovered in the exercise of reasonable diligence prior to purchase or lease; (iii) Navistar unilaterally drafted the express warranties described herein and presented them on a take-it-or-leave-it basis post-sale; and (iv) when presented with Trucks for repair under warranty, Navistar was unable to and did not fix the problem, but merely replaced defective parts/systems with the same or similar defective parts/systems, thereby ensuring additional failures during and after expiration of the warranty period.

**C.    As a Result of the Defect, the Trucks Repeatedly Fail, Uniformly Injuring Proposed Class Members.**

20.    Many owners and lessees of Trucks containing the MaxxForce Engines have repeatedly repaired or replaced the EGR Only Systems and/or other parts damaged by EGR Only System failure, often at their own expense, and often after Navistar failed to properly repair them during the warranty.  Those that have not already failed—and those that have been "repaired" by Navistar under warranty by replacing defective parts/systems with defective parts/systems—are substantially certain to fail well before their intended and expected useful life.

21.    Indeed, Plaintiffs and Class Members experienced failures that stemmed from the EGR strategy and from high soot and high temperatures.  The Defect has caused, and is substantially certain to continue to cause, the MaxxForce Engines to fail repeatedly within their intended and expected useful life.  For this reason, all Class members have been injured uniformly. Among other things, all Class members paid a higher price than the one that would have prevailed in the market had the Engines' Defect been known outside of Navistar.  Damages as a result of this injury include:

7

a.    Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b.    Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

c.    Loss of profits and revenue, as well as harm to commercial reputation, as a result of decreased reliability.  For example, Plaintiffs lost profit and revenue when they had to pay for repair costs and towing, as well as the purchase, rental, and maintenance of additional Trucks.[4]

22.    This action arises from Navistar's knowledge that the emissions system designed into the MaxxForce Engines has an inherent Defect that leads to repeated failures, and its failure to disclose to, and active concealment from, Plaintiffs and all Class members, of that material fact.  The action also arises from Navistar's failure to properly repair the Defect as required by Navistar's express and implied warranties.  As a direct result, the Trucks equipped with the defective Engines are not as represented by Navistar.  At the time of sale, the Trucks equipped with defective Engines were worth less than the price that Plaintiffs and Class members paid, and worth less than what they would have been had the Engine been free of the Defect.  In other words, Plaintiffs and Class members did not get what they paid for.

23.    On behalf of themselves and all Class members, Plaintiffs seek a) a declaratory judgment that Navistar's express warranties cover the Defect and related failures alleged here, and that any/all attempts to limit or exclude remedies or claims contained in those warranties are unconscionable and/or cause them to fail of their essential purpose, and/or b) injunctive relief

---

[4] Plaintiffs are only pursuing lost profits damages individually.

8

compelling Navistar to cover this Defect under its express warranties and prohibiting it from enforcing any limitations of remedies or claims contained therein.

24. On behalf of themselves and all Class members, Plaintiffs also seek an award of compensatory damages against Navistar for intentional, willful, and/or negligent failure to disclose and/or concealment of the inherently defective and dangerous condition posed by the MaxxForce Engines, and Navistar's failure to honor its warranty obligation to properly repair the Defect.

## II. PARTIES

### A. Plaintiffs[5]

#### i. Alabama entities

##### 1. Storey Trucking Company, Inc.

25. Plaintiff Storey Trucking Company, Inc. ("Storey Trucking") is an Alabama corporation with its principal place of business in Alabama.

26. Storey Trucking leased five Navistar ProStar Trucks, one Model Year 2011 and four Model Year 2012, from Plaintiff Lakeside Leasing, Inc. The Trucks were equipped with MaxxForce 13 Liter Engines.

27. Plaintiff Lakeside Leasing, Inc. (see below) purchased the Trucks in 2011 in Tennessee.

28. At all relevant times, the Trucks and/or the MaxxForce Engines were covered by the Navistar warranties.

29. Storey Trucking complied with all of its obligations under the Navistar warranty.

---

[5] Plaintiffs are sorted by state of operation for the "Parties" section of the Second Amended Complaint; however, the state of operation does not control all causes of action. Plaintiffs bring specific causes of action based upon specific state sub-classes as noted in Section VIII, below.

30.　　The MaxxForce Engines in Storey Trucking's Trucks failed on numerous occasions due to the Defect. These failures included cooler failures and other engine failures and issues related to the faulty EGR Only System.

31.　　Due to failure of the Engines, the Trucks broke down in circumstances and locations that put the driver and the public at risk.

32.　　Within the express warranty period, Storey Trucking brought its Trucks to an authorized Navistar repair facility for repair or replacement. Specifically, within 1 year of purchase, the Trucks had been taken to the dealer for repairs 31 times.

33.　　Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in the Trucks continued to fail due to the Defect.

34.　　Neither Navistar, nor any of its dealers or representatives, informed Storey Trucking that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives told Plaintiff that the MaxxForce Engine did not have the Defect.

35.　　Had Storey Trucking been notified of the Defect, it would not have leased the five Navistar vehicles, or it would have paid less for the lease of the Trucks.

### 2.　Lakeside Leasing, Inc.

36.　　Plaintiff Lakeside Leasing, Inc. ("Lakeside") is an Alabama corporation with its principal place of business in Alabama.

37.　　Lakeside purchased five Navistar ProStar Trucks, one Model Year 2011 and four Model Year 2012, and leased them to Plaintiff Storey Trucking.  The Trucks were equipped with MaxxForce 13 Liter Engines.

38.　　The Trucks were purchased in 2011 in Tennessee.

10

39.    At all relevant times, the Trucks and/or the MaxxForce Engines were covered by the Navistar warranties.

40.    Lakeside complied with all of its obligations under the Navistar warranties.

41.    The MaxxForce Engines in Lakeside's Trucks failed on numerous occasions due to the Defect. These failures included cooler failures and other engine failures and issues related to the faulty EGR Only System.

42.    Due to failure of the Engines, the Trucks broke down in circumstances and locations that put the driver and the public at risk.

43.    Within the express warranty period, Lakeside's Trucks were taken to an authorized Navistar repair facility for repair or replacement. Specifically, within one year of purchasing the Trucks, they were taken to the dealer for repairs 31 times.

44.    Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Lakeside's Trucks continued to fail due to the Defect. These failures included cooler failures and other engine failures and issues related to the faulty EGR Only System.

45.    Neither Navistar, nor any of its dealers or representatives, informed Lakeside that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar's representatives told Lakeside that the Engines did not have the Defect.

46.    Had Lakeside been advised of the Defect, it would not have purchased the Trucks, or it would have paid less for them.

47.    As a result of Navistar's misrepresentations and omissions associated with the Defect, both Storey Trucking and Lakeside suffered ascertainable losses.  Storey Trucking and

11

Lakeside seek recovery of all actual damages including, but not limited to direct, incidental and consequential damages including:

      a.      Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

      b.      Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

48.      Storey Trucking's and Lakeside's experiences mirror those of thousands of other owners and lessees of Trucks with the defective Engines.

#### ii.  Arkansas entities

#### 1.  Cesar Calderone, representing C & T Transport

49.      Plaintiff Cesar Calderone, representing the interests of C & T Transport (collectively, "C & T Transport"), is the representative plaintiff for an Arkansas corporation in Rogers, Arkansas. C & T Transport is a trucking industry company that offers specialized custom logistics. It transports and warehouses food products and provides logistical support on behalf of its customers.

50.      C & T Transport purchased one used Navistar International ProStar Truck with a MaxxForce 13 Engine, which it uses in the operation of its business. It purchased the Truck from Summit Truck Group, a dealership in Lowell, Arkansas.

51.      At all relevant times, the Truck and/or the MaxxForce Engine was covered by the Navistar warranty.

52.      The MaxxForce Engine in C & T Transport's Truck failed on numerous occasions due to the Defect. These failures included numerous operational warnings and breakdowns necessitating repair.

53. Within the express warranty period, C & T Transport brought the Truck to an authorized Navistar repair facility for repair or replacement.

54. Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engine in C & T Transport's Truck continued to fail due to the Defect.

55. Neither Navistar, nor any of its dealers or representatives, informed C & T Transport that the Engine was defective, or of Navistar's misrepresentations and omissions associated with the Defect.

56. Had C & T Transport been notified of the Defect, it would not have purchased the Truck, or it would have paid less for it.

57. C & T Transport suffered ascertainable losses as a result of Navistar's misrepresentations and omissions associated with the Defect. C & T Transport seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

      a. Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

      b. Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

58. C & T Transport's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### iii. California entities

### 1. Two Star Trucking, Inc.

59. Plaintiff Two Star Trucking, Inc. ("Two Star") is a California limited liability company based out of Maywood, California.

60.     Two Star purchased 12 Navistar International ProStar Trucks with MaxxForce 13 Engines from Westrux International in Montebello, California.

61.     The MaxxForce Engine in Two Star's Trucks failed on numerous occasions due to the Defect, which should have been covered under warranty.  Two Star complained to Navistar and authorized service technicians on repeated occasions regarding the Defect and experienced failures that stemmed from the EGR strategy and from high soot and high temperatures.  Specifically, these failures included issues related to the faulty EGR Only System.

62.     Two Star brought the Trucks to authorized Navistar repair facilities for repair or replacement.

63.     Despite attempts at repair, the MaxxForce Engines in Two Star's Trucks continued to fail due to the Defect. Neither Navistar, nor any of its dealers or representatives, informed Two Star that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.

64.     Two Star experienced long wait times to have the Engine repaired. There were not enough technicians or emissions system parts to repair the Defect.

65.     Had Two Star been told of the Defect, it would not have purchased the Trucks, or it would have paid less for them.

66.     Two Star suffered ascertainable losses as a result of Navistar's misrepresentations and omissions associated with the Defect.  Two Star seeks recovery of all actual damages including, but not limited to direct, incidental and consequential damages including:

> a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

        b.      Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

67.     Two Star's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### iv. Connecticut entities

### 1. Killer B Trucking LLC

68.     Plaintiff Killer B Trucking LLC ("Killer B Trucking") is a trucking company based in Bristol, Connecticut.

69.     Killer B Trucking bought four used International Model Year 2012 ProStar Trucks with 13-liter Engines from MHC Truck Source Inc. in Kansas City, Kansas.

70.     Killer B Trucking experienced numerous breakdowns with its ProStar vehicles, most related to the emissions system.

71.     Killer B Trucking complied with all of its obligations under the Navistar warranty.

72.     Despite bringing the vehicles to Navistar authorized repair facilities within the express warranty period for repair, the Engines continued to experience the same Defect.

73.     While under warranty, the vehicles required multiple engine repairs, each of which required the Truck to be in the shop for extended periods of time.

74.     Only Navistar authorized technicians could work on the Engines' defective emissions systems.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

75.     Had Killer B Trucking known of the Defect, it would not have purchased the Trucks or it would have paid less for them.

76.     Killer B Trucking has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Killer B Trucking seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

a.      Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b.      Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

77.     Killer B Trucking's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

**v. Florida entities**

**1. Lance R. Edwards**

78.     Plaintiff Lance R. Edwards ("Edwards") is a resident of Lakeland, Florida, and a citizen of the State of Florida.

79.     Mr. Edwards provided commercial trucking services hauling dry freight and container vans.

80.     Mr. Edwards bought a used International Model Year 2012 ProStar Truck with a 13-liter Engine from a Navistar Used Truck Center in Tampa, Florida.

81.     Mr. Edwards experienced numerous breakdowns with the ProStar vehicle, most related to the emissions system.

82.     Despite bringing the vehicle to Navistar authorized repair facilities within the express warranty period for repair, the Engine continued to experience the same Defect.

16

83.     While under warranty, the vehicle required multiple engine repairs, each of which required the Truck to be in the shop for extended periods of time.

84.     Mr. Edwards complied with all of his obligations under the Navistar warranty.

85.     Only the Navistar authorized technicians could work on the Engine's defective emissions system.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

86.     Had Mr. Edwards known of the Defect, he would not have purchased the Truck or would have paid less for it.

87.     Plaintiff Edwards has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Plaintiff Edwards seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

        a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

        b.     Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

88.     Plaintiff Edwards' experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### 2.  Peninsular Transfer Inc.

89.     Plaintiff Peninsular Transfer Inc. ("Peninsular Transfer") is a trucking company based in Miami, Florida.

90.     Peninsular Transfer bought a used International Model Year 2011 ProStar Truck with a 13-liter Engine from International Used Truck Center of Atlanta in Atlanta, Georgia.

91.     Peninsular Transfer experienced breakdowns with its ProStar vehicle, most related to the emissions system.

92.     Peninsular Transfer complied with all of its obligations under the Navistar warranty.

93.     Despite bringing the vehicle to Navistar authorized repair facilities for repair, the Engine continued to experience the same Defect.

94.     The vehicle required multiple engine repairs, each of which required the Truck to be in the shop for extended periods of time.

95.     Only the Navistar authorized technicians could work on the Engine's defective emissions systems. There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

96.     Had Peninsular Transfer known of the Defect, it would not have purchased the Truck or it would have paid less for it.

97.     Peninsular Transfer has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Peninsular Transfer seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

> a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

> b.     Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

98.     Peninsular Transfer's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### 3. Deanna and Natali Garcia, representing Vera Transport, LLC

99.     Plaintiffs Deanna and Natali Garcia represent the interests of Vera Transport, LLC (collectively "Vera Transport"), which was a Florida trucking company based in Davie, Florida.

100.     Vera Transport bought two used International Model Year 2012 ProStar trucks with 13-liter Engines from Westrux International Trucks of Southern California in Fontana, California.

101.     Vera Transport experienced numerous breakdowns with its ProStar vehicles, most related to the emissions system.

102.     The vehicles required multiple engine repairs, some of which required the Truck to be in the shop for extended periods of time.

103.     Only Navistar authorized technicians could work on the Engines' defective emissions systems.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

104.     Had Vera Transport known of the Defect, it would not have purchased the Trucks or it would have paid less for them.

105.     Vera Transport has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Vera Transport seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

19

a.  Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b.  Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

106.  Vera Transport's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### vi.  Idaho entities

#### 1.  David A. Lord

107.  Plaintiff David A. Lord d/b/a Lord AG Transportation ("Lord AG") is an Idaho sole proprietorship with its principal place of business in Idaho.

108.  Lord AG purchased a 2011 International ProStar on or about September 21, 2012 in Idaho.

109.  This Truck was equipped with a MaxxForce Engine.

110.  At all relevant times, the Truck and/or the MaxxForce Engine were covered by a Navistar warranty.

111.  Lord AG complied with all of its obligations under the Navistar warranty.

112.  The MaxxForce Engine in Lord AG's vehicle failed on numerous occasions due to the Defect.

113.  Due to failure of the Engine, the Truck broke down in circumstances and locations that put the driver and the public at risk.

114.  Within the express warranty period, Lord AG's vehicle was brought to an authorized Navistar repair facility for repair or replacement.

115.    Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engine in Lord AG's vehicle continued to fail due to the Defect.

116.    Neither Navistar, nor any of its dealers or representatives informed Lord AG that the Engine was defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives told Lord AG that the MaxxForce Engine did not have the Defect.

117.    Had Lord AG been notified of the Defect, it would not have purchased the Truck, or it would have paid less for it.

118.    Lord AG has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  Lord AG seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

    a.    Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

    b.    Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

119.    Lord AG's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

**vii.  Illinois entities**

**1.  Carmichael Leasing Co., Inc.**

120.    Plaintiff Carmichael Leasing Co., Inc. ("Carmichael") is a family-owned business headquartered in Chicago, Illinois and incorporated in Illinois.  It was founded in 1972 and has been in continuous operation ever since.

121.    Plaintiff Carmichael is a full service and full maintenance truck leasing company, with a strong foothold in providing refrigerated trucks.

122.    Plaintiff Carmichael has a long-standing relationship with Navistar. Up until 2003, Plaintiff Carmichael purchased almost exclusively Navistar vehicles.

123.    Plaintiff Carmichael purchased 19 new International TranStar vehicles with 13-liter engines from Chicago International Truck in Chicago, Illinois.

124.    Plaintiff Carmichael typically owns its trucks for 8 years before needing to replace them.

125.    Plaintiff Carmichael has experienced numerous breakdowns with its Navistar vehicles, most related to the emissions system.  Despite bringing the vehicles to Navistar authorized repair facilities within the express warranty period for repair, the Engines continued to experience the same Defect, often within six months.

126.    Neither Navistar nor any of its dealers or representatives, informed Carmichael of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar's representatives told Carmichael that the 2011 and 2012 Engines did not have the Defect.

127.    Had Carmichael been told of the Defect, it would not have purchased the Trucks, or it would have paid less for them.

128.    As a result of Navistar's misrepresentations and omissions associated with the Defect, Carmichael has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect, including:

a. Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b. Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

129. Carmichael's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

## 2. Robert Grieser

130. Plaintiff Robert Grieser ("Grieser") resides in Pekin, Illinois, and is a citizen of the State of Illinois.

131. Mr. Grieser bought a new International Model Year 2012 ProStar Truck with 13-liter Engine for $124,000 from Husky Trucks International in Seattle, Washington.

132. Mr. Grieser experienced numerous breakdowns with his ProStar vehicle, most related to the emissions system.

133. Mr. Grieser complied with all of his obligations under the Navistar warranty.

134. Despite bringing the vehicle to Navistar authorized repair facilities within the express warranty period for repair, the Engine continued to experience the same Defect.

135. While under warranty, the vehicle required multiple engine repairs, each of which required the Truck to be in the shop for extended periods of time.

136. Only Navistar authorized technicians could work on the Engine's defective emissions systems. There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

137. Had Mr. Grieser known of the Defect, he would not have purchased the Truck or would have paid less for it.

23

138.     Mr. Grieser has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Mr. Grieser seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

        a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

        b.     Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

139.     Plaintiff Grieser's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines .

### 3. Randy Quick

140.     Plaintiff Randy Quick ("Quick") resides in Buffalo, Illinois, is a citizen of the State of Illinois, and operates a truck.

141.     Mr. Quick bought a used International Model Year 2011 ProStar Truck with a 13-liter Engine from an International Used Truck Center in Indianapolis, Indiana.

142.     Mr. Quick experienced numerous breakdowns with his ProStar vehicle, most related to the emissions system.

143.     Mr. Quick complied with all of his obligations under the Navistar warranty.

144.     Despite bringing the vehicle to Navistar authorized repair facilities within the express warranty period for repair, the Engine continued to experience the same Defect.

145.     While under warranty, the vehicle required multiple engine repairs, each of which required the Truck to be in the shop for extended periods of time.

146.    Only Navistar authorized technicians could work on the Engine's defective emissions systems.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

147.    Had Mr. Quick known of the Defect, he would not have purchased the Truck or it would have paid less for it.

148.    Mr. Quick has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Mr. Quick seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

   a.    Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

   b.    Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

149.    Mr. Quick's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### 4.  GT Expedited, Inc., Go To Logistics, Inc., and ToGo Express, Inc.

150.    Plaintiffs GT Expedited, Inc.; Go To Logistics, Inc.; and ToGo Express, Inc. (collectively "Go To") are family-owned Illinois businesses operating out of Northlake, Illinois.

151.    In 2011, ToGo Express, Inc., purchased 12 Navistar International ProStar Trucks with 13-liter Engines from Chicago International Trucks in Forest View, Illinois.  Both GT Expedited, Inc., and Go To Logistics, Inc. lease trucks from ToGo Express, Inc., and Go To Logistics, Inc. pays for repairs to leased rucks.

152.    Go To experienced numerous breakdowns with the Trucks—most related to the emissions system—resulting in extended periods of time of up to two months when the Trucks were not drivable due to the Defects.

153.    The Trucks were covered by Navistar's warranty, and Go To complied with all of its obligations under the Navistar warranty.

154.    After repeated Engine failures, and multiple engine repairs, Go To complained to Navistar representatives, the dealership, and sales representatives.  Eventually, Go To was able to negotiate a trade to Navistar's 2013 Model Year MaxxForce 13-liter Engines, provided that Go To pay for the mileage already accrued on its 2012 Trucks.  Under the trade, Go To was still responsible for paying the entire original cost of the Trucks.

155.    Despite assurances that the Trucks would not experience the same problems, they did.

156.    Had Go To known of the Defect, it would not have purchased the Trucks or would have paid less for them.

157.    Go To has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Go To seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

a.    Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b.    Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

26

158.    Go To's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

**viii.    Indiana entities**

**1.    Binder Trucking, Inc.**

159.    Plaintiff Binder Trucking, Inc. ("Binder Trucking") is a leased contractor for Federal Express Ground, based in Franklin, Indiana.

160.    Binder Trucking bought a total of five used International Model Year 2012 ProStar Trucks with 13-liter Engines from Navistar, Inc. in Ohio.

161.    Binder Trucking experienced numerous breakdowns with its five ProStar vehicles, most related to the emissions system.

162.    Binder Trucking complied with all of its obligations under the Navistar warranty.

163.    Despite bringing the vehicles to Navistar authorized repair facilities within the express warranty period for repair, the Engines continued to experience the same Defect.

164.    While under warranty, each vehicle required multiple engine repairs, many of which required the Truck to be in the shop for extended periods of time.

165.    Only Navistar authorized technicians could work on the Engines' defective emissions systems.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

166.    Had Binder Trucking known of the Defect, it would not have purchased the Trucks or it would have paid less for them.

167.    Binder Trucking, Inc. has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  Binder Trucking seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

a. Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b. Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

168. Binder Trucking's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### ix. Kentucky entities

#### 1. Fike Logistics, Inc.

169. Plaintiff Fike Logistics, Inc. ("Fike Logistics") is a Kentucky corporation with its principal place of business in Hazel, Kentucky.

170. In or about May 2013, Fike Logistics purchased two Trucks with MaxxForce 13 Engines in Texas, which it used in the operation of its business.

171. In or about June 2013, Fike Logistics purchased three Trucks with MaxxForce 13 Engines in North Carolina, which it used in the operation of its business.

172. Each of these Trucks was equipped with a MaxxForce Engine.

173. At all relevant times, these Trucks and/or the MaxxForce Engines were covered by a Navistar warranty.

174. Fike Logistics complied with all of its obligations under the Navistar warranty.

175. The MaxxForce Engines in Fike Logistics' vehicles failed on numerous occasions due to the Defect. These failures included numerous operational warnings and breakdowns necessitating repair.

176. Due to failure of the Engines, the Trucks broke down in circumstances and locations that put the driver and the public at risk.

177. Within the express warranty period, Fike Logistics' vehicles were brought to an authorized Navistar repair facility for repair or replacement.

178. Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Fike Logistics' vehicles continued to fail due to the Defect. The Engines did not function as required and will not do so for the expected life of the vehicles.

179. Neither Navistar, nor any of its dealers or representatives, informed Fike Logistics that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect. To the contrary, Navistar representatives told Fike Logistics that the MaxxForce Engine did not have the Defect.

180. Had Fike Logistics been notified of the Defect, it would not have purchased the Trucks.

181. As a result of Navistar's misrepresentations and omissions associated with the Defect, Fike Logistics suffered ascertainable losses. Fike Logistics seeks recovery of all actual damages including, but not limited to direct, incidental and consequential damages including:

     a.    Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

     b.    Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

182. Fike Logistics' experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

x.  **Massachusetts entities**

1.  **Robert Constantine**

183.    Plaintiff Robert Constantine ("Constantine") is a resident of Sturbridge, Massachusetts, and a citizen of the State of Massachusetts.

184.    Mr. Constantine bought a used International Model Year 2012 ProStar Truck with a 13-liter Engine from Don Baskin Truck Sales LLC in Covington, Tennessee.

185.    Mr. Constantine experienced numerous breakdowns with his ProStar Truck, most related to the emissions system.

186.    Mr. Constantine complied with all of his obligations under the Navistar warranty.

187.    Despite bringing the vehicle to Navistar authorized repair facilities within the express warranty period for repair, the Engine continued to experience the same Defect.

188.    The vehicle required multiple engine repairs, each of which required the Truck to be in the shop for extended periods of time.

189.    Only Navistar authorized technicians could work on the Engine's defective emissions systems.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

190.    Had Mr. Constantine known of the Defect, he would not have purchased the Truck or would have paid less for it.

191.    Mr. Constantine has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Plaintiff Constantine seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

a. Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b. Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

192. Mr. Constantine's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### xi. New Jersey entities

#### 1. Joandnas Operations, Inc.

193. Joandnas Operations Inc. ("Joandnas") is a New Jersey trucking company with its principal place of business in the state of New Jersey.

194. Joandnas purchased two used 13-liter 2012 International ProStar Trucks, Model Year 2012 at the Truck Country of Iowa in Dubuque, Iowa at a live auction.

195. The Trucks and/or the MaxxForce Engines would have been covered by a Navistar warranty when they were brought in for repairs.

196. Joandnas complied with all of its obligations under the Navistar warranty.

197. Joandnas's vehicles experienced numerous failures of EGR Only System components, which resulted in an inability to employ drivers who will drive its Trucks due to these long inoperable periods for repairs.

198. Despite bringing these vehicles to a Navistar authorized repair facility, the engines continued to experience the same Defect.

199. Joandnas has incurred significant costs for the replacement repairs required for all of the engine and EGR issues, and these replacements did not repair the Defect, which remained in the Engines after the replacements were done.

31

200. Had Joandnas known of the Defect, it would not have purchased the Trucks or it would have paid less for them.

201. Joandnas has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Joandnas seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

      a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

      b.     Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

202. Joandnas's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### 2. Dulce Alvarez, representing the interests of A-Rapid Logistics

203. Plaintiff Dulce Alvarez represents the interests of A-Rapid Logistics (collectively "A-Rapid Logistics"), a New Jersey corporation with its principal place of business in Englewood, New Jersey. A-Rapid Logistics is a trucking company employer that offers specialized custom logistics shipping freight for Federal Express, and it transports products and provides logistical support on its behalf.

204. A-Rapid is leasing one used Navistar International ProStar Truck with a MaxxForce 13 Engine, which it uses in the operation of its business. Alka Trucking (see below) purchased the Truck from Ransome CAT, a dealership in Bensalem, Pennsylvania.

205. At all relevant times, the Truck and/or the MaxxForce Engine was covered by the Navistar warranty.

32

206. The MaxxForce Engine in A-Rapid Logistics's Truck failed on numerous occasions due to the Defect. These failures included numerous operational warnings and breakdowns necessitating repair.

207. Within the express warranty period, A-Rapid Logistics brought the Truck to an authorized Navistar repair facility for repair or replacement.

208. Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in A-Rapid Logistics' Truck continued to fail due to the Defect.

209. Neither Navistar, nor any of its dealers or representatives, informed A-Rapid Logistics that the Engine was defective, or of Navistar's misrepresentations and omissions associated with the Defect.

210. A-Rapid Logistics suffered ascertainable losses as a result of Navistar's misrepresentations and omissions associated with the Defect. A-Rapid Logistics seeks recovery of all actual damages (including direct, incidental, and consequential damages).

211. A-Rapid Logistics' experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engine.

### 3. Dulce Alvarez, representing the interests of Alka Trucking, Inc.

212. Plaintiff Dulce Alvarez represents the interests of Alka Trucking, Inc. (collectively "Alka Trucking"), a New Jersey corporation with its principal place of business in Englewood, New Jersey. Alka Trucking is a trucking company employer that offers specialized custom logistics shipping freight for Federal Express, and it transports products and provides logistical support on its behalf.

213.     Alka Trucking purchased one used Navistar International ProStar Truck with a MaxxForce 13 Engine, which it uses in the operation of its business.  It purchased the Truck from Ransome CAT, a dealership in Bensalem, Pennsylvania.

214.     At all relevant times, the Truck and/or the MaxxForce Engine was covered by the Navistar warranty.

215.     The MaxxForce Engine in Alka Trucking's Truck failed on numerous occasions due to the Defect.  These failures included numerous operational warnings and breakdowns necessitating repair.

216.     Within the express warranty period, Alka Trucking brought the Truck to an authorized Navistar repair facility for repair or replacement.

217.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Alka Trucking's Truck continued to fail due to the Defect.

218.     Neither Navistar, nor any of its dealers or representatives, informed Alka Trucking that the Engine was defective, or of Navistar's misrepresentations and omissions associated with the Defect.

219.     Had Alka Trucking been notified of the Defect, it would not have purchased the Truck, or it would have paid less for it.

220.     Alka Trucking suffered ascertainable losses as a result of Navistar's misrepresentations and omissions associated with the Defect.  Alka Trucking seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

        a.      Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

34

b.    Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

221.    Alka Trucking's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engine.

### 4. Ferraro Foods, Inc.

222.    Plaintiff Ferraro Foods, Inc. ("Ferraro Foods") is a New Jersey corporation with its principal place of business in Piscataway, New Jersey. Ferraro Foods is a trucking industry employer that offers specialized custom logistics. It transports and warehouses food products and provides logistical support on behalf of its customers.

223.    Ferraro Foods purchased twenty new Navistar International ProStar Trucks with MaxxForce 13 Engines used in the operation of its business. It purchased the Trucks from a Brown Truck Group, a dealership in Bloomsbury, New Jersey.

224.    At all relevant times, the Trucks and/or the MaxxForce Engines were covered by the Navistar warranty.

225.    The MaxxForce Engines in Ferraro Foods' Trucks failed on numerous occasions due to the Defect. These failures included numerous operational warnings and breakdowns necessitating repair.

226.    Within the express warranty period, Ferraro Foods brought the Trucks to an authorized Navistar repair facility for repair or replacement.

227.    Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Ferraro Foods' Trucks continued to fail due to the Defect.

228.    Neither Navistar, nor any of its dealers or representatives, informed Ferraro Foods that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.

35

229.     Had Ferraro Foods been notified of the Defect, it would not have purchased the Trucks, or it would have paid less for them.

230.     Ferraro Foods suffered ascertainable losses as a result of Navistar's misrepresentations and omissions associated with the Defect. Ferraro Foods seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

      a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

      b.     Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

231.     Ferraro Foods' experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### xii.  North Carolina entities

### 1.  Jenkins Unlimited, Inc.

232.     Plaintiff Jenkins Unlimited, Inc. ("Jenkins Unlimited") is a North Carolina trucking company moving recycled materials based in Sanford, North Carolina.

233.     Jenkins Unlimited bought four used International Model Year 2011 ProStar Trucks with 13-liter Engines from Navistar in Charlotte, North Carolina.

234.     Jenkins Unlimited experienced numerous breakdowns with its ProStar vehicles, most related to the emissions system.

235.     Jenkins Unlimited complied with all of its obligations under the Navistar warranty.

236.     Despite bringing the vehicles to Navistar authorized repair facilities within the express warranty period for repair, the Engine continued to experience the same Defect.

237.    While under warranty, the vehicles required multiple engine repairs, each of which required the Trucks to be in the shop for extended periods of time.

238.    Only authorized Navistar technicians could work on the Engines' defective emissions systems.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

239.    Had Jenkins Unlimited known of the Defect, it would not have purchased the Trucks or it would have paid less for them.

240.    Jenkins Unlimited has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  Jenkins Unlimited seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

a.    Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b.    Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

241.    Jenkins Unlimited's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### 2.  Phifer Trucking, Inc.

242.    Plaintiff Phifer Trucking, Inc. ("Phifer Trucking") is a North Carolina long-haul trucking company moving general commodities, based in Marshville, North Carolina.

243.    Phifer Trucking bought one used International Model Year 2010 ProStar Truck with a 13-liter Engine from Rush International Truck Center in Charlotte, North Carolina.

244.     Phifer Trucking experienced numerous breakdowns with its ProStar vehicle, and failures that stemmed from the EGR strategy and from high soot and high temperatures.

245.     Phifer brought the Truck to Navistar authorized repair facilities, and had to pay out of pocket despite requesting that the repairs be covered under warranty.  Despite numerous repairs, the Engine continued to experience the same Defect.

246.     The vehicle required multiple engine repairs, each of which required the Truck to be in the shop for extended periods of time.

247.     Only authorized Navistar technicians could work on the Engine's defective emissions systems.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

248.     Had Phifer Trucking known of the Defect, it would not have purchased the Truck or it would have paid less for it.

249.     Phifer Trucking has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  Phifer Trucking seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

> a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.
>
> b.     Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

250.     Phifer Trucking's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

xiii.   **Oregon entities**

1.   **Ronald L. Anderson; RLA Holdings, LLC; and A&K Development Co.**

251.   Plaintiff Ronald L. Anderson resides in Eugene, Oregon, and is a citizen of the State of Oregon.

252.   Plaintiff RLA Holdings, LLC ("RLA") is a limited liability company organized under the laws of the State of Oregon.  Ronald L. Anderson is the sole member and 100% owner of RLA.

253.   Plaintiff A&K Development Co. ("A&K") is an Oregon corporation.  Ronald L. Anderson is the president and sole shareholder of A&K.

254.   RLA bought a used International Model Year 2012 ProStar Truck from Westside Truck & Equipment Sales in Portland, Oregon.

255.   RLA experienced numerous breakdowns with the ProStar vehicle, most related to the emissions system.

256.   Only authorized Navistar technicians could work on the Engine's defective emissions system.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

257.   Had RLA known of the Defect, it would not have purchased the Truck or would have paid less for it.

258.   In May 2017, RLA transferred ownership of the Truck to A&K.

259.   Plaintiffs Anderson, RLA, and A&K have suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Plaintiffs Anderson, RLA, and A&K seek recovery of all actual damages (including direct, incidental, and consequential damages), including:

39

      a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Truck been known.

      b.     Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

260.    The experiences of Anderson, RLA, and A&K mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### 2. Victor Caballero

261.    Plaintiff Victor Caballero ("Caballero") resides in Salem, Oregon, and is a citizen of the State of Oregon.

262.    Mr. Caballero provides commercial trucking services individually and through Citlalli Trucking LLC, an Oregon limited liability company.

263.    Mr. Caballero bought a used International Model Year 2012 ProStar Truck with a 13-liter Engine from MHC Kenworth in Fort Worth, Texas.

264.    Mr. Caballero experienced numerous breakdowns with the ProStar vehicle, most related to the emissions system.

265.    Despite bringing the vehicle to Navistar authorized repair facilities the Engine continued to experience the same Defect.

266.    The vehicle required multiple engine repairs, each of which required the Truck to be in the shop for days.

267.    Only Navistar authorized technicians could work on the Engine's defective emissions system. There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

268.    Had Mr. Caballero known of the Defect, he would not have purchased the Truck or would have paid less for it.

269.     Mr. Caballero has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Mr. Caballero seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

      a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

      b.     Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

270.     Mr. Caballero's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### xiv.  South Carolina entities

#### 1.  The Cross Express

271.     Plaintiff The Cross Express ("Cross Express") is a South Carolina sole proprietor with its principal place of business in Lexington, South Carolina.  Cross Express is a trucking industry company that offers specialized custom logistics relating to shipping containers.  It transports shipping products and provides logistical support on behalf of its customers.

272.     Cross Express purchased one used Navistar International ProStar Truck with a MaxxForce 13 Engine, which it uses in the operation of its business.  It purchased the Truck from World Wide Equipment Greenville Division, Greenville, South Carolina.

273.     The MaxxForce Engine in Cross Express's Truck failed on numerous occasions due to the Defect.  These failures included numerous operational warnings and breakdowns necessitating repair.

274.    Within the express warranty period, Cross Express brought the Truck to an authorized Navistar repair facility for repair or replacement.

275.    Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engine in Cross Express's Truck continued to fail due to the Defect.

276.    Neither Navistar, nor any of its dealers or representatives, informed Cross Express that the Engine was defective, or of Navistar's misrepresentations and omissions associated with the Defect.

277.    Had Cross Express been notified of the Defect, it would not have purchased the Truck, or it would have paid less for it.

278.    Cross Express suffered ascertainable losses as a result of Navistar's misrepresentations and omissions associated with the Defect. Cross Express seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

> a.    Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.
>
> b.    Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

279.    Cross Express's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engine.

xv. **Tennessee entities**

1. **Leonard Butler**[6]

280.    Plaintiff Leonard Butler ("Butler") is a resident of Murfreesboro, Tennessee, and a citizen of the State of Tennessee.

281.    Mr. Butler bought a used International Model Year 2012 ProStar Truck with a 13-liter Engine from International Used Truck Center of Nashville in LaVergne, Tennessee.

282.    Mr. Butler experienced numerous breakdowns with the ProStar vehicle, most related to the emissions system.

283.    Despite bringing the vehicle to Navistar authorized repair facilities within the express warranty period for repair, the Engine continued to experience the same Defect.

284.    While under warranty, the vehicle required multiple engine repairs, each of which required the Truck to be in the shop for extended periods of time.

285.    Mr. Butler complied with all of his obligations under the Navistar warranty.

286.    Only Navistar authorized technicians could work on the Engine's defective emissions system.  There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

287.    Had Mr. Butler known of the Defect, he would not have purchased the Truck or would have paid less for it.

288.    Mr. Butler has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Plaintiff Butler seeks

---

[6] Unfortunately, because of the substantial losses Mr. Butler suffered due to the Defect in the Navistar Truck, Mr. Butler recently declared bankruptcy.  *See In re Leonard Howard Butler, Robbie Elaine Butler*, No. 17-bk-04037 (Bankr. M.D. Tenn.).

recovery of all actual damages (including direct, incidental, and consequential damages), including:

     a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

     b.     Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

289.    Mr. Butler's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

## 2. Steven A. Hamilton

290.    Plaintiff Steven A. Hamilton ("Hamilton") resides in Buchanan, Tennessee, and is a citizen of the State of Tennessee.

291.    Mr. Hamilton provided commercial trucking services within Tennessee and throughout the United States.

292.    Mr. Hamilton purchased an International ProStar on July 8, 2011, from Tri-State International in Murray, Kentucky, equipped with the 13-liter MaxxForce diesel engine manufactured by Navistar.

293.    At all relevant times, the Truck and/or the MaxxForce Engine was covered by a Navistar warranty.

294.    Mr. Hamilton complied with all of his obligations under the Navistar warranty.

295.    The MaxxForce Engine in Mr. Hamilton's vehicle failed on numerous occasions due to the Defect. These failures included recurring performance and reliability problems stemming from the EGR strategy and from high soot and high temperatures related to the Defect.

296.     Due to failure of the Engine, the Truck broke down in a circumstance and location that put the driver and the public at risk.

297.     Within the express warranty period, Mr. Hamilton's vehicle was brought to an authorized Navistar repair facility for repair or replacement. Navistar refused to repair the engine or initiate a responsive effort to repair the engine consistent with its obligation.  Navistar failed to provide the promised warranty benefits for Mr. Hamilton's vehicle despite Mr. Hamilton continuing demand to do so and notwithstanding the earnest need for repairs, the same within the warranty's time and mileage eligibility.

298.     Despite Mr. Hamilton undertaking some repairs and an increased effort to monitor and maintain the Defective Engine by Navistar dealerships, the engine continued to chronically malfunction and Mr. Hamilton repeatedly was requested to bring the malfunctioning vehicle to an authorized Navistar dealership.  At all relevant times, Navistar refused to perform an adequate, suitable or capable repair and/or refused to provide repair services of any sort or type.

299.     Despite knowing that Mr. Hamilton and the members of the Class had bought ProStar vehicles outfitted with defective Engines that failed to perform wholly, or in substantial part, Navistar responded by authorizing minor recalibrations, adjustments and replacement of isolated components that Navistar knew would not repair the engine or its related components. Diesel technicians working on Mr. Hamilton's vehicle at authorized Navistar dealerships have repeatedly acknowledged the high and unusual volume of problems inherent in the defective Engines.

300.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engine in Mr. Hamilton's vehicle continued to fail due to the Defect.

45

301.    Neither Navistar, nor any of its dealers or representatives, informed Mr. Hamilton that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar representatives told Mr. Hamilton that the MaxxForce Engine did not have the Defect.

302.    Mr. Hamilton has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Plaintiff seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

a.    Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

b.    Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

303.    Had Mr. Hamilton been notified of the Defect, he would not have purchased the Truck.

304.    Mr. Hamilton's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

xvi.    **Texas entities**

**1. Stephen Slough**

305.    Plaintiff Stephen Slough ("Slough") is a resident of Commerce, Texas, and a citizen of the State of Texas.  Mr. Slough has been in the trucking industry for 44 years.

306.    Mr. Slough purchased a 2012 used ProStar MaxxForce 13 Liter Engine from Used Truck Center Southwest International in Dallas, Texas.

307. The Truck and/or the MaxxForce Engine was covered by the Navistar warranty when Mr. Slough purchased the vehicle, and Mr. Slough complied with all warranty requirements.

308. The MaxxForce Engine in Mr. Slough's Truck failed on numerous occasions due to the Defect. These failures included numerous operational warnings and breakdowns necessitating repair.

309. Despite attempts at repair or replacement by an authorized Navistar repair facility, the MaxxForce Engine in Mr. Slough's Truck continued to fail due to the Defect.

310. Neither Navistar, nor the dealership which sold Mr. Slough the Truck, informed Mr. Slough that the Engine was defective, or of Navistar's misrepresentations and omissions associated with the Defect.

311. Had Mr. Slough been notified of the Defect, he would not have purchased the Truck, or it would have paid less for it.

312. Mr. Slough suffered ascertainable losses as a result of Navistar's misrepresentations and omissions associated with the Defect. Mr. Slough seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

    a. Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

    b. Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

313. Mr. Slough's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

xvii.   **Washington entities**

1.   **Charles Keplinger**

314.    Plaintiff Charles Keplinger ("Keplinger") is a citizen and a resident of the State of Illinois and resides in Peoria, Illinois.

315.    In 2012, Mr. Keplinger purchased a 2012 MaxxForce 13 Liter Engine from Husky International in Tukwila, Washington.

316.    Mr. Keplinger's Truck and/or the MaxxForce Engine was covered by a Navistar warranty.

317.    Mr. Keplinger complied with all of its obligations under the Navistar warranty.

318.    The MaxxForce Engine in Mr. Keplinger's vehicle failed on numerous occasions due to the Defect.

319.    Due to failure of the Engine, Mr. Keplinger's vehicle broke down in circumstances and locations that put the driver and the public at risk.

320.    Within the express warranty period, Mr. Keplinger's Truck was brought to authorized Navistar repair facilities for repair or replacement of its EGR Only systems and emissions systems.

321.    Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engine in Plaintiff's vehicle continued to fail due to the Defect.

322.    Neither Navistar, nor any of its dealers or representatives, informed Plaintiff that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.

323.    Finally, after the Truck could not be repaired for a year, Mr. Keplinger sold the Truck for far below what he paid for it, taking a loss on his investment.

324.     Mr. Keplinger has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect. Mr. Keplinger seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

      a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

      b.     Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

325.     Had Mr. Keplinger been told of the Defect, he would not have purchased the Truck or it would have paid less for it.

326.     Mr. Keplinger's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### xviii.  Wisconsin entities

#### 1.  G&G Specialized Carriers LLC

327.     Plaintiff G&G Specialized Carriers LLC ("G&G") is a Wisconsin limited liability company with its principal place of business located at S82 W19480 Apollo Drive, Muskego, Wisconsin, that conducts business within and outside of Wisconsin.

328.     On or about November 2012, G&G purchased a new International LoneStar Truck with a MaxxForce 13 Engine, which it used in the operation of its business.  Plaintiff purchased the vehicle in Wisconsin.

329.     At all relevant times, the Truck and/or the MaxxForce Engine was covered by a Navistar warranty.

330.     G&G complied with all of its obligations under the Navistar warranty.

49

331.     The MaxxForce Engine in G&G's vehicle failed on numerous occasions due to the Defect.  These failures included numerous operational warnings and breakdowns necessitating repair.

332.     Due to failure of the Engine, the Truck broke down in circumstances and locations that put the driver and the public at risk.

333.     Within the express warranty period, G&G's vehicle was brought to an authorized Navistar repair facility for repair or replacement.

334.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engine in G&G's vehicle continued to fail due to the Defect.

335.     Neither Navistar, nor any of its dealers or representatives, informed G&G that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.

336.     Had G&G been notified of the Defect, it would not have purchased the Truck, or it would have paid less for it.

337.     G&G has suffered ascertainable losses as a result of the Navistar Defendants' misrepresentations and omissions associated with the Defect.  G&G seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

  a.     Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

  b.     Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

338.     G&G's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

### 2.  Michael Jackson, Sr.

339.     Plaintiff Michael Jackson, Sr. ("Jackson") is a resident of Milwaukee, Wisconsin, and a citizen of the State of Wisconsin.

340.     Mr. Jackson purchased a Navistar International ProStar Truck with a MaxxForce 13 Engine, which he used in the operation of his business.  He purchased the Truck from a Freightliner dealership in Grand Rapids, Michigan.

341.     At all relevant times, the Truck and/or the MaxxForce Engine was covered by the Navistar warranty.

342.     The MaxxForce Engine in Mr. Jackson's Truck failed on numerous occasions due to the Defect.  These failures included numerous operational warnings and breakdowns necessitating repair.

343.     Within the express warranty period, Mr. Jackson brought his Truck to an authorized Navistar repair facility for repair or replacement.

344.     Despite attempts at repair or replacement by the authorized Navistar repair facility, the MaxxForce Engines in Mr. Jackson's Truck continued to fail due to the Defect.

345.     Neither Navistar, nor any of its dealers or representatives, informed Mr. Jackson that the Engines were defective, or of Navistar's misrepresentations and omissions associated with the Defect.

346.     Had Mr. Jackson been notified of the Defect, he would not have purchased the Truck, or he would have paid less for it.

347.    Mr. Jackson suffered ascertainable losses as a result of Navistar's misrepresentations and omissions associated with the Defect.  Mr. Jackson seeks recovery of all actual damages (including direct, incidental, and consequential damages), including:

    a.    Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the true nature of the Trucks been known.

    b.    Loss of resale value because a defective Truck cannot be sold for the same price as a comparable non-defective truck.

348.    Mr. Jackson's experience mirrors that of thousands of other owners and lessees of Trucks with the defective Engines.

**B.    Defendants**

349.    Defendant Navistar International Corporation is a parent company whose subsidiary Navistar, Inc. produces, among other things, heavy-duty commercial trucks.

350.    Defendant Navistar, Inc. is a wholly-owned subsidiary of Navistar International Corporation.  Navistar, Inc. manufactures International brand heavy-duty commercial trucks and MaxxForce brand diesel engines.

351.    Navistar International Corporation and Navistar, Inc. are corporations organized under the laws of the State of Delaware.  Both Navistar Defendants have the same principal place of business: 2701 Navistar Drive, Lisle, Illinois 60532.

352.    Navistar, Inc. is an alter ego and/or agent of Navistar International Corporation.  As such, they will be referred to as "Navistar" or "the Navistar Defendants" throughout this complaint.

### i. Defendant Navistar, Inc. is an Alter Ego for Defendant Navistar International Corporation, and the Two Companies Have Abused the Corporate Form

#### 1. Defendant Navistar International Corporation has financial interest, ownership and control over Defendant Navistar, Inc.

353.     Defendant Navistar, Inc. has claimed that it is a wholly-owned subsidiary of a "holding" company, Defendant Navistar International Corporation.

354.     Defendant Navistar, Inc.'s income is reported on a consolidated return with Defendant Navistar International Corporation to the SEC and other entities, presumably the Internal Revenue Service.

355.     Defendant Navistar, Inc.'s income is funneled directly to Defendant Navistar International Corporation as income from a subsidiary.

356.     $8.6 billion of Navistar International Corporation's $11.5 billion net sales worldwide in 2009 was derived from the North American truck and engines market.   "Heavy duty vehicles," including Class 7 and 8 vehicles and those at issue here, comprise a substantial majority of Navistar International Corporation's truck and engine revenue.  For example, in 2009, Navistar, Inc. delivered 181,800 units in the North American truck market, of which 119,400 were Class 8 trucks, representing a 32% retail delivery market share.

357.     The financial benefit of Defendant Navistar, Inc.'s actions accrues solely to the shareholders of Defendant Navistar International Corporation, and the NIC Board "establishes broad corporate policies, sets strategic direction and oversees management, which is responsible for [Defendant Navistar International Corporation's] day-to-day operations."

358.     Thus, Defendant Navistar International Corporation has financial interest, ownership and control over Defendant Navistar, Inc.[7]

### 2.  There is such unity between the two corporations that the separateness of the two corporations has ceased.

359.     Navistar International Corporation and Navistar, Inc. share common officers and common offices.

360.     Defendant Navistar International Corporation's most recent quarterly report, filed with the SEC on September 6, 2017, states that Navistar's principal operating entities are Defendant Navistar, Inc. and Navistar Financial.

361.     Navistar International Corporation is operated by Navistar, Inc. employees. According to pleadings in a separate litigation, as well as deposition testimony from this case, Defendant Navistar International Corporation has "no operational employees," including any management employees, but is instead operated by its subsidiary employees.

362.     Based on Navistar International Corporation's public statements and official filings with the U.S. Securities and Exchange Commission ("SEC"), all or most of the officers of Navistar International Corporation also hold positions as officers and/or directors of Navistar, Inc., and Navistar International Corporation has at times claimed that it has no operational employees, and has had only one "employee": the CEO, who is also the CEO of Navistar, Inc.

363.     The "officers" of Defendant Navistar International Corporation comprise the same officers of Defendant Navistar, Inc.  According to pleadings in a separate litigation,

---

[7] Navistar, Inc., an Illinois corporation, was organized in 1988, while Navistar International Corporation, the parent company, was organized in Delaware in 1993, according to Navistar's own website.  Navistar, Inc. appears to have acquired or absorbed several companies in existence prior to Navistar, Inc., including International Truck and Engine Corporation.

Defendant Navistar International Corporation's only officers are also officers of Defendant Navistar, Inc., and share the same titles.

364.    Navistar International Corporation's investor relations department—dealing with Navistar International Corporation's shareholders, market analysts, and the media—is staffed solely by Navistar, Inc. employees.

365.    Even Defendant Navistar, Inc.'s own employees, both former and current, do not know the difference between the two companies.  In a separate litigation, Navistar International Corporation and Defendant Navistar, Inc. produced a "common" corporate representative for deposition.  During that deposition, the vice-president of customer support for Defendant Navistar, Inc., testified that "if the employees of [Navistar] don't [know the distinction and the difference between Navistar International Corporation and Navistar, Inc.], I wouldn't expect the customers to…."  The corporate representative further testified that the subsidiary's officers speak on behalf of the parent company, although he does not understand under what authority they do so.

366.    In a separate litigation, one of Navistar, Inc.'s authorized dealers testified that he didn't understand the difference between the two companies and he wouldn't expect customers to know the difference.

367.    Navistar, Inc. and its financial activities—manufacturing engines and trucks and selling those through its "Dealer Network"—are solely for the benefit of Navistar International Corporation.

368.    Navistar International Corporation's most recent quarterly reports show that the majority of Defendant Navistar International Corporation's gross revenues come from Defendant Navistar, Inc.

55

369.     When Navistar International Corporation's "officers" discuss sales of trucks to customers on earnings calls, in press releases, and in analyst presentations—sales presumably made by Navistar, Inc.—they represent those sales as "our engine volumes" and "our trucks and parts business."

370.     However, the "loss" [or presumably gain] that the shareholders of Defendant Navistar International Corporation have is directly related, and is almost solely created, by the subsidiary Defendant Navistar, Inc.

371.     Navistar International Corporation and Navistar, Inc. act in complete cooperation with each other and with knowledge of the other's actions when they deliver information to the public.  For example, the "navistar.com" website—including information from and about Navistar International Corporation—contains information regarding both truck sales and sales of shares to investors.

### 3. Holding only Defendant Navistar, Inc. or Defendant Navistar International Corporation liable—without the other—would result in grave injustice to Plaintiffs and the Class.

372.     On information and belief, one or the other of the Defendants may be inadequately capitalized.

373.     Clearly, the corporate form utilized by Defendants here is a sham to perpetrate a fraud.  This is a shell game where common officers of the parent and subsidiary make presentations to analysts and investors in order to gain media/customer attention, but—when customers or investors attempt to hold the parent company accountable for those very statements and the direct benefit the parent company and its shareholders obtained from those sales—the parent company points to the subsidiary, which now has inadequate capital alone to withstand the warranty and other obligations that were the direct result of the fraud to begin with.

374.    Defendants' combined failure to fully and completely disclose to their shareholders, investors, dealers, and customers (i) the extent of the problems they knew they were experiencing with the EGR Only System; (ii) the resulting defects to the equipment being sold to the public; and (iii) their escalating inability to correct those defects, while assuring the public and their customers that the equipment sold was of a high quality and any problems had been and were being solved, is actionable actual fraud, common law fraud, and fraud by nondisclosure.

### III.    JURISDICTION AND VENUE

375.    This Court has original subject matter jurisdiction over this Class Action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2).  Plaintiffs are citizens of Alabama, Arkansas, California, Connecticut, Florida, Idaho, Illinois, Indiana, Kentucky, Massachusetts, New Jersey, North Carolina, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, and Wisconsin.  Navistar International Corporation and Navistar, Inc. are corporations organized under the laws of Delaware, with their principal place of business in Illinois.  As a result, the named Plaintiffs, Class members, and Navistar are citizens of different states within the meaning of 28 U.S.C. §§ 1332(c), 1332(d)(2)(A), and 1332(d)(10).

376.    On information and belief, the proposed Class exceeds 100 persons.  Pursuant to 28 U.S.C. § 1332(d)(6), the aggregate amount of the Class members' claims substantially exceeds $5,000,000, and thus, exceeds the requisite amount in controversy set forth in 28 U.S.C. § 1332(d)(2).  The "local controversy exception" and "home state exception" to jurisdiction under 28 U.S.C. § 1332(d)(2), as set forth under 28 U.S.C. § 1332(d)(4)(A) and (B), do not apply here.

377.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), (b) and (c) on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

## IV.     CHOICE OF LAW

378.     Navistar is headquartered in Illinois and conducted all relevant business related to these claims in and from Illinois.  As a result, the claims of Plaintiffs and all Class members have substantial contacts with Illinois, such that application of Illinois law to these claims is neither arbitrary nor unfair.  Illinois has a substantial relationship to the claims of all Class members, and Illinois has a greater interest than any state in the claims asserted here.

379.     In the alternative, the law of each state in which Plaintiffs and Class members purchased or leased the Trucks, and/or in which they reside, can be applied to Plaintiffs and Class members (as alleged in the separate State Sub-Classes).

## V.     FACTUAL ALLEGATIONS

### A.     Background

380.     On January 18, 2001, the U.S. Environmental Protection Agency ("EPA"), pursuant to its authority under The Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*, issued new emissions standards for heavy-duty highway engines and vehicles.  E.P.A. Final Rule, 66 Fed. Reg. 5002 (Jan. 18, 2001) (codified at 40 C.F.R. pts. 69, 80, and 86), hereinafter, "2010 EPA Standards."  The Standards required manufacturers to, among other things, reduce nitrogen oxide ("NOx") emissions to 0.20 grams per brake horsepower-hour (g/bhp-hr).  Compliance would be measured on a percent-of-sales basis, *i.e.*, for model years 2007, 2008, and 2009, 50% of a manufacturer's heavy-duty engine and vehicle sales had to comply with the new standard, and for model year 2010, 100% of a manufacturer's sales had to be compliant.  The Standards also required manufacturers' emission control systems to be integrated with on-board diagnostic

systems that could detect and identify malfunctions in all monitored emission-related engine systems.

381.    Pursuant to Section 7541 of The Clean Air Act, manufacturers are required to "warrant to the ultimate purchaser and each subsequent purchaser" that the manufacturer's vehicles and engines comply with the EPA's emissions standards.

382.    Every manufacturer selling commercial trucks in the U.S., except Navistar, chose to meet the 2010 EPA Standards predominantly with SCR technology, which treated engine exhaust with a urea-based chemical after it left the engine.

383.    Navistar's emissions strategy overstretched the limits of an older technology, EGR, to try to meet the more stringent EPA emission standards.  EGR technology involves first cooling and then recirculating a portion of an engine's exhaust gas back into the engine cylinders. The cooled exhaust lowers in-cylinder temperatures during combustion, which reduces the amount of NOx formed.  Navistar's system cooled the engine exhaust with an EGR cooler.  The cooled exhaust gas was then circulated back into the engine's air intake through EGR valves. The EGR Only system, however, created heat and soot that ultimately caused engine damage as well as damage to other parts of the Navistar vehicle.

384.    Navistar International Corporation and its officers and directors, including its then-President and CEO, Daniel Ustian, insisted that Navistar, Inc. use the EGR Only System in the Engines rather than an SCR system to meet 2010 EPA Standards over objections from Navistar, Inc. employees.  At all relevant times, Navistar International Corporation knew the MaxxForce Engines were defective.  Navistar International Corporation directly interfered with and exercised control over Navistar, Inc.'s decision making, and Navistar, Inc. was no longer

59

free to utilize its own expertise. Navistar International Corporation therefore directly participated in the harm caused to Plaintiffs and the Class.

385. Ultimately, Navistar was unable to design the Engines so that they would comply with the emissions standards set forth by the EPA. Accordingly, in order to sell the Engines, Navistar had to pay non-conformance penalties ("NCPs") to the EPA.

## B. Navistar's Authorized Dealers

386. Navistar provides a package of goods and services to buyers of International Trucks with MaxxForce engines by manufacturing and distributing its products through a nationwide network of authorized dealers (the "Navistar Network").

387. Authorized dealers in the Navistar Network have actual authority from Navistar to act as agents for Navistar in connection with the marketing, advertising and selling of International Trucks with MaxxForce engines.

388. Upon information and belief, dealers in the Navistar Network rely almost exclusively on materials and training received from Navistar when making representations about International Trucks and MaxxForce engines to their customers.

389. Navistar regularly provides authorized dealers with International and MaxxForce branded literature, signage, and training materials for use in promoting, selling and financing the purchase or lease of their Trucks to customers.

390. In addition, Navistar routinely holds training seminars for authorized dealers in the Navistar Network.

391. During these seminars, Navistar coaches dealers in the Navistar Network and their sales staff on the best ways to sell International Trucks to customers, including providing detailed comparisons of competing manufacturers' products and outlining the specific information dealers should emphasize when pursuing a sale.

392.     In areas where they lack knowledge, dealers in the Navistar Network are encouraged to visit the "navistar.com" website for additional information regarding both Defendants.

393.     Potential customers are also encouraged to visit the "navistar.com" website when seeking information about International Trucks and the MaxxForce engine.

394.     The "navistar.com" website contains informational materials and statements to aid dealers and induce the customer to purchase or lease Navistar products.

395.     In addition, Navistar furnishes the actual specifications of each Truck, including fuel efficiency information, rather than relying on the dealers to generate those details for customers interested in purchasing International Trucks.

396.     Upon information and belief, Navistar provides the above-described training and information with the intention that the dealers in the Navistar Network rely almost exclusively on information provided by Navistar when making representations to potential customers and inducing customers to purchase or lease International Trucks with MaxxForce engines.

397.     Upon information and belief, in exercise of the authority granted to them by and at the direction of Navistar, authorized dealers relied upon such training and information when they marketed and sold the Trucks to Class members, including in the course of making the misrepresentations and omissions associated with the Defect, as detailed herein.

**C.     The Navistar Defendants Concealed the Defect.**

398.     Navistar made numerous, repeated false public statements that its engines would meet the 2010 EPA Standards, that the EGR Only System was a "proven technology" that would provide a "no-hassle emissions solution," that the Engines would be just as reliable and durable as its earlier engines, and that Trucks equipped with the EGR Only System would have a "much higher residual value" on the used truck market than trucks equipped with SCR.

399.    At the same time Navistar was making these false public statements, its officers were outspoken critics of SCR.  For example, Jim Hebe, Senior Vice President of North American Sales Operations frequently criticized competitors' SCR offering, and was quoted as saying SCR "could be the biggest false-start in trucking history."  Dee Kapur, President of the Truck Group, called SCR a "marooned technology" that would ultimately be abandoned by all manufacturers in favor of EGR Only.

**D.    The Navistar Defendants Knew About the Defect at Least as Early as 2004.**

400.    Navistar knew that stretching the limits of an EGR system was a flawed strategy at least as early as 2004, when Navistar's 6.0-liter diesel engines were used in various 2004 Model Year Ford vehicles.  Ford faced an unprecedented number of complaints with Navistar's 6.0-liter diesel engine, leading to Ford suing Navistar, Inc. for supplying this defective engine. These problems persisted throughout the production life of those engines.  Navistar's next diesel engine produced for Ford, the 6.4-liter engine, also had an EGR system, and also was plagued with problems throughout its production life in model years 2008 through 2010, leading Ford to begin producing its own diesel engines after Model Year 2010, rather than having them supplied by Navistar.  For Model Year 2010, Ford went to an SCR system.

401.    Shockingly, despite seeing first-hand the problems with its EGR system from 2004 through 2010, and despite losing Ford as a customer for its EGR-based diesel engines, Navistar continued stretching the limits of EGR-based engines and selling them to its customers, including the MaxxForce Engines at issue here.

402.    In addition, according to industry standards, heavy-duty commercial truck engines are extensively tested for years before public distribution.

403.    Manufacturers of heavy-duty commercial truck engines run the engines in controlled conditions for thousands of hours in order to simulate actual driving conditions.

62

404.     As a result of this extensive testing, manufacturers obtain huge amounts of data regarding problems associated with engine performance.

405.     While Navistar's testing of the Engines was below industry standards, its testing still accurately predicted the exact types of problems that would occur with 13-liter MaxxForce engines.

406.     A complaint filed on October 10, 2013 against Navistar International Corporation demonstrates that Navistar was aware of the Defect and the negative results that resulted from its tests of the Engine's design.  The complaint alleged securities violations[8] and listed several "Confidential Witnesses" ("CWs"), many of whom discussed problems with the EGR Only System that were made known to the Navistar Defendants.[9]  For example:

   a.     CW2, identified in the complaint as a former "Chief Engineer for the Engine Group on several Navistar truck and engine launches," noted problems with, and expressed concerns about, the EGR Only System, and presented these concerns to Navistar International Corporation's then-President and CEO, Daniel Ustian.

   b.     CW3, identified in the complaint as "a project development team lead for Navistar in its Fort Wayne, Indiana facility," claims to have been asked to assist in developing a fallback SCR solution in case the EGR solution was

---

[8] *Construction Workers Pension Trust Fund – Lake County and Vicinity v. Navistar Int'l Corp.*, Civ. No. 1:13-cv-2111 (N.D. Ill.), Docket Entry 66.

[9] The *Construction Workers Pension Trust Fund* complaint does not differentiate between Navistar International Corporation and Navistar, Inc. with respect to the employment of the confidential witnesses.

unsuccessful. However, Navistar Inc. executives issued an order to cease and desist development of the SCR backup plan.

c.  CW5, identified in the complaint as a former "Navistar . . . Chief Engineer," allegedly told his supervisors that the EGR Only System was not achievable given fuel economy and performance parameters; the stage of EGR development at the time; and that the entire engineering community was saying that the physics of EGR was not possible.

d.  CW8, identified in the complaint as a "Project Manager and Senior Project Manager at Navistar from 1997 through 2007," noted problems with a diesel particulate filter in the EGR engines that would "stop up and shut down the engine as more exhaust flowed through the engine." This increase in exhaust gas recirculation also lowered fuel economy, decreased durability, and increased cooling demands on the engine.

e.  CW12, identified in the complaint as "Navistar's Senior Vice President, North American Sales Operations," claims that Mr. Ustian told him directly not to discuss an alternate solution to the EGR Only System or he would be fired.

f.  CW13, identified in the complaint as a "Navistar" employee from July 2008 to April 2013 and holding various Vice President and Manager roles throughout that time period, claims that "[b]y mid-2011, the EGR solution engines were experiencing significant warranty issues." Mr. Ustian and other management had access to these reports detailing the warranty issues.

g.   CW16, identified in the complaint as a "Navistar" employee from 2007 until 2012, claims that it became apparent in 2011 that Navistar was experiencing an increase in failure of components of the Engines.  The increase in failures was linked to an increase in exhaust gas flowing through the engine, and the resulting soot buildup.

h.   CW18, identified as a "Navistar" employee since July 2001, stated that the warranty problem was initially believed to be related to the EGR valve.  However, even after the EGR valve's fix, warranty issues persisted through 2012, allegedly as a result of failure of the EGR cooler.

407.   Accordingly, Navistar knew the MaxxForce Engines were defective before the first Truck equipped with a MaxxForce Engine was ever sold.  Nonetheless, Navistar failed to disclose the problems with the MaxxForce Engines.

**E.   Navistar's Representations Regarding the MaxxForce Engines**

408.   Despite Navistar's knowledge of the Defect, it failed to inform Plaintiffs and the Class of the Defect, and it represented that the MaxxForce Engines: were free of defects, were fit for heavy-duty trucking, and that any problems experienced with the Engines would be repaired by an authorized Navistar service center.

409.   Navistar press releases regarding the MaxxForce Engines quoted Ramin Younessi, group vice president of product development and business strategy, as stating that the MaxxForce Engines were "some of the cleanest and most energy-efficient diesel engines ever produced."

410.   Navistar press releases also quoted Jim Hebe as stating that the MaxxForce 15 engine with EGR Only "gives customers the ultimate combination in durability and power."

411.     Navistar press releases represented that the MaxxForce EGR Only Engines were a "no-hassle, business-as-usual solution that will deliver lower total operating costs for customers."  The press releases also stated that prior to launching sales of Navistar vehicles with EGR Only solutions, Navistar test vehicles had "logged millions of driving miles in real-world conditions."

412.     Navistar marketing materials state that "MaxxForce Engines deliver: Reliability; Durability; Power; Performance; [and] Fuel Economy" and that the Engines are a "no-hassle" solution that "eliminate the hassle of … additional maintenance …."

413.     Navistar also made a number of public statements regarding the lower cost of ownership and superior fuel economy of the Engines, when compared to other engines equipped with an SCR system.  Those statements include, but are not limited to, the following:

> a.     At a conference call for investors, analysts, and media representatives on December 22, 2010, Ustian stated, "The fuel economy of [the MaxxForce 13-liter engine] will be better and there will be no change in the heat rejection at the same time, so this product will be even better."

> b.     At a conference call for investors, analysts, and media representatives on January 25, 2011, then-North America Truck Group President Jack Allen stated, "Well, the facts are now out, our products are out there and they're delivering actually a little bit better than what we said on fuel economy, durability, the whole thing…The MaxxForce 7 is doing phenomenal. We're seeing 9% better fuel economy than the prior model.  The MaxxForce 13, as I've said the fuel economy is at parity or better than

66

anything in the market and we'll be applying for our 0.2 certification here in the next couple of months."

    c.    In a *Transport Topics* article published on July 29, 2010 and a *Fleet Owner* article published on July 20, 2010, representatives of Navistar were quoted making claims about the Engines' "fluid economy" saying "The test results were clear. In the comparison of fluid economy, the International ProStar+ with MaxxForce 13 Liter consistently outperformed the competing trucks 1% to 2.5%."

    d.    In a *Fleet Owner* article published on July 20, 2010, Jim Hebe was quoted as saying "If liquid urea SCR trucks can't compete on fluid economy, then why would customers want to deal with the cost and hassle of adding and maintaining after-treatment equipment, finding and filling up with liquid urea and retraining technicians?"

414.    Navistar also made a number of public statements regarding Truck reliability, maintenance and repairs. Those statements include, but are not limited to, the following:

    a.    At a conference call for investors, analysts, and media representatives on March 9, 2011, Ustian stated, "Since we were the only ones out there, there is a lot coming at us with oh, this can't work. And of course, now were out in the marketplace, and that's over. That argument's over. We're out there in the marketplace. We're exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over."

67

b.      At a conference call for investors, analysts, and media representatives on June 7, 2011, Ustian stated, "We haven't heard any signs of—any even discussion on it, other than the benefits that we get from EGRs, lower weights, and not having to deal with urea.  But as far as any discussion on SCR versus EGR, those things were passed a long time ago."

c.      At a conference call for investors, analysts, and media representatives on September 7, 2011, then-CFO Andrew Cederoth stated, "This technology is proving extremely viable providing fuel economy and performance on par with the best SCR competitors….As we develop 0.20g NOx capability our goal of continuing to improve performance and fuel economy at this emissions level is being realized."

d.      At a conference call for investors, analysts, and media representatives on December 20, 2011, Ustian stated, "We compete against everyone that's out there on a product, not on a technology.  So as long as our product performs as well or better, we can price it not based on cost, but based on vehicle and that's exactly what we have been able to do."

e.      At a conference call for investors, analysts, and media representatives on February 1, 2012, Allen stated, "We are providing equal or better performance than the SCR systems without any of the cost, without the maintenance or without the hassle of SCR."

415.    Other representations regarding the MF ProStars' reliability and outstanding performance were published to Plaintiffs via the "navistar.com" website.

68

416.     Navistar also made representations regarding Engine reliability in Navistar brochures.  For example, Navistar's "Maintenance Information Guide"  stated: (i) that the MaxxForce Engine had "lower operating costs" and "less hassle"; (ii) that the EGR Only System resulted in "optimal performance and low cost of ownership"; (iii) that the design of MaxxForce Engine resulted in "better fuel efficiency," "more power to the wheels and less soot out the exhaust," and "improved combustion"; (iv) that the "Dual-path EGR cooling provides optimized cooled EGR … [that] allows long-term system performance"; (v) that the MaxxForce Engine had "Premium Reliability"; (vi) that the "MaxxForce Engine can be counted on to show up for work every day"; and (vii) that the MaxxForce Engine was "Always Performing."

417.     Upon information and belief, Plaintiffs assert that Navistar made representations regarding reliability, performance, and operating costs to all Plaintiffs and Class members, directly and/or through its authorized dealer network, with the intention of inducing Plaintiffs and Class members to purchase or lease the Trucks.

418.     According to its public filings, Navistar spends close to $30 million per year on advertising intended to reach customers and induce them to purchase or lease Defendants' products.

## F.     The Defect Is Widespread and Harms the Class.

419.     Contrary to Navistar's representations regarding the fitness, durability, and low operating costs of MaxxForce Engines, Plaintiffs and the Class experienced numerous repeated breakdowns related to the Defect.  Upon information and belief, Navistar was aware of numerous complaints regarding multiple component failures as a result of the EGR System and the potential dangers related to it, including Trucks losing power and exhaust leaks into the cab. Navistar failed to repair the problem despite the Truck operators' repeated complaints to and visits at Navistar service centers.  These Defect-related breakdowns, and subsequent periods of

69

attempted repair by Navistar service centers, harmed Plaintiffs and the Class since they were unable to operate their Trucks extended periods of time.

420.    Complaints by owners of the Trucks demonstrate how widespread the Defect is, how the Defect manifests without warning, that Navistar is and has long been aware of the Defect, and how potentially dangerous the defective condition is.  As evidenced by comments appearing on internet sites such as http://www.thetruckersreport.com/truckingindustryforum/ trucks-eighteen-wheelers/83372-maxxforce-13-a.html, which based upon information and belief are monitored by Navistar's agents and/or employees, Navistar has been aware of complaints about the Defect since at least June 2009.

421.    The MaxxForce Engine exhaust pipes between the EGR valve and exhaust manifold can leak, allowing exhaust fumes into the cab.  This was the subject of a complaint filed with the NHSTA on 10/11/2011:

> THERE IS A STAINLESS STEEL EXHAUST FLEX PIPE UNDER THE CAB, RIGHT SIDE, JUST AFTER THE REGEN DOSER THAT IS WRAPPED IN A FLEX SHEATHING.  THE INSIDE OF THE PIPE CRACKS AND WHITE EXHAUST FLOWS OUT AND INTO THE CAB WHEN THE ENGINE GOES THRU A REGEN CYCLE.  WE HAD SEVERAL DRIVERS COMPLAIN OF THIS ISSUE, UPON INSPECTION YOU CAN NOT FIND ANY VISIBLE CRACKS IN THE EXHAUST.  SEVERAL DRIVERS WERE HAVING TO PUT THE WINDOWS DOWN IN ORDER TO ELIMINATE THE FUMES INSIDE THE CABIN WHILE DRIVING.  AFTER SENDING TO THE DEALER, THEY ADVISED THAT THE PIPE WAS CRACKED INTERNALLY BEHIND THE SHEATHING AND NEEDED TO BE REPLACED.  THEY ADVISED ON THE PROCEDURE TO CHECK FOR THIS SYMPTOM, YOU HAVE TO USE THE ENGINE SOFTWARE AND FORCE A REGEN SESSION.  ONCE YOU DO THAT, YOU CAN SEE THE WHITE FUEL SMOKE AND SMELL RAW FUEL.  THIS IS THEN DRAWN UP THRU THE HVAC DUCT AND PUTS IT INSIDE THE CABIN.  THE REPAIR IS A 500.00 PIPE PLUS LABOR FOR A TOTAL OF 800.00.  WE HAVE 2 OF 5 PROSTAR TRUCKS SO FAR THAT HAVE HAD TO HAVE THIS PIPE REPLACED, BOTH DRIVERS WITH SAME COMPLAINT.

422. Complaints of exhaust leaks into the cab were very common on the internet as well. *See, e.g.*, http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-wheelers/126451-maxx-force-13-engines-4.html, accessed May 11, 2015.

423. While paying hundreds of millions of dollars in warranty claims to replace defective parts with equally defective parts on the MaxxForce Engines, Navistar continued to tout its EGR technology as the future of emissions technology and omitted to disclose that the Defect was not fixable. Navistar blamed the Defect and warranty claims on manufacturing problems (which it claimed to have resolved), and continued to portray the Engines as reliable.

424. Moreover, these were the same problems experienced with Navistar's EGR-based diesel engines since 2004, and Navistar knew it would continue as long as Navistar stayed with the EGR Only System.

425. On information and belief, Plaintiffs allege that Navistar failed to disclose to customers that coolant consumption caused by the Defect was outside the normal range.

426. Commercial trucks are not earning money for their owners and lessees if they are sitting in the shop for repairs. The owners and lessees suffer not only a loss of use of the truck itself, but also suffer a loss of use of other tangible property, including, but not limited to, trailers and other equipment which cannot be used when the truck is out of service. The relationships between Plaintiffs and their customers were harmed because the Navistar Engines were defective and prevented Plaintiffs from providing reliable service to their customers. Navistar's customers who bought Trucks equipped with the MaxxForce Engines in reliance on Navistar's representations were financially devastated by the MaxxForce Engines' repeated failures.

427. In July 2012, Navistar finally announced that it was abandoning EGR Only and adopting for the 2013 model year the same SCR technologies that its competitors had been using.

71

428.    Even after announcing the switch to SCR technology, Navistar continued to sell the Engines and omitted to disclose to buyers that resale market demand for vehicles equipped with those Engines would be weak.

429.    In August 2012, discussing Navistar's announcement that beginning in March 2013 it would equip its International Trucks with SCR and abandon EGR Only, the Commercial Carrier Journal quoted Jack Allen, North American Truck Group President, downplaying any problems with the EGR Only Engine Trucks:

> Customers should not be hesitant to purchase an EGR-only MaxxForce-equipped truck between now and March, Allen said.  And likewise, he predicted concerns over the resale value of EGR-only MaxxForce-equipped trucks will prove to be temporary.
>
> "The judge didn't void the trucks," he said of [an appellate court ruling involving whether the EPA followed proper procedures in implementing a certain policy].[10] "Check out the Website about trucks sold under interim rule.  Nothing will happen.  And as for used truck values? We feel the secondary market will be very receptive to a truck built without SCR.  Our MaxxForce fuel economy is great. Our performance is great.  And we have more than 50,000 of those engines out there."[11]

430.    The trucking industry is now well aware of the problems with the Engines.  Not only were the Trucks equipped with these Engines worth far less at the time of purchase or lease than they would have been with an engine free from defects, the Trucks have a significantly diminished value on the resale market compared with competitors' trucks with similar mileage and are very difficult to sell.  Customers who bought the Trucks with MaxxForce Engines are

---

[10] *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95 (D.C. Cir. 2013).

[11] Jack Robers, *Navistar devises plan to counter losing EGR gamble*, Commercial Carrier Journal (Aug. 23, 2012), http://www.ccjdigital.com/navistar-devises-plan-to-counter-losing-egr-gamble.

now stuck with an unfixable Defect, dwindling or expired warranties, and a greatly diminished market for resale or trade-in of the used Trucks.

## VI.  TOLLING OF STATUTES OF LIMITATIONS

431.  **Discovery Rule**.  Plaintiffs' claims accrued upon discovery that the EGR emissions system designed into the MaxxForce Engines was defective in that it led to the repeated failure of various truck parts, and the Defect could not be repaired.  While Navistar knew, and concealed, the fact that the Engines have a Defect that causes failures, Plaintiffs and Class members could not and did not discover this fact through reasonable diligent investigation until after they experienced failures, could reasonably exclude other potential causes of the failures, learned that warranty "repairs" by Navistar did not solve the problem, and discovered that the Engines themselves caused the failures.

432.  **Active Concealment Tolling**.  Any statutes of limitations are tolled by Navistar's knowing and active concealment of the fact that the Engines suffered from an inherent design Defect.  Navistar kept Plaintiffs and all Class members ignorant of vital information essential to the pursuit of their claim, without any fault or lack of diligence on the part of Plaintiffs.  The details of Navistar's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery.  Plaintiffs could not reasonably have discovered the fact that their Engines suffered from an inherent design Defect that would cause repeated and significant failures.

433.  **Estoppel**.  Navistar was and is under a continuous duty to disclose to Plaintiffs and all Class members the true character, quality, and nature of the Engines.  At all relevant times, and continuing to this day, Navistar knowingly, affirmatively, and actively misrepresented and concealed the true character, quality, and nature of the Engines.  The details of Navistar's

efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery. Plaintiffs reasonably relied upon Navistar's affirmative misrepresentations and knowing, affirmative, and/or active concealment. Based on the foregoing, Navistar is estopped from relying upon any statutes of limitation in defense of this action.

434. **Equitable Tolling**. Navistar took active steps to conceal the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and/or leased the Trucks with the defective EGR Only System in the Engines. The details of Navistar's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class members, and await discovery. When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims. Navistar fraudulently concealed its above-described wrongful acts. Should such be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## VII. CLASS ALLEGATIONS

435. The named Plaintiffs bring this action as a Class Action pursuant to Rules 23(a), 23(b)(1)(A), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

**A. Class Definitions**

436. The Classes are defined as follows:

a. **Nationwide Declaratory and/or Injunctive Relief Class, and Nationwide Damages Class**

All entities and natural persons who owned or leased a 2011-2014 model year vehicles equipped with a MaxxForce 11- or 13-liter engine certified to meet EPA 2010 emissions standards without selective catalytic reduction technology, provided that vehicle was purchased or leased in any of the fifty (50) States, the District of Columbia, Puerto Rico, and all other United States territories and/or possessions.

74

b.    *In the alternative*, **Plaintiffs also bring this case on behalf of individuals in certain State Sub-Classes.**

(i)    **Statutory Sub-Classes.**  Plaintiffs allege certain causes of action based upon state-specific laws for the following states: Arkansas, California, Florida, Idaho, Illinois, New Jersey, North Carolina, Oregon, Pennsylvania, Tennessee, Washington, and Wisconsin on behalf of the Classes defined above**.**

(ii)    **Warranty Sub-Classes.**  Plaintiffs allege certain causes of action based upon state-specific warranty laws for the following states: Alabama, Arkansas, California, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Washington, and Wisconsin on behalf of the Classes defined above.

(iii)    **Declaratory and/or Injunctive Relief Sub-Classes.**  Plaintiffs also allege seek declaratory and/or injunctive relief based upon state-specific warranty laws of the following states: Alabama, Arkansas, California, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Washington, and Wisconsin on behalf of the Classes defined above.

437.     Claims for personal injury are specifically excluded from the Class definitions. Further, Plaintiffs do not seek to certify any individualized damages issues of lost profits, such as loss of a particular client or non-payment for a particular contract.

**438.**     Excluded from the Class are:  (1) all federal court judges who have presided over this Litigation and any members of their immediate families; (2) all entities and natural persons that have litigated claims involving Class Vehicles' allegedly defective EGR emissions system against Navistar to final, nonappealable judgment; (3) all entities and natural persons who, via a settlement or otherwise, delivered to Navistar releases of their claims involving Class Vehicles' allegedly defective EGR emissions system; (4) Defendants' employees, officers, directors, agents, and representatives, and their family members; (5) any Authorized Navistar Dealer of new or used vehicles; (6) any person or entity that purchased or leased a Class Vehicle solely for the purposes of resale (with respect to those Class Vehicles only); (7) any person or entity that was a lessee of a Class Vehicle for fewer than thirty (30) days (with respect to those vehicles only); and (8) Idealease and Navistar Leasing Co. (lessees of Class Vehicles from these entities are part of the Class).

**B.     The Prerequisites of Rule 23(a) Are Satisfied.**

439.     *Numerosity*.  The requirements of Rule 23(a)(1) are satisfied in that there are too many Class members for joinder of all of them to be practicable.  On information and belief, each of the proposed Classes includes over five hundred members.  The Classes, as defined above, meet the numerosity requirement.

440.     *Commonality*.  The claims of the Class members raise numerous common issues of fact and/or law, thereby satisfying the requirements of Rule 23(a)(2).  These common legal and factual questions—the answers to which will drive resolution of the litigation—may be

determined without the necessity of resolving individualized factual disputes concerning any Class Member, and include, but are not limited to, the following questions:

**Questions of Fact**

a.  Whether the MaxxForce EGR Only Engines contain the latent defect alleged in this complaint;

b.  Whether the complained-of defect caused the damages of Plaintiffs and other members of the Class;

c.  Whether the MaxxForce EGR Only Engines are defectively designed and/or manufactured such that they are not suitable for their intended use;

d.  Whether the MaxxForce EGR Only Engines suddenly and dangerously fail;

e.  Whether the latent defect is a necessary cause of the sudden and dangerous failure of the Engines and resulting damages;

f.  Whether the MaxxForce EGR Only Engines are substantially likely to fail before the end of their intended useful life as a result of their defective design and/or manufacture;

g.  Whether Navistar had actual or imputed knowledge of the Defect but failed to disclose it to Plaintiffs or the Class;

h.  Whether Navistar has a pattern and practice of attributing damages claimed by Plaintiffs and the Class to misuse or improper maintenance or other causes rather than the complained-of Defect;

i.  Whether Navistar has a pattern and practice of denying Plaintiffs' and the Class's claims as "out of warranty" and not due to the complained-of Defect;

j.  Whether Navistar fraudulently concealed from and/or failed to disclose to Plaintiffs and Class members that MaxxForce Engines were inherently defective and dangerous and prone to fail prematurely;

k.  Whether Navistar failed to adequately warn Plaintiffs and Class members of the inherent defects and dangers posed by the MaxxForce Engines;

l.  Whether Navistar dealerships were unable to properly repair the Defect, such that Navistar failed to honor its warranty obligation to properly repair the Engine during the warranty period;

m.  Whether Plaintiffs and other members of the Class have been damaged and, if so, what is the proper measure of damages; and

n.  Whether Navistar has acted or refused to act on grounds generally applicable to the Class.

**Questions of Law**

a.  Whether this Court should grant the declaratory relief requested herein;

b.  Whether EGR system-related failures are covered by the Navistar Standard Warranty, the Navistar Federal Emission System Warranty, and the Navistar California Emission System Warranty;

c.  Whether limitations on the Navistar warranties are invalid or unenforceable;

      d.      Whether statements contained in the Maintenance Information Guide constitute warranties made by Navistar to Plaintiffs and members of the Class;

      e.      Whether Navistar had duty to disclose to Plaintiffs and all Class members the true character, quality, and nature of the Engines and the Defect;

      f.      Whether Navistar's conduct in manufacturing, marketing, and selling Engines it knew to be defective, including misrepresentations and/or omissions concerning the defective Engine, constitutes consumer fraud and/or common law fraud;

      g.      Whether Navistar engaged in unfair or deceptive acts or practices when it concealed the inherent defective conditions and dangers of the MaxxForce Engines and failed to warn Plaintiffs and the Class members of same;

      h.      Whether Navistar was unjustly enriched by its conduct; and

      i.      Whether Navistar breached obligations to Plaintiffs and the Class members imposed by express and implied warranties, implied contracts, and other common law doctrines.

441. *Typicality*. The claims of the named Plaintiffs are typical of the unnamed Class members because they have a common factual source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Rule 23(a)(3). For example, the named Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class members were injured or damaged by the same wrongful practices in which Navistar engaged, namely the manufacture and sale of the inherently defective and dangerous MaxxForce Engines, the intentional concealment of those defects, and Navistar's inability to repair the Defect.

442.    *Adequacy of Representation*.  The requirements of Rule 23(a)(4) are satisfied in that each named Plaintiff has a sufficient stake in the litigation to prosecute its claims vigorously on behalf of the Class members, and each named Plaintiff's interests are aligned with those of the proposed Class.  There are no defenses of a unique nature that may be asserted against any Plaintiff individually, as distinguished from the other members of the Class, and the relief sought is common to the Class.  No Plaintiff has any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and no Plaintiff has any conflict with any other member of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation, including product defect and, specifically, vehicle defect class actions, to represent them and the Class members in this litigation.

443.    In addition to meeting the requirements specified in Rule 23(a), the Classes are easily ascertainable through a combination of the use of Navistar's, purchasers', and lessees' records, publication of notice, visual inspection of the Engine and/or its label, and verification by photograph.  Upon information and belief, Navistar, its authorized dealers, and its service centers keep records of purchasers, service records, and warranty claims data.  Where the records of Navistar, its authorized dealers, and its service centers may be insufficient, provision of notice can supplement class identification efforts, and purchasers or lessees responding to the class notice can verify that they are class members through their purchase records, maintenance and repair records, and a photograph of the emission label, located on top of the high-pressure charge air cooler, which indicates the model year of the engine.

**C.    The Prerequisites of Rule 23(b)(1) and (b)(2) Are Satisfied.**

444.    *Rule 23(b)(1)*.  With respect to Plaintiffs' claim for declaratory relief, the requirements of Rule 23(b)(1)(A) are satisfied since individual litigation of the claims of all Class members would create a risk of inconsistent or varying adjudications that would, in turn,

establish incompatible standards of conduct for Navistar. For example, one court might decide that the challenged actions are illegal and enjoin them, while another court might decide that those same actions are not illegal. Similarly, inconsistent rulings regarding the issue of whether the Defect is present in all MaxxForce Engines equipped with the EGR Only System would cause Navistar to respond to warranty claims in an inconsistent manner.

445. *Rule 23(b)(2)*. Class members who might need future repairs to or replacement of the Engine seek a declaration that there is an inherent design flaw in the Engine, that the warranties extend to them, and that they are entitled to final equitable relief, or to specific performance of the warranty when any future EGR system-related failure occurs. The requirements of Rule 23(b)(2) are satisfied since the claim for declaratory relief is based upon Navistar's systemic policies and practices, making final declaratory relief, with respect to the class as a whole, appropriate.

446. Navistar's actions are generally applicable to the Class as a whole, and Plaintiffs seek, among other things, equitable remedies with respect to the class as a whole.

**D.     The Prerequisites of Rule 23(b)(3) Are Satisfied.**

447. *Rule 23(b)(3): Predominance*. The Rule 23(b)(3) predominance requirement is satisfied because the common factual and legal issues identified above are sufficiently cohesive to warrant adjudication by representation and predominate over questions affecting only individual members of the Class. The central issues in this litigation are the same for all class members: whether the Engines suffered from an inherent defect when they left the factory, whether Navistar knew of the Defect, and the scope and applicability of Navistar's warranties. These common issues predominate over any individual issues.

448. *Rule 23(b)(3): Superiority*. The Rule 23(b)(3) superiority requirement is also satisfied. Class action treatment is superior to other available methods for the fair and efficient

adjudication of this controversy because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable. The expense of individual Class members prosecuting separate claims is large, and even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases. Individual litigation would also present the potential for varying, inconsistent or contradictory judgments while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation. As a result, it is desirable to concentrate litigation in this forum. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class is proper.

## VIII.   CAUSES OF ACTION

### A.   Claims Brought on Behalf of the Nationwide Class

**FIRST CAUSE OF ACTION**
**CLAIM FOR DECLARATORY AND/OR INJUNCTIVE RELIEF**
**Asserted on behalf of all Plaintiffs and the Nationwide Class**
**or, in the alternative, on behalf of all Plaintiffs and all State Declaratory and/or**
**Injunctive Relief Sub-Classes**

449.    Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth herein.

450.    As illustrated in the foregoing allegations, there is an actual controversy between Navistar and Plaintiffs concerning: (1) whether the Engines have an inherent design Defect that causes failures; (2) whether Navistar knew, or should have known, of that design Defect; (3) whether Navistar knew, or should have known, that the Defect would impact Engine performance and Truck parts; (4) whether Navistar knew, or should have known, that no amount of warranty service would cure the Defect; (5) whether Navistar improperly asserted

maintenance, misuse, and other defenses to otherwise valid warranty claims; (6) whether the limitations in the applicable warranties (*i.e.*, the Navistar Standard Warranty, the Navistar Federal Emission System Warranty, the Navistar California Emission System Warranty, and the descriptions and affirmations of fact contained in the Navistar "Maintenance Information Guide," each of which are hereto as Exhibits A-C) were drafted solely by Navistar and were non-negotiable; and (7) whether the time, mileage, or other limitations and disclaimers in Navistar's warranties are unconscionable and/or invalid.

451.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," provided that the declaratory relief requested does not fall within any of the exemptions set forth in the Act.

452.     Accordingly, Plaintiffs pray this Court declare that:

  a. The MaxxForce Engines equipped with the EGR Only System suffer from a design Defect that is material and warrants disclosure since that design Defect leads to repeated, sudden, and accidental failures, which might occur outside the warranty period;

  b. All members of the Declaratory Relief Class are to be provided the best practicable notice of the Defect, which cost shall be borne by Navistar;

  c. Navistar warranted the Engines under the Navistar Standard Warranty, the Navistar Federal Emission System Warranty, and the Navistar California Emission System Warranty.  It also warranted the Engines according to descriptions and affirmations of fact contained in the Navistar

83

"Maintenance Information Guide."  Those warranties failed of their essential purpose.

d.  Because Navistar knew of the Defect when it first manufactured the Engines, any repairs made to remedy EGR system-related failures were insufficient to remediate the Defect known by Navistar to exist. Therefore, any time, mileage or other limitations on the applicable warranties are invalid and unenforceable.  Navistar shall provide notice to all persons covered by those warranties of the removal of the time, mileage, and other limitations; and

e.  Navistar shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims regarding EGR system-related failures.

453.    The declaratory relief requested does not fall within any of the exemptions set forth in the Declaratory Judgment Act.

454.    The requested declaratory relief will generate common answers that will resolve controversies that lie at the heart of this litigation and would make it significantly likely that Plaintiffs will obtain relief that directly redresses the injury suffered.  There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

### SECOND CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
**Asserted on behalf of all Plaintiffs and the Nationwide Class
or, in the alternative, on behalf of all Plaintiffs and all State Warranty Sub-Classes**

455.    Plaintiffs adopt and incorporate herein the allegations set forth above.

84

456.     The Navistar Defendants sold Trucks equipped with defective Engines to Plaintiffs and members of the Class.

457.     In consideration of and as part of each sale, Navistar warranted that the Trucks conformed to (1) the Navistar Standard Warranty (attached hereto as Exhibit A); (2) the Navistar Federal Emission System Warranty (*see, e.g.,* "Engine Operation and Maintenance Manual," pp. 7-9, attached hereto as Exhibit B); (3) the Navistar California Emission System Warranty (*see, e.g.,* "Engine Operation and Maintenance Manual," pp.10-12); and (4) descriptions and affirmations of fact that were contained in Navistar's "Maintenance Information Guide" (attached hereto as Exhibit C).

458.     Such warranties formed the basis of the bargain when Plaintiffs purchased or leased the Navistar Trucks.

459.     With respect to the emissions-related warranties, such warranties are mandated and regulated by federal and state law.  They cannot be disclaimed.

460.     Federal law sets forth the minimum requirements for an emissions-related warranty, but manufacturers can issue one that is more generous than what federal law requires.

461.     Navistar's Emissions Warranties go beyond the federal standard by (1) issuing a federal emissions warranty that warrants against defects in design, in addition to warranting against defects in materials and workmanship; and (2) warranting nationwide, to all Plaintiffs and members of the Class, that the Trucks satisfy California's emissions-related warranty requirements, which are more rigorous than what is required under federal law.

462.     In addition to the Standard Warranty, Federal Emission System Warranty, and California Emissions System Warranty, Navistar issued a "Maintenance Information Guide" that contained affirmations of fact and descriptions concerning MaxxForce Engines and the EGR

Only System. Those affirmations of fact expressly warranted the following: (i) that the MaxxForce Engines had "lower operating costs" and "less hassle"; (ii) that the MaxxForce Engines resulted in "optimal performance and low cost of ownership"; (iii) that the design of MaxxForce Engines resulted in "better fuel efficiency," "more power to the wheels and less soot out the exhaust," and "improved combustion"; (iv) that the "Dual-path EGR cooling provides optimized cooled EGR … [that] allows long-term system performance"; (v) that the MaxxForce Engine had "Premium Reliability"; (vi) that the "MaxxForce Engine can be counted on to show up for work every day"; and (vii) that the MaxxForce Engine was "Always Performing."

463. It was in this manner that Navistar expressly warranted its Engines—all the while knowing that those Engines were designed with a material Defect that was present at the time of sale and lease to Plaintiffs and Class members.

464. When manufacturers and merchants such as Navistar sell goods with express warranties, they are obligated to provide goods that conform to those warranties. As detailed in the foregoing allegations, Navistar's Trucks and Engines did not conform to its express warranties.

465. Plaintiffs met all of their obligations under the express warranty. Plaintiffs used the Engines in a manner consistent with their intended use. When the Defect, which was not known to Plaintiffs, caused repeated failures in Plaintiffs' Trucks, Plaintiffs brought their Trucks to Navistar service centers for repeated repairs. Plaintiffs have performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Navistar or by operation of law in light of Navistar's unconscionable conduct described throughout this Complaint.

466.     Pursuant to the express warranties, Navistar was obligated to pay for or reimburse Plaintiffs and the Class members for costs incurred in replacing the defective Engines.

467.     Pursuant to the express warranties, Navistar also was obligated to properly repair the Defect.

468.     Navistar breached (and continues to breach) the above-described express warranties by (i) failing and refusing to conform the Engines to the express warranties, (ii) failing and refusing to properly repair or replace the defective Engines in Plaintiffs' and Class members' Trucks when Plaintiffs and Class members presented the Trucks for repair, and/or (iii) purportedly "repairing" the Engines that needed servicing by replacing them with Engines that contained the same Defect and were equipped with the same EGR Only System.

469.     Plaintiffs provided Navistar with actual notice of the breach of the express warranties.

470.     Navistar had actual knowledge of, and/or received timely notice regarding, the Defect at issue in this litigation and, notwithstanding such knowledge and notice, failed and refused to offer an effective remedy.

471.     Upon information and belief, Navistar has received thousands of complaints and other notices from customers advising them of the Defect at issue in this litigation.

472.     Any attempt by Navistar to limit its express warranties in a manner that would exclude or limit coverage for the Engines with respect to claims based upon the Defect is unconscionable since (i) the Defect was present as of the time of sale or lease; (ii) Navistar knew about the Defect prior to offering the Engines for sale; and (iii) Navistar concealed and did not disclose the Defect, and did not remedy the Defect prior to sale or lease (or afterward).  Any attempt to limit these warranties to defects in "material and workmanship" in such a way as to

87

exclude defective design is also unconscionable. Any effort by Navistar to disclaim or otherwise limit liability for the Defect at issue is, therefore, null and void.

473.    Accordingly, Plaintiffs and Class members suffered damages caused by Navistar's breach of the express warranties and are entitled to recover damages as set forth herein. Those damages include, but are not limited to, general damages (*i.e.*, the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted); incidental damages; and consequential damages.

**B.    Claims Brought on Behalf of State Sub-Classes**

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**Asserted on behalf of all Plaintiffs and the Nationwide Class**
**or, in the alternative, on behalf of all Plaintiffs and all State Warranty Sub-Classes**

474.    Plaintiffs adopt and incorporate herein the allegations set forth above.

475.    Navistar is and was at all relevant times a merchant with respect to the Engines.

476.    Navistar was and is in actual or constructive privity with all Plaintiffs and all Class members.

  a.    Plaintiffs had and continue to have sufficient direct dealings with Navistar and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract. Navistar's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Engines and have no rights under the warranty agreements provided with the Engines. The warranty agreements were designed for and intended to benefit only the ultimate Truck purchasers and lessees, *i.e.*, Plaintiffs and Class members.

      b.     Privity is not required to assert this claim because Plaintiffs and the Class members are intended third-party beneficiaries of contracts between Navistar and its dealers, franchisees, representatives, and agents.

      c.     By extending express written warranties to end-user purchasers and lessees, Navistar brought itself into privity with all Plaintiffs and Class members.

477.    At all times relevant hereto, applicable law imposed upon Navistar a duty that the Engines be fit for the ordinary purposes for which Engines are used and that they pass without objection in the trade under the contract description.

478.    Navistar has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

479.    The Engines were defective at the time they left the possession of Navistar, as set forth above.  Navistar knew of this Defect at the time the purchase and lease transactions occurred.  Thus, the Engines, when sold and at all times thereafter, were not in merchantable condition or quality because they are not fit for their ordinary intended purpose and they do not pass without objection in the trade under the contract description.

480.    Plaintiffs and Class members used the Engines in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Navistar or by operation of law in light of Navistar's unconscionable conduct.

481.    Navistar had actual knowledge of, and received timely notice regarding, the Defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

482.    In addition, Navistar received, on information and belief, thousands of complaints and other notices from customers advising of the Defect associated with the Engines.

483.    By virtue of the conduct described herein and throughout this Complaint, Navistar breached the implied warranty of merchantability.

484.    As a direct and proximate result of Navistar's breach of warranties, Plaintiffs and Class members suffered economic damage, including loss attributable to the diminished value of their Engines, loss of use of the Trucks and other tangible property, as well as the monies spent and to be spent to repair and/or replace their Engines.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**Asserted on behalf of all Plaintiffs and the Nationwide Class**
**or, in the alternative, on behalf of all Plaintiffs and all State Warranty Sub-Classes**

485.    Plaintiffs adopt and incorporate herein the allegations set forth above.

486.    Plaintiffs and Class members entered into agreements to purchase or lease Engines with Navistar or otherwise were in contractual privity with Navistar as a result of the express warranties and representations described herein.

487.    The contracts and warranties were subject to the implied covenant that Navistar would conduct business with Plaintiffs and Class members in good faith and would deal fairly with them.

488.    Navistar breached those implied covenants by failing to disclose that any repair or replacement of defective parts in Plaintiffs' and Class members' Engines, would not cure the defect.

90

489.    As a direct and proximate result of Navistar's breach of its implied covenants,

Plaintiffs and Class members have been damaged in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**Asserted on behalf of all Plaintiffs and the Nationwide Class**
**or, in the alternative, on behalf of all Plaintiffs and all State Sub-Classes**

490.    Plaintiffs adopt and incorporate herein the allegations set forth above.

491.    Navistar manufactured, distributed, and sold to Class members the Engines that

they knew contained an inherently dangerous or defective condition.

492.    Navistar continued to manufacture, distribute, and sell to Class members the

Engines after receiving substantial complaints of systematic product failure due to the dangerous

or defective condition.

493.    Navistar did not disclose this dangerous or defective condition to potential and

actual purchasers and lessees, and the condition was not easily discoverable by them.

494.    Navistar omitted this information to induce Plaintiffs and Class members to

purchase or lease its Trucks, which were equipped with the defective Engines.

495.    Navistar made affirmative representations, as detailed in the foregoing

allegations, regarding the Engines' reliability, performance, and operating costs, with the intent

to induce Plaintiffs and the Class to purchase or lease its Trucks, which were equipped with the

defective Engines.

496.    Plaintiffs and the Class justifiably relied on Navistar's omissions and

misrepresentations in that Plaintiffs and the Class paid more for the Engines than they would

have had Navistar disclosed the defective condition and its effect on reliability, performance, and

operating costs, or Plaintiffs and the Class would have purchased or leased different vehicles

altogether.

91

497.    Plaintiffs and Class members were harmed by Navistar's misrepresentations regarding the dangerous and defective condition of the Engines and are entitled to damages as a result in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION
### FRAUDULENT CONCEALMENT
**Asserted on behalf of all Plaintiffs and the Nationwide Class
or, in the alternative, on behalf of all Plaintiffs and all State Sub-Classes**

498.    Plaintiffs adopt and incorporate herein the allegations set forth above.

499.    Navistar omitted an existing fact about the Engines when it failed to disclose information regarding the Engines' dangerous and defective condition.

500.    The omission is material because the defective condition poses a serious safety issue to Engines' owners and to the public.

501.    The omission rendered Navistar's representations regarding the Engines false because the Engines were in fact defective.

502.    Navistar manufactured, distributed, and sold the Engines despite having knowledge of their defective and dangerous condition.

503.    Navistar intended that purchasers and lessees would rely on Navistar's omissions regarding safety, reliability, and resale value of the Engines to bolster sales.

504.    Plaintiffs and Class members were not aware of the defective condition and could not reasonably have discovered the defective condition.

505.    Plaintiffs relied on Navistar's omission in that they paid more for the Engines than the Engines would have been worth had Navistar disclosed the defective condition, or they would have purchased or leased different vehicles altogether.

506.    Plaintiffs had the right to rely on Navistar's omissions that created the false impression that the Engines were safe and reliable based on reasonable purchaser and lessee

92

expectations that the Engines would not be designed such that they fail under normal conditions of use or would be substantially certain to fail before the end of their useful life.

507.     Navistar had an affirmative duty to disclose the defective condition of the Engines to potential and actual purchasers and lessees because it was in a superior position to know the true state of the defective Engines.  Navistar knew of the defective and dangerous condition and the condition was not easily discoverable by potential or actual purchasers and lessees.  Navistar breached its duty by failing to disclose the condition.

508.     Navistar fraudulently concealed the defective condition of the Engines, causing damages to Plaintiffs.

### SEVENTH CAUSE OF ACTION
### FRAUD IN THE INDUCEMENT
### Asserted on behalf of all Plaintiffs and the Nationwide Class
### or, in the alternative, on behalf of all Plaintiffs and all State Sub-Classes

509.     Plaintiffs adopt and incorporate herein the allegations set forth above.

510.     As detailed in the foregoing allegations, Navistar made false and material misrepresentations regarding the Engines' quality, reliability, performance, and operating costs.

511.     Navistar knew or should have known that these misrepresentations were false when it made them.

512.     Navistar intended that purchasers and lessees, including Plaintiffs and Class members, would rely on Navistar's misrepresentations regarding quality, reliability, performance, and operating costs when determining whether to enter into contracts to purchase or lease the Trucks.

513.     Plaintiffs and Class members did not know that the misrepresentations were false and justifiably and reasonably relied on Navistar's misrepresentations when determining whether to enter into contracts to purchase or lease the Trucks.

93

514.     Plaintiffs and Class members relied on Navistar's misrepresentations by entering into contracts to purchase or lease, and actually purchasing or leasing, the Trucks equipped with the defective Engines.

515.     Plaintiffs and Class members would not have entered into contracts to purchase or lease the defective Engines, or would have paid less to purchase or lease the Trucks, but for the fraudulent misrepresentations made by Navistar.

516.     Navistar's false representations, which fraudulently induced Plaintiffs and Class members into entering into contracts to purchase or lease the Engines, caused harm to Plaintiffs. Plaintiffs seek affirmance of the contract with damages, or in the alternative, rescission with return of the Trucks in exchange for the full purchase or lease price.

**EIGHTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**Asserted on behalf of all Plaintiffs and the Nationwide Class**
**or, in the alternative, on behalf of all Plaintiffs and all State Sub-Classes**

517.     Plaintiffs adopt and incorporate herein the allegations set forth above, and allege this cause of action in the alternative to Plaintiffs' warranty claims.

518.     Navistar has been unjustly enriched by the sale of vehicles containing defective MaxxForce Engines to Plaintiffs and the Class members.

519.     Plaintiffs and the Class members conferred a benefit on Navistar, but Navistar failed to disclose its knowledge that Plaintiffs did not receive what they paid for and misled Plaintiffs and Class members regarding the qualities of the MaxxForce Engines, and the vehicles containing these Engines, while profiting from this deception.

520.     Navistar also continues to be unjustly enriched by benefitting from, *inter alia*, (i) the saved cost of manufacturing a properly performing and safe EGR System in the Engines, (ii)

the shifted risk and expense of the defective and dangerous EGR System in the Engines to

Plaintiffs and Class members, and (iii) the return on investment on all above-described amounts.

521.     It would be inequitable, unconscionable, and unjust to permit Navistar to retain

the benefit of these profits that it unfairly obtained from Plaintiffs and the Class members.

522.     Plaintiffs and the Class members, having been injured by Navistar's conduct, are

entitled to restitution or disgorgement of profits as a result of the unjust enrichment of Navistar

to the detriment of Plaintiffs and Class members.

### NINTH CAUSE OF ACTION
### NEGLIGENCE
**Asserted on behalf of all Plaintiffs and the Nationwide Class**
**or, in the alternative, on behalf of all Plaintiffs and all State Sub-Classes**

523.     Plaintiffs adopt and incorporate herein the allegations set forth above.

524.     Navistar owed Plaintiffs and the other Class members the duty to design and

manufacture the Engines in such a way as to ensure that the emissions system would not fail and

the Defect would not occur.

525.     Navistar breached this duty by negligently designing and/or manufacturing the

Engines, including, but not limited to, the negligent design and/or manufacture of the Engines'

EGR system as more fully described in this Complaint.

526.     As a direct and proximate result of Navistar's negligence, Plaintiffs and the other

Class members have sustained damages.

## ALTERNATIVE STATE LAW CAUSES OF ACTION

**C.     Additional Claims Brought Under Arkansas Law**

### TENTH CAUSE OF ACTION
### VIOLATIONS OF ARKANSAS PRODUCTS LIABILITY ACT,
### ARK. CODE ANN. §§ 16-116-101, *et seq.*
### Asserted on behalf of C&T Transport and the Arkansas Statutory
### and Warranty Sub-Classes

527.     Plaintiffs adopt and incorporate herein the allegations set forth above.

528.     Plaintiff C&T Transport brings this claim on behalf of itself and the Arkansas Statutory and Warranty Sub-Classes.

529.     Plaintiff C&T Transport brings this claim on behalf of itself and members of the Arkansas Sub-Classes.

530.     The Engines were defectively designed, manufactured, sold, or otherwise placed in the stream of commerce.

531.     Navistar is strictly liable in tort for C&T Transport's and sub-class members' injuries and damages, and C&T Transport relies upon the doctrine set forth in Restatement, Second, Torts § 402(a).

532.     Because of the negligence of the design and manufacture of the Engines, by which C&T Transport and sub-class members were injured, and the failure of Navistar to warn C&T Transport and sub-class members of the certain dangers concerning the operation of the Engines, which were known to Navistar but were unknown to C&T Transport and sub-class members, Navistar has committed a tort.

533.     The Engines that caused C&T Transport's and sub-class members' injuries were manufactured by Navistar.

534.     At all times herein material, Navistar negligently and carelessly did certain acts and failed to do other things, including, but not limited to, inventing, developing, designing,

researching, manufacturing, building, inspecting, investigating, testing, labeling, instructing, and negligently and carelessly failing to provide adequate and fair warning of the characteristics, dangers, and hazards associated with the operation of the Engines to C&T Transport and sub-class members, and willfully failing to recall or otherwise cure one or more of the defects in the Engines thereby directly and proximately causing the described injuries.

535.    The Engines were unsafe for use because they were defective.  For example, the Engines were defective in their design, development, manufacture, and lack of permanent, accurate, adequate, and fair warning of the characteristics, danger, and hazard to C&T Transport and sub-class members, and because Navistar failed to recall or otherwise cure one or more defects in the Engines thereby directly and proximately causing the described injuries.

536.    Navistar knew or reasonably should have known that the Engines would be purchased and used without all necessary testing or inspection for defects not readily visible.

537.    C&T Transport and sub-class members were not aware of those defects at any time before the incidents and occurrences mentioned in this complaint, or else C&T Transport and sub-class members were unable, as a practical matter, to cure that defective condition.

538.    C&T Transport and sub-class members used the products in a foreseeable manner.

539.    As a proximate result of Navistar's negligence, C&T Transport and members of the Arkansas Sub-Classes suffered injuries and damages.

**D.    Additional Claims Brought Under California Law**

**ELEVENTH CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW**
**CAL. 17200BUS. & PROF. CODE §§ 17200, _et seq._**
**Asserted on behalf of Vera Transport, Two Star Trucking,**
**and the California Statutory and Warranty Sub-Classes**

540.    Plaintiffs adopt and incorporate herein the allegations set forth above.

541.    Plaintiff Two Star Trucking brings this claim on behalf of itself and members of the California Statutory Sub-Class, and Plaintiffs Vera Transport and Two Star Trucking bring this claim on behalf of themselves and members of the California Warranty Sub-Class.

542.    Vera, Two Star, and members of the California Sub-Classes are natural persons and legal entities and, as such, constitute "persons" as defined by Bus. & Prof. Code § 17201.

543.    By its plain terms, Bus. & Prof. Code § 17200 provides a private right of action for any person who is injured in his or her business or property by an unfair and/or deceptive act or practice.

544.    By the conduct described in detail above and incorporated herein, Navistar engaged in unfair, unlawful, and fraudulent business practices in violation of Bus. & Prof. Code § 17200 *et seq.*

545.    Navistar intentionally concealed or failed to disclose that the Engines were defectively designed and/or manufactured, posed a significant and dangerous risk to the general public, would suddenly and dangerously fail before the end of their useful life, and were not suitable for their intended use.  These omissions were contrary to Navistar's representations regarding the Engines' reliability, performance, and operating costs.

546.    The facts regarding the Defect, which were intentionally concealed or not disclosed by Navistar to Vera, Two Star, and sub-class members, are material facts that a reasonable person would have considered in deciding whether to purchase or lease (or to pay the same price for) the Engines.  Because such facts were in the exclusive possession of Navistar, Navistar owed a duty Vera, Two Star, and sub-class members to disclose those facts.

547. Navistar intended that Vera, Two Star, and sub-class members rely on Navistar's misrepresentations and omissions concerning the defective Engines, so that Vera, Two Star, and sub-class members would lease or purchase vehicles containing the Engines.

548. Vera, Two Star, and sub-class members viewed Navistar's material misrepresentations prior to the purchase or lease of their Trucks, and Vera, Two Star, and sub-class members justifiably acted or relied to their detriment upon those misrepresentations (and related omissions of fact concerning the Defect), as evidenced by Vera, Two Star, and sub-class members' purchase or lease of the defective Engines.

549. Had Navistar disclosed all material information regarding the defective Engines to Vera, Two Star, and sub-class members, they would not have purchased or leased vehicles containing the Engines or they would have paid less for them.

550. Navistar's unfair, unlawful, and fraudulent business practices have deceived Vera and Two Star, and those same business practices have deceived or are likely to deceive members of the consuming public and the members of the California Sub-Classes.

551. By engaging in the above-described acts and practices, Navistar has committed one or more acts of unfair competition within the meaning of Business and Professions Code § 17200, *et seq.*

552. Navistar knowingly sold Vera, Two Star, and sub-class members Engines with defects that have rendered the Engines essentially unusable for the purposes for which they were sold.

553. The injuries to Vera, Two Star, and sub-class members greatly outweigh any alleged countervailing benefit to Plaintiffs and the sub-class or to competition under all of the

circumstances. Moreover, in light of Navistar's exclusive knowledge of the Defects, the injury is not one the Plaintiffs and sub-class members could have reasonably avoided.

554. Navistar's acts and practices are unlawful because they violate Cal. Code §§ 1668, 1709, 1710, and Cal. Commercial Code § 2313.

555. As a direct and proximate cause of Navistar's unfair or deceptive acts or practices, Vera, Two Star, and members of the California Sub-Classes have suffered actual damages and are entitled to recover such damages together with all other relief allowed under Section 17200, *et seq.*, plus interest, attorneys' fees and costs of suit.

**E. Additional Claims Brought Under Florida Law**

**TWELFTH CAUSE OF ACTION**
**VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, F.S.A. § 501.201, *et seq*.**
**Asserted on behalf of Plaintiffs Edwards, Peninsular, Vera Transport, and the Florida Statutory and Warranty Sub-Classes**

556. Plaintiffs adopt and incorporate herein the allegations set forth above.

557. Plaintiffs Vera, Edwards, and Peninsular bring this claim on behalf of themselves and members of the Florida Statutory Sub-Class, and Plaintiff Edwards brings this claim on behalf of himself and members of the Florida Warranty Sub-Class.

558. Plaintiffs Edwards, Vera Transport, and Peninsular bring this claim on behalf of themselves and members of the Florida Sub-Classes.

559. The Florida Deceptive and Unfair Trade Practices Act, F.S.A. § 501.201, *et seq.*, stipulates that, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

560. By the conduct described in detail above and incorporated herein, Navistar engaged in unfair or deceptive acts in violation of F.S.A. § 501.204.

561.     Navistar's omissions regarding the Defect, and the related representations regarding the Engines' reliability, performance and operating costs, are material facts that a reasonable person would have considered in deciding whether to purchase (or to pay the same price for) the Engines.

562.     Edwards, Vera, Peninsular, and the sub-class members justifiably acted or relied to their detriment upon Navistar's misrepresentations (and related omissions of fact concerning the Defect), as evidenced by Edwards, Vera, Peninsular, and the sub-class members' purchase of the defective Engines.

563.     Had Navistar disclosed all material information regarding the defective Engines to Edwards, Vera, Peninsular, and the sub-class members, and had Navistar refrained from making material misrepresentations regarding the reliability, performance and operating costs of the Engines, Edwards, Vera, Peninsular, and the sub-class members would not have purchased or leased vehicles containing the Engines or would have paid less.

564.     Navistar's representations and omissions have deceived Edwards, Vera, and Peninsular, and those same business practices have deceived or are likely to deceive members of the consuming public and the members of the Florida Sub-Classes.

565.     In addition to being deceptive, the business practices of Navistar were unfair since Navistar knowingly sold Edwards, Vera, Peninsular, and the sub-class members Trucks with defective Engines that have rendered the Engines essentially unusable for the purposes for which they were sold.  The injuries to Edwards, Vera, Peninsular, and the sub-class members are substantial and greatly outweigh any alleged countervailing benefit to Edwards, Vera, Peninsular, and the sub-class or to competition under all of the circumstances.  Moreover, in light

of Navistar's exclusive knowledge of the defects, the injury is not one Edwards, Vera,

Peninsular, and the sub-class members could have reasonably avoided.

566.    As a direct and proximate result of these unfair and deceptive commercial

practices, Edwards, Vera, Peninsular, and members of the Florida Sub-Classes have been

damaged and are entitled to recover actual damages, attorneys' fees and costs, and all other relief

allowed under F.S.A. § 501.201, *et seq*.

**F.    Additional Claims Brought Under Idaho Law**

**THIRTEENTH CAUSE OF ACTION**
**VIOLATIONS OF IDAHO CONSUMER PROTECTION ACT,**
**IDAHO CODE §§ 48-601, *et seq*.**
**Asserted on behalf of Lord AG and the Idaho Statutory and Warranty Sub-Classes**

567.    Plaintiffs adopt and incorporate herein the allegations set forth above.

568.    Plaintiff Lord AG brings this claim on behalf of itself and members of the Idaho

Statutory and Warranty Sub-Classes.

569.    Lord AG and sub-class members are natural persons and legal entities and, as

such, constitute "persons" as defined by Idaho Code § 48-602(1).

570.    By its plain terms, Idaho Code § 48-603(17) declares that it is unlawful to engage

"in any act or practice which is otherwise misleading, false, or deceptive to the consumer."

571.    Idaho Code § 48-608(1) provides a private cause of action to "any person who

purchases or leases goods or services and thereby suffers ascertainable loss of money or property

as a result of a method, act or practice declared unlawful."

572.    By the conduct described in detail above and incorporated herein, Navistar

engaged in unlawful practices in violation of Idaho Code §§ 48-601 *et seq*.

573.    Navistar intentionally concealed or failed to disclose that the Engines were

defectively designed and/or manufactured, posed a significant and dangerous risk to the general

public, would suddenly and dangerously fail before the end of their useful life, and were not suitable for their intended use. These omissions were contrary to Navistar's representations regarding the Engines' reliability, performance, and operating costs.

574. The facts regarding the Defect, which were intentionally concealed or not disclosed by Navistar to Lord AG and sub-class members, are material facts that a reasonable person would have considered in deciding whether to purchase or lease (or to pay the same price for) the Engines. Because such facts were in the exclusive possession of Navistar, Navistar owed a duty to Lord AG and sub-class members to disclose those facts.

575. Navistar intended that Lord AG and sub-class members rely on their misrepresentations and omissions concerning the defective Engines, so that Lord AG and sub-class members would lease or purchase vehicles containing the Engines.

576. Lord AG and sub-class members viewed Navistar's material misrepresentations prior to the purchase or lease of their Trucks, and Lord AG and sub-class members justifiably acted or relied to their detriment upon those misrepresentations (and related omissions of fact concerning the Defect), as evidenced by Lord AG and sub-class members' purchase or lease of the defective Engines.

577. Had Navistar disclosed all material information regarding the defective Engines to Lord AG and sub-class members, they would not have purchased or leased vehicles containing the Engines or they would have paid less for them.

578. Navistar's unlawful practices have deceived Lord AG, and those same practices have deceived or are likely to deceive members of the consuming public and the members of the Idaho Sub-Classes.

579.    By engaging in the above-described acts and practices, Navistar has committed one or more acts of unfair competition within the meaning of Idaho Code §§ 48-601 et seq.

580.    Navistar knowingly sold Lord AG and sub-class members Engines with defects that have rendered the Engines essentially unusable for the purposes for which they were sold.

581.    The injuries to the Lord AG and sub-class members greatly outweigh any alleged countervailing benefit to Lord AG and sub-class members or to competition under all of the circumstances.  Moreover, in light of Navistar's exclusive knowledge of the defects, the injury is not one Lord AG and sub-class members could have reasonably avoided.

582.    As a direct and proximate cause of Navistar's unlawful practices, Lord AG and members of the Idaho Sub-Classes have suffered economic damages as well as actual damages and are entitled to recover all relief allowed under Idaho Code § 48-608 plus interest, attorneys' fees and costs of suit.

**G.    Additional Claims Brought Under Illinois Law**

**FOURTEENTH CAUSE OF ACTION**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT, 815 ILCS 505/1, *et seq.***
**Asserted on behalf of Carmichael, Quick, Go To, Grieser, Keplinger, and the Illinois Statutory and Warranty Sub-Classes**

583.    Plaintiffs adopt and incorporate herein the allegations set forth above.

584.    Plaintiffs Carmichael, Quick, Grieser, Keplinger, and Go To bring this claim for themselves and members of the Illinois Statutory Sub-Class, and Plaintiffs Carmichael and Go To bring this claim for themselves and members of the Illinois Warranty Sub-Class.

585.    The Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA") prohibits "unfair and deceptive practices."

586.    Plaintiffs Carmichael, Quick, Go To, Keplinger, and Grieser bring this claim on behalf of themselves and members of the Illinois Sub-Class.

104

587.     Carmichael, Quick, Go To, Keplinger, Grieser and sub-class members are consumers as defined in 815 ILCS 505/1(c) & (e).

588.     Navistar had knowledge of the defective Engines at all relevant times herein.

589.     Despite this knowledge, Navistar has failed to disclose the existence of this material information to Carmichael, Quick, Go To, Keplinger, Grieser and sub-class members at the time each of them purchased or leased the vehicles containing the defective Engines, and/or at the time they made warranty claims related to the defective Engines.  To the contrary, Navistar made affirmative representations regarding the reliability, performance, and operating costs of the Engines.

590.     Carmichael, Quick, Go To, Keplinger, Grieser and sub-class members reasonably expected that their Trucks would not have defective Engines that caused their Trucks to repeatedly and inevitably fail, leading to, among other things, their inability to use the Trucks for their intended purpose, lost revenue, deflated resale value, repair costs, and towing costs incurred by Carmichael, Quick, Go To, Keplinger, Grieser and sub-class members.

591.     Navistar intended, and continues to intend, that Carmichael, Quick, Go To, Keplinger, Grieser and sub-class members rely on Navistar's material misrepresentations and omissions of material facts.

592.     Navistar's misconduct, including the misrepresentations and the omissions of material facts, took place in the course of trade or commerce in Illinois, arose out of transactions that occurred in Illinois, and/or harmed individuals and entities located in Illinois.

593.     In so doing the above, Navistar has engaged in an unfair or deceptive act prohibited by the ICFA.

594.     If not for Navistar's deceptive and unfair acts of concealing from the Illinois Plaintiffs and Sub-Class members the material facts as alleged herein, they would not have purchased or leased the Trucks, or would have paid significantly less for them.

595.     Navistar, at all relevant times, knew or should have known that the Illinois Plaintiffs and Sub-Class members did not know and could not have reasonably discovered the defective Engines prior to their purchases or leases.

596.     As a direct and proximate result of Navistar's violations of the ICFA, the Illinois Plaintiffs and Sub-Class members suffered damages.

597.     Navistar's violation of the ICFA entitles the Illinois Plaintiffs and the Sub-Class members to statutory and actual damages, punitive damages, injunctive relief, attorney's fees and costs, and all other relief allowed under the ICFA.

**H.     Additional Claims Brought Under New Jersey Law**

**FIFTEENTH CAUSE OF ACTION**
**VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT,**
**N.J. STAT. ANN. § 56:8-1 *ET SEQ.***
**Asserted on behalf of Ferraro Foods, Joandnas, Alka, A-Rapid, and the New Jersey**
**Statutory and Warranty Sub-Classes**

598.     Plaintiffs adopt and incorporate herein the allegations set forth above.

599.     Plaintiffs Joandnas, Ferraro, Alka, and A-Rapid bring this claim for themselves and the New Jersey Statutory Sub-Class, and Plaintiff Ferraro brings this claim for itself and the New Jersey Warranty Sub-Class.

600.     Joandnas, Ferraro, Alka, A-Rapid, and sub-class members are natural persons and legal entities and, as such, constitute "persons" as defined by N.J. Stat. Ann. § 56:8-1.

601.     By its plain terms, N.J. Stat. Ann. § 56:8-2 declares unlawful "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact."

602.    N.J. Stat. Ann. provides a private cause of action to "any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act."

603.    By the conduct described in detail above and incorporated herein, Navistar engaged in unlawful practices in violation of N.J. Stat. Ann. § 56:8-1 *et seq.*

604.    Navistar intentionally concealed or failed to disclose that the Engines were defectively designed and/or manufactured, posed a significant and dangerous risk to the general public, would suddenly and dangerously fail before the end of their useful life, and were not suitable for their intended use.  These omissions were contrary to Navistar's representations regarding the Engines' reliability, performance, and operating costs.

605.    The facts regarding the Defect, which were intentionally concealed or not disclosed by Navistar to Joandnas, Ferraro, Alka, A-Rapid, and sub-class members, are material facts that a reasonable person would have considered in deciding whether or not to purchase or lease (or to pay the same price for) the Engines.  Because such facts were in the exclusive possession of Navistar, Navistar owed a duty to Joandnas, Ferraro, Alka, A-Rapid, and sub-class members to disclose those facts.

606.    Navistar intended that Joandnas, Ferraro, Alka, A-Rapid, and sub-class members rely on Navistar's misrepresentations and omissions concerning the defective Engines, so Joandnas, Ferraro, Alka, A-Rapid, and sub-class members would lease or purchase vehicles containing the Engines.

607.    Joandnas, Ferraro, Alka, A-Rapid, and sub-class members viewed Navistar's material misrepresentations prior to the purchase or lease of their Trucks, and they justifiably

acted or relied to their detriment upon those misrepresentations (and related omissions of fact concerning the Defect), as evidenced by their purchase or lease of the defective Engines.

608.   Had Navistar disclosed all material information regarding the defective Engines to Joandnas, Ferraro, Alka, A-Rapid, and sub-class members, they would not have purchased or leased vehicles containing the Engines or they would have paid less for them.

609.   Navistar's unlawful practices have deceived Joandnas, Ferraro, Alka, and A-Rapid, and those same practices have deceived or are likely to deceive members of the consuming public and the members of the New Jersey Sub-Classes.

610.   By engaging in the above-described acts and practices, Navistar has committed one or more acts of consumer fraud within the meaning of N.J. Stat. Ann. § 56:8-1 *et seq.*

611.   Navistar knowingly sold or leased Engines with defects that have rendered the Engines essentially unusable for the purposes for which they were sold.

612.   The injuries to Joandnas, Ferraro, Alka, A-Rapid, and sub-class members greatly outweigh any alleged countervailing benefit to Joandnas, Ferraro, Alka, A-Rapid, and sub-class members or to competition under all of the circumstances.  Moreover, in light of Navistar's exclusive knowledge of the defects, the injury is not one Joandnas, Ferraro, Alka, A-Rapid, and sub-class members could have reasonably avoided.

613.   As a direct and proximate cause of Navistar's unfair or deceptive acts or practices, Joandnas, Ferraro, Alka, A-Rapid, and members of the New Jersey Sub-Classes have suffered actual damages and are entitled to recover such damages together with all other relief allowed under N.J. Stat. Ann. § 56:8-19, plus interest, attorneys' fees and costs of suit.

614.     Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiffs have already served the New Jersey Attorney General with a copy of Plaintiffs' First Amended Consolidated Class Action Complaint, and will also serve a copy of this complaint, once operative.

## I.     Additional Claims Brought Under North Carolina Law

**SIXTEENTH CAUSE OF ACTION**
**VIOLATIONS OF THE NORTH CAROLINA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, N.C. GEN. STAT. § 75-1, *et seq.***
**Asserted on behalf of Fike Logistics, Jenkins Unlimited, Phifer Trucking, and the North Carolina Statutory and Warranty Sub-Classes**

615.     Plaintiffs adopt and incorporate herein the allegations set forth above.

616.     Plaintiffs Jenkins Unlimited and Phifer Trucking bring this claim for themselves and members of the North Carolina Statutory Sub-Class, and Plaintiffs Fike Logistics, Phifer, and Jenkins bring this claim for themselves and members of the North Carolina Warranty Sub-Class.

617.     The North Carolina Deceptive and Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1, makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

618.     Navistar engaged in unlawful, deceptive acts in violation of N.C. Gen. Stat. § 75-1.1 in selling and warranting the MaxxForce Engines.  Navistar misrepresented the characteristics of the Engines and Trucks and failed to give Fike, Phifer, Jenkins, and sub-class members sufficient notice or warning regarding the defects in the Engine, even though Navistar knew or reasonably should have known about the Defect.  Navistar intended that Fike, Phifer, Jenkins, and sub-class members rely upon the Navistar's omissions and misrepresentations when purchasing vehicles containing the Engines.  Fike, Phifer, Jenkins, and sub-class members were deceived by Navistar's concealment of the Defect.

619.    Navistar also engaged in unlawful and deceptive practices in violation of N.C.

Gen. Stat. § 75-1, *et seq.*, when it failed to provide the full cost to repair or replace the

MaxxForce Engines after being notified of defects and problems by Fike, Phifer, Jenkins, and

sub-class members.

620.    Navistar's conduct was in commerce and affected commerce.

621.    As a direct and proximate result of these unfair, willful, unconscionable, and

deceptive commercial practices, Fike, Phifer, Jenkins, and members of the North Carolina Sub-

Classes have been damaged and are entitled to recover actual and treble damages as well as

attorneys' fees and costs and all other relief allowed under N.C. Gen. Stat. §§ 75-16 and 75-16.1.

**J.      Additional Claims Brought Under Ohio Law**

**SEVENTEENTH CAUSE OF ACTION**
**VIOLATIONS OF OHIO DECEPTIVE TRADE PRACTICES ACT**
**OHIO REV. CODE ANN. § 4165.01, *ET SEQ.***
**Asserted on behalf of Binder Trucking, individually**

622.    Plaintiffs adopt and incorporate herein the allegations set forth above.

623.    Plaintiff Binder Trucking brings this claim for itself.

624.    The Ohio Deceptive Trade Practices Act ("DTPA") is codified at Ohio Rev. Code

Ann. § 4165.01, *et seq.*  The statute permits a "person" who is injured or who is likely to be

injured as a result of a deceptive practice to bring an action under the DTPA.  Ohio Rev. Code

Ann. § 4165.03(A)(1)-(2).

625.    The DTPA defines a "person" broadly to include, *inter alia*, a corporation,

business trust, partnership, unincorporated association, and limited liability company.  Ohio Rev.

Code Ann. § 4165.01(D).  As such, the Binder Trucking is a "person" within the meaning of the

DTPA.

626.    Navistar violated the DTPA by doing the following in the course of its business:

110

a. Causing a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods;

b. Causing a likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

c. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; and

d. Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

627.    As a direct and proximate result of Navistar's violations of the DTPA, Binder Trucking has been injured and suffered actual damages and is entitled to recover such damages together with all other relief allowed under the DTPA.

**EIGHTEENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY IN TORT (BASED ON OHIO LAW)**
**Asserted on behalf of Binder Trucking and the Ohio Sub-Class**

628.    Plaintiff Binder adopts and incorporates herein the allegations set forth above.

629.    Binder brings this claim on behalf of itself and the Ohio Warranty Sub-Class.

630.    The Engines contained a dangerous design defect as detailed above that caused the vehicles to lose power.

631.    The design, manufacturing, and/or assembly defect existed at the time these Engines left the hands of Navistar.

111

632.    Based upon the dangerous Defect and its certainty to occur, Navistar failed to meet the expectations of a reasonable consumer.  The Engines failed their ordinary, intended use. The EGR system Defect presents a serious danger to Binder and the other sub-class members that cannot be eliminated without significant and expensive repairs.

633.    The design defect in the Engines was the direct and proximate cause of economic damages to Binder, as well as damages incurred or to be incurred by each of the other sub-class members.  Binder and members of the Ohio Sub-Classes are entitled to recover such damages along with all other relief allowed under applicable Ohio common law.

**K.    Additional Claims Brought Under Texas Law**

**NINETEENTH CAUSE OF ACTION**
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER**
**PROTECTION ACT, TEXAS BUS. & COM. CODE § 17.00, *et seq.***
**Asserted on behalf of Caballero, Slough, and Fike**

634.    Plaintiffs adopt and incorporate herein the allegations set forth above.

635.    Plaintiffs Caballero, Slough, and Fike bring this claim on behalf of themselves.

636.    Caballero, Slough, and Fike are "consumers" protected under the Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") since they are individuals, partnerships, corporations, that have assets less than $25 million and since they are not owned or controlled by a corporation or entity with assets of $25 million or more.  Tex. Bus. & Com. Code § 17.45(4).  The Navistar Defendants are both "persons" governed by the Texas DTPA.  Tex. Bus. & Com. Code § 17.45(3).

637.    As detailed in the foregoing allegations, Navistar knowingly and intentionally made representations regarding the reliability, performance, and operating costs of the Engines, despite knowing that such representations were false, given the nature of the Defect.  Navistar knowingly and intentionally omitted material information concerning the Engines by failing to

112

inform Caballero, Slough, and Fike of the Defect. Navistar then sold and/or leased Trucks with the defective Engines.

638.     Navistar's sale and/or lease of Trucks containing the Defect to those who had no knowledge of the Defect constitutes an unconscionable action in violation of the Texas DTPA. Tex. Bus & C. Code §17.50(a)(3). Navistar's actions took advantage of the lack of knowledge possessed by Caballero, Slough, and Fike and the resulting unfairness is glaringly noticeable, flagrant, complete and unmitigated.

639.     Navistar's above-described knowing and intentional unconscionable actions and/or unconscionable course of action, inaction and/or omissions directly and/or proximately caused Caballero, Slough and Fike to suffer economic damages and other actual injury and harm, and collectively constitute violations of the Texas DTPA. Tex. Bus. & C. Code § 17.50(a)(3). Had Navistar not engaged in such knowing and intentional unconscionable actions and/or unconscionable course of action, inaction and/or omissions, Caballero, Slough, and Fike would not have overpaid to purchase and/or lease Trucks with the defective EGR System in the Engines, or would not have purchased or leased the Trucks.

640.     Caballero, Slough, and Fike, therefore, are entitled to recover their economic damages and other actual injury and harm, under Section 17.50 of the Texas Business and Commerce Code.

641.     The Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.00, *et seq.*, makes unlawful "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

642.     Navistar engaged in unlawful, deceptive acts in violation of V.T.C.A., Bus. & C. § 17.00, *et seq.*, in selling and warranting the MaxxForce Engines. Navistar failed to give

Caballero, Slough, and Fike any kind of sufficient notice or warning regarding the Defect in the MaxxForce Engine, of which Navistar knew or reasonably should have known, intending that Caballero, Slough, and Fike rely upon Navistar's omission when purchasing vehicles containing the MaxxForce Engines.   Caballero, Slough, and Fike were deceived by Navistar's concealment that its MaxxForce Engines contained the Defect.

643.    As a direct and proximate result of these unfair, unconscionable, and deceptive commercial practices, Caballero, Slough, and Fike have been damaged and are entitled, pursuant to the Texas DTPA, to recover damages as well as attorneys' fees and costs and all other relief allowed under the Texas DTPA.

**L.**     **Additional Claims Brought Under Washington Law**

**TWENTIETH CAUSE OF ACTION**
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**RCW 19.86.020,** *et seq.*
**Asserted on behalf of Grieser, Keplinger, and the Washington Statutory and**
**Warranty Sub-Classes**

644.    Plaintiffs adopt and incorporate herein the allegations set forth above.

645.    Plaintiff Keplinger brings this claim for himself and on behalf of the Washington Statutory Sub-Class, and Plaintiffs Grieser and Keplinger bring this claim on behalf of themselves and members of the Washington Warranty Sub-Class.

646.    Grieser, Keplinger, and sub-class members are natural persons and legal entities and, as such, constitute "persons" as defined by the Washington Consumer Protection Act (the "Washington CPA") and fall within the meaning of the term "any person" as contained in the Washington CPA.  RCW 19.86.010; 19.86.090.

647.    By its plain terms, the Washington CPA provides a private right of action for any person who is injured in his or her business or property by an unfair and/or deceptive act or practice.

648.    By the conduct described in detail above and incorporated herein, Navistar engaged in unfair and deceptive acts and practices in violation of the Washington CPA.

649.    Navistar's unfair and deceptive acts and practices occurred in the conduct of "trade" or "commerce" as those terms are defined in the Washington CPA.

650.    Navistar's unfair and deceptive acts and practices have an impact on the public interest since they involve the sale of goods that were defective, posed safety hazards, and were sold to members of the public who had no knowledge of the Defect.

651.    Navistar's omissions regarding the Defect, and the related representations regarding the Engines' reliability, performance and operating costs, are material facts that a reasonable person would have considered in deciding whether to purchase or lease (or to pay the same price for) the Engines.

652.    Grieser, Keplinger, and sub-class members justifiably acted or relied to their detriment upon Navistar's misrepresentations (and related omissions of fact concerning the Defect), as evidenced by Grieser, Keplinger, and sub-class members' purchase or lease of the defective Engines.

653.    Had Navistar disclosed all material information regarding the defective Engines to Grieser, Keplinger, and sub-class members, and had Navistar refrained from making material misrepresentations regarding the reliability, performance and operating costs of the Engines, Grieser, Keplinger and sub-class members would not have purchased or leased vehicles containing the Engines or would have paid less.

654.    Navistar's representations and omissions have deceived Grieser and Keplinger, and those same business practices have deceived or are likely to deceive members of the consuming public and the members of the Washington Sub-Classes.

655.     In addition to being deceptive, the business practices of Navistar were unfair since Navistar knowingly sold Grieser, Keplinger, and sub-class members Engines with defects that have rendered the Engines essentially unusable for the purposes for which they were sold.  The injuries to Grieser, Keplinger, and sub-class members are substantial and greatly outweigh any alleged countervailing benefit to Grieser, Keplinger, and sub-class members or to competition under all of the circumstances.  Moreover, in light of Navistar's exclusive knowledge of the Defects, the injury is not one Grieser, Keplinger, and sub-class members could have reasonably avoided.

656.     As a direct and proximate result of these unfair and deceptive commercial practices, Grieser, Keplinger, and members of the Washington Sub-Classes have been damaged and are entitled to recover actual damages, as well as attorneys' fees and costs, and all other relief available under the Washington CPA.

**M.     Additional Claims Brought Under Wisconsin Law**

**TWENTY-FIRST CAUSE OF ACTION**
**VIOLATIONS OF WISCONSIN DECEPTIVE TRADE PRACTICES ACT**
**WIS. STAT. § 100.18,** *et seq.*
**Asserted on behalf of G&G, Michael Jackson, Sr., and the Wisconsin Statutory and Warranty Sub-Classes**

657.     Plaintiffs adopt and incorporate herein the allegations set forth above.

658.     Plaintiffs Jackson and G&G bring this claim for themselves and on behalf of the Wisconsin Statutory Sub-Class, and Plaintiff G&G brings this claim for itself and on behalf of the Wisconsin Warranty Sub-Class.

659.     The Wisconsin Deceptive Trade Practices Act ("DTPA") prohibits making untrue, deceptive, or misleading representations to the public with intent to sell, distribute, and increase the consumption of products.

660.    G&G, Jackson, and sub-class members are members of the public within the meaning of Wisconsin DTPA.

661.    G&G, Jackson, and sub-class members reasonably expected that their Navistar vehicles would not have defective Engines that caused their vehicles to repeatedly and inevitably fail, leading to, among other things, their inability to use the vehicles for their intended purpose, lost revenue, deflated resale value, repair costs, and towing costs incurred by the Wisconsin Plaintiffs and Sub-Class members.

662.    Navistar's misconduct, including the omissions of material facts, took place in the course of trade or commerce in Wisconsin, and arose out of transactions that occurred in Wisconsin.

663.    Navistar had knowledge of the defective Engines at all relevant times herein.

664.    Despite this knowledge, Navistar made affirmative representations, as detailed in the foregoing allegations, regarding the Engines' reliability, performance, and operating costs, with the intent to induce G&G, Jackson, and sub-class members' purchase or lease.

665.    In so doing the above, Navistar has made untrue, deceptive, and misleading representations to the public prohibited by the DTPA.

666.    If not for Navistar's untrue, deceptive, and misleading representations and omissions of the material facts as alleged herein, G&G, Jackson, and sub-class members would not have purchased or leased the Navistar vehicles, or would have paid significantly less for them.

667.    Navistar, at all relevant times, knew or should have known that G&G, Jackson, and sub-class members did not know and could not have reasonably discovered the defective Engines prior to their purchases or leases.

117

668.    As a direct and proximate result of Navistar's violations of the DTPA, G&G, Jackson, and sub-class members suffered damages.

669.    Navistar's violation of the DTPA entitles G&G, Jackson, and members of the Wisconsin Sub-Classes to statutory and actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, on behalf of themselves and all others similarly situated, Plaintiffs demand judgment against Navistar on each Count of the Complaint and pray for the following relief:

1.    Issue an Order certifying the Classes and/or any Subclasses the Court deems appropriate, appointing Plaintiffs and their counsel to represent the Classes, and directing that reasonable notice of this action be given by Navistar to all Class members;

2.    Grant any reasonable request to amend this Class Action Complaint to conform to the discovery and evidence obtained in this Class Action;

3.    Empanel a jury to try this matter;

4.    Grant Plaintiffs and members of the Declaratory Relief Class the declaratory judgment and/or injunctive relief requested herein;

5.    Award to Plaintiffs and the Class members all compensatory damages provided for and consistent with their claims for relief;

6.    Award to Plaintiffs and the Class members all appropriate damages and equitable relief that the Court deems appropriate;

7.    Award to Plaintiffs and the Class members all exemplary and/or punitive damages allowed by law that the Court deems appropriate;

8.      Grant Plaintiffs and Class members their reasonable attorneys' fees and costs incurred in this litigation as allowed by law;

9.      Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

10.     Award pre-and post-judgment interest as allowed by law; and

11.     Grant Plaintiffs and Class members such further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.


Dated: May 30, 2019

By: */s Adam J. Levitt*　　　　　　　　　　
　　　　Adam J. Levitt

Adam J. Levitt
　　alevitt@dicellolevitt.com
DiCELLO LEVITT GUTZLER LLC
Ten North Dearborn Street
Eleventh Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900

*Interim Co-Lead Counsel*

By: */s William M. Audet*　　　　　　　　　
　　　　William M. Audet

William M. Audet
　　waudet@audetlaw.com
AUDET & PARTNERS, LLP
711 Van Ness Avenue, Suite 500
San Francisco California 94102
Telephone: (415) 568-2555

*Interim Co-Lead Counsel*

By: */s Jonathan D. Selbin*　　　　　　　　　
　　　　Jonathan D. Selbin

Jonathan D. Selbin
　　jselbin@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN
250 Hudson Street, 8th Floor
New York, New York 10013
Telephone: (212) 355-9500

*Interim Co-Lead Counsel*

By: */s Laurel G. Bellows*　　　　　　　　　
　　　　Laurel G. Bellows

Laurel G. Bellows
　　lbellows@bellowslaw.com
THE BELLOWS LAW GROUP, P.C.
209 South LaSalle Street, #800
Chicago, Illinois 60604
Telephone: (312) 332-3340

*Liaison Counsel*

119

## SIGNATURE ATTESTATION

Pursuant to the United States District Court for the Northern District of Illinois' General Order on Electronic Case Filing, General Order 14-0009(IX)(C)(2), I hereby certify that authorization for the filing of this document has been obtained from the signatories shown above and that each signatory concurs in the filing's content.

*/s/ Adam J. Levitt*

## <u>CERTIFICATE OF SERVICE</u>

I, Adam J. Levitt, hereby certify that on May 30, 2019, a copy of the foregoing document was filed electronically using the CM/ECF System, which will send notification of such filing to all counsel of record.

*/s/ Adam J. Levitt*